No. 23-12331

_____

# In the United States Court of Appeals for the Eleventh Circuit

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF FLORIDA,

Defendant-Appellant,

_____

On Appeal From the United States District Court
for the Southern District of Florida

_____

**BRIEF OF THE STATE OF FLORIDA**

_____

Andy Bardos
James Timothy Moore, Jr.
Ashley H. Lukis
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
tim.moore@gray-robinson.com
ashley.lukis@gray-robinson.com
*Attorneys for Appellant, the State of Florida*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, the State of Florida furnishes a complete list of the following:

1.      Agency for Health Care Administration, State of Florida.

2.      Agency for Persons with Disabilities, State of Florida.

3.      Altonaga, Cecilia M., United States District Judge, Southern District of Florida.

4.      Bardos, Andy, counsel for the State of Florida.

5.      Bond, Rebecca B., counsel for the United States.

6.      Boudet, John, counsel for the State of Florida.

7.      Clarke, Kristen, counsel for the United States.

8.      Department of Children and Families, State of Florida.

9.      Department of Health, State of Florida.

10.     Dimitrouleas, William P., United States District Judge, Southern District of Florida.

11.     Fletcher, James, counsel for the United States.

12.     Foster, Sydney A.R., counsel for the United States.

13.     Geddes, Janelle, counsel for the United States.

14.     Gonzalez, Juan Antonio, counsel for the United States.

15.     GrayRobinson, P.A., counsel for the State of Florida.

16.    Harrell-James, Veronica, counsel for the United States.

17.    Hooper, Dylan, counsel for the State of Florida.

18.    Hunt, Patrick M., Magistrate Judge, United States District Court, Southern District of Florida, Fort Lauderdale Division.

19.    LaPointe, Markenzy, counsel for the United States.

20.    Lenson, Jillian, counsel for the United States.

21.    Lukis, Ashley Hoffman, counsel for the State of Florida.

22.    McDonald, Elizabeth E., counsel for the United States.

23.    Meros, George N., Jr., counsel for the State of Florida.

24.    Middlebrooks, Donald M., United States District Judge, Southern District of Florida, West Palm Beach Division.

25.    Moore, James Timothy, Jr., counsel for the State of Florida.

26.    Park, H. Justin, counsel for the United States.

27.    Onyekweli, Nonney, counsel for the United States.

28.    Pearlstein, Amanda Brooke, counsel for the United States.

29.    Powell, Lauren Latterell, counsel for the United States.

30.    Price, Tara R., counsel for the State of Florida.

31.    Protopapadakis, Anastasia, counsel for the State of Florida.

32.    Raish, Anne S., counsel for the United States.

33.    Robin-Vergeer, Bonnie I., counsel for the United States.

34.    Rosenbaum, Robin S., Former United States District Judge, Southern District of Florida.

35.    Seltzer, Barry S., Former United States Magistrate Judge, Southern District of Florida.

36.    Sheeran, Andrew T., counsel for the State of Florida.

37.    Shelton, Chantel Doakes, counsel for the United States.

38.    Shutts & Bowen LLP, counsel for the State of Florida.

39.    Snow, Lurana S., United States Magistrate Judge, Southern District of Florida.

40.    State of Florida, Defendant/Appellant.

41.    Street, Leslei G., counsel for the State of Florida.

42.    Thomas, Victoria, counsel for the United States.

43.    United States of America, Plaintiff/Appellee.

44.    United States Department of Justice, counsel for the United States.

45.    Weinstock, Lindsey, counsel for the United States.

46.    Zeitler, Nicole K., counsel for the United States.

47.    Zloch, William J., United States District Judge, Southern District of Florida.

*United States of America v.*
***State of Florida*, No. 23-12331**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The State of Florida certifies that no publicly traded company or corporation has an interest in the outcome of the case. The entities listed above are not publicly traded and do not have stock ticker symbols.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The district court misconstrued the Americans with Disabilities Act and entered a systemwide injunction that overhauls aspects of Florida's Medicaid program. Given the importance of these issues, Florida respectfully requests oral argument. This Court has granted Florida's motion to expedite oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ...................................................................C-1

CORPORATE DISCLOSURE STATEMENT ......................................................C-4

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CITATIONS ..................................................................... iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES ...............................................................1

STATEMENT OF THE CASE...................................................................2

    A.    Nursing Homes...................................................................2

    B.    In-Home Nursing.................................................................4

    C.    This Litigation. ...................................................................6

STANDARD OF REVIEW ...................................................................12

SUMMARY OF ARGUMENT ................................................................12

ARGUMENT .......................................................................................17

    I.    THE DISTRICT COURT MISINTERPRETED—AND DILUTED—ALL THREE *OLMSTEAD* ELEMENTS...................................................................18

    A.    The Appropriateness Element. ............................................18

    B.    The Non-Opposition Element................................................22

    C.    The Reasonable-Accommodation Element. ..........................30

        1.    The District Court Ordered "Accommodations" Without Evidence of Redressability. ...................................................................30

        2.    The District Court Ordered "Accommodations" That Were First Disclosed After Trial—and Thus Never Subjected to Evidentiary Testing. ...................................................................34

II.    THE DISTRICT COURT'S SYSTEMWIDE INJUNCTION IS AN INAPPROPRIATE
       REMEDY................................................................................38

    A.    The United States Failed to Prove Widespread Unlawful
          Institutionalization.....................................................38

    B.    The Injunction Is Overbroad and Offends Federalism Principles.........42

    C.    The Injunction's Cornerstone Provision Does Not Prescribe Objective
          Actions, But an Arbitrary and Unachievable Performance Goal..........47

III.   THE UNITED STATES LACKS AUTHORITY TO ENFORCE THE RIGHTS OF
       CHILDREN WHO NEVER INITIATED THE ADA'S ADMINISTRATIVE
       ENFORCEMENT PROCESS. ...........................................................51

CONCLUSION .............................................................................53

CERTIFICATE OF COMPLIANCE .......................................................54

## TABLE OF CITATIONS

### Cases

*A.R. v. Secretary, Florida Agency for Health Care Administration,*

769 F. App'x 718 (11th Cir. 2019) ...........................................................52

*ACORN v. Edgar,*

56 F.3d 791 (7th Cir. 1995) ....................................................................44

*Biden v. Nebraska,*

143 S. Ct. 2355 (2023) ..........................................................................43

*Bill M. v. Nebraska Department of Health and Human Services,*

408 F.3d 1096 (8th Cir. 2005) .................................................................41

*Boyd v. Steckel,*

753 F. Supp. 2d 1163 (M.D. Ala. 2010) .....................................................21

*Buchanan v. Maine,*

469 F.3d 158 (1st Cir. 2006) ...................................................................42

* *Clapper v. Amnesty International USA,*

568 U.S. 398 (2013) .............................................................................41

*Clark v. Coye,*

60 F.3d 600 (9th Cir. 1995)....................................................................44

*Consumer Party v. Davis,*

778 F.2d 140 (3d Cir. 1985)....................................................................44

*Disability Rights Florida*, *Inc. v. Palmer*,

   No. 4:18-cv-342, 2019 WL 11253085 (N.D. Fla. Aug. 29, 2019) .........................16

*Doe 1–13 by and through Doe*, *Sr. 1–13 v. Chiles*,

   136 F.3d 709 (11th Cir. 1998) .......................................................... 38, 39

*Dykes v. Dudek*,

   No. 4:11-cv-00116-RS-WCS, 2011 WL 4904407 (N.D. Fla. Oct. 14, 2011) .........41

*Factory Mutual Insurance Company v. Alon USA L.P.*,

   705 F.3d 518 (5th Cir. 2013).................................................................28

*Florida v. United States*,

   143 S. Ct. 89 (2022) ..........................................................................6

*Georgia v. President of the United States*,

   46 F.4th 1283 (11th Cir. 2022)..............................................................43

*Goldberg v. Florida International University*,

   838 F. App'x 487 (11th Cir. 2020) .........................................................28

*Goode v. Rizzo,*

   506 F.2d 542 (3d Cir. 1974)..................................................................44

*Hollis v. Chestnut Bend Homeowners Association*,

   760 F.3d 531 (6th Cir. 2014)................................................................31

*Horne v. Flores*,

   557 U.S. 433 (2009) ..........................................................................46

\* *Hughey v. JMS Development Corporation*,

   78 F.3d 1523 (11th Cir. 1996) .......................................................... 47, 48

*Jones v. Governor of Florida*,

   975 F.3d 1016 (11th Cir. 2020) ...............................................................12

*L.C. by Zimring v. Olmstead*,

   138 F.3d 893 (11th Cir. 1998) .......................................................... 30, 34

*Lake Shore Asset Management Limited v. Commodity Futures Trading Commission*,

   511 F.3d 762 (7th Cir. 2007) ...................................................................48

\* *Lewis v. Casey*,

   518 U.S. 343 (1996) .................................................................................38

*Lujan v. Defenders of Wildlife*,

   504 U.S. 555 (1992) .................................................................................31

*MCI Telecommunications Corporation v. American Telephone and Telegraph Company*,

   512 U.S. 218 (1994) .................................................................................43

*Morrow v. Harwell*,

   768 F.2d 619 (5th Cir. 1985) ...................................................................44

*National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. City Savings, F.S.B.*,

   28 F.3d 376 (3d Cir. 1994) ......................................................................36

*NLRB v. Bell Oil and Gas Company*,

    98 F.2d 405 (5th Cir. 1938)......................................................................48

\* *Olmstead v. L.C. ex rel. Zimring*,

    527 U.S. 581 (1999) ...................................................................... passim

*Owens v. Governor's Office of Student Achievement*,

    52 F.4th 1327 (11th Cir. 2022)...............................................................28

*Radaszewski ex rel. Radaszewski v. Maram*,

    383 F.3d 599 (7th Cir. 2004)..................................................................21

\* *Rizzo v. Goode*,

    423 U.S. 362 (1976) ................................................................... 44, 45

*Securities and Exchange Commission v. Globe*,

    682 F.3d 934 (11th Cir. 2012)...............................................................47

\* *Shotz v. Cates*,

    256 F.3d 1077 (11th Cir. 2001)..............................................................41

*Smith Lee Associates*, *Inc. v. City of Taylor*,

    102 F.3d 781 (6th Cir. 1996)..................................................................46

*Tennessee v. Lane*,

    541 U.S. 509 (2004)...............................................................................43

*TransUnion LLC v. Ramirez*,

    141 S. Ct. 2190 (2021) ...........................................................................42

*United States v. Askins & Miller Orthopaedics*, *P.A.*,

924 F.3d 1348 (11th Cir. 2019) ...............................................................47

*United States v. Cruz*,

698 F.2d 1148 (11th Cir. 1983) ...............................................................25

*United States v. Florida*,

938 F.3d 1221 (11th Cir. 2019) ..........................................................6, 51

*United States v. Georgia*,

No. 1:10-cv-00249 (N.D. Ga.) ................................................................47

*United States v. Missouri*,

535 F.3d 844 (8th Cir. 2008) ...................................................................44

*United States v. Nebraska Department of Health and Human Services Finance and Support*,

547 U.S. 1067 (2006) ...............................................................................41

*United States v. Secretary*, *Florida Agency for Health Care Administration*,

21 F.4th 730 (11th Cir. 2021) .............................................................6, 52

*US Airways*, *Inc. v. Barnett*,

535 U.S. 391 (2002) .................................................................................30

*Willis v. Conopco*, *Inc.*,

108 F.3d 282 (11th Cir. 1997) .................................................................30

## Statutes

28 U.S.C. § 1291.................................................................1

28 U.S.C. § 1331.................................................................1

42 U.S.C. § 12132...............................................................41

42 U.S.C. § 12188(a)(1)........................................................41

42 U.S.C. § 1396a(a)(30)(A)....................................................40

## Regulations

28 C.F.R. § 35.130(b)(7)(i) ........................................ 31, 36, 43

28 C.F.R. § 35.130(d)................................................ 18, 21

## Other Authorities

H.R. 2273, 101st Cong. (1989) ................................................41

Merriam-Webster Dictionary ................................................21

S. 933, 101st Cong. (1989) ................................................41

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action to enforce Title II of the ADA under 28 U.S.C. § 1331. ECF No. 700. The district court entered its injunction on July 14, 2023, ECF No. 1171, and a final judgment on July 21, 2023, ECF No. 1175. Florida filed its notice of appeal on July 17, 2023. ECF No. 1172. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In this action, the United States alleged a single claim: a claim under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). *Olmstead* held that Title II of the Americans with Disabilities Act requires States to make reasonable accommodations to enable individuals with disabilities to live outside of institutional settings—such as nursing homes—if:

> community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [disabilities].

*Id*. at 587. The district court relied on this holding to order wholesale, systemic changes to Florida's Medicaid program—even though the United States did not propose those changes until after trial—because, in the court's view, the Florida Medicaid program delivers insufficient access to nursing care in the home.

1

The issues presented are:

1.      Whether the district court erred in concluding that the United States, based on expert testimony and the handful of unrepresentative exemplars it presented at trial, met its burden to prove that children are unlawfully institutionalized on a widespread basis, and that the accommodations the United States proposed for the first time after trial were reasonable and would redress the widespread injuries that the United States attempted to establish at trial.

2.      Whether the injunction—which foists on Florida an impossible and unprecedented burden to ensure that each of the thousands of children who receives in-home nursing through the Florida Medicaid program utilizes at least 90 percent of authorized hours—is an overly broad and disproportionate response to the evidence presented at trial.

3.      Whether, under Title II of the ADA, the United States may sue to enforce the civil rights of thousands of children who never sought federal enforcement through the ADA's administrative enforcement process.

## **STATEMENT OF THE CASE**

### **A.    Nursing Homes.**

In Florida today, approximately 140 Medicaid-recipient children with complex medical needs reside in three private nursing homes that serve the pediatric population. ECF No. 840 at 10 ¶¶ 25–26. Most of these children suffer from severe neurological

injuries, whether from birth or a traumatic event, or were born prematurely and receive rehabilitative services associated with their respiratory conditions. T7A at 18:4–21:1.[1]

Children in Florida reside in nursing homes for diverse reasons personal to their parents and families. Some parents want their children to be fully weaned from ventilators and other medical equipment before their children come home. *Id*. at 121:11–16, 123:7–19, 125:2–5, 135:1–8, 138:16–25. One child's parents were incarcerated until recently, *id*. at 124:9–17, while another child's parents returned to their home in China, *id*. at 132:2–12. Hurricane Ian caused extensive damage to one child's family home. *Id*. at 116:20–117:10. Another child's parents are engaged in a custody dispute. *Id*. at 141:10–16. For other parents, a transfer home is simply "too much." *Id*. at 126:14–18.

Some children's families consider their home settings unstable or inappropriate for a child with complex medical needs. *Id*. at 128:15–22; T8B at 262:25–263:4. One child's mom lives with her mother and would like to establish her own situation before her child comes home. T7A at 131:7–11. Another mom lives in the Bahamas and lacks confidence in the care available there. T5 at 224:2–4, 233:9–16. One father wants to find a larger apartment before his child comes home. T6 at 77:13–21. One mom wants to convert her garage into a bedroom for the child first. *Id*. at 285:5–286:12. Another lives in Mississippi and plans to return to Florida before her child comes home. T5 at

---

[1] Trial transcripts are designated by a "T" and the volume number (*e.g.*, "7A"), and are available at ECF Nos. 894, 896–97, and 906–13.

219:20–221:8. One parent lives with seven other people in a home that has insufficient space for her child. T6 at 34:21–35:9. One mom will transfer her child home once she and her new baby are settled. T8B at 264:7–18. One parent was homeless. T3 at 37:4–25. Another is learning to care for her child, but is not yet comfortable. T7A at 144:15–19.

Some parents feel that nursing homes offer the best care for their children. One parent, whose husband suffers from Parkinson's, thinks a nursing home is best suited to care for her child. T6 at 42:8–45:5. One guardian is so happy with the care provided at the nursing home that she does not want her child to live anywhere else. *Id*. at 11:13–12:10. One father thinks highly of the care his daughter receives in a nursing home and insists she remain there. *Id*. at 59:16–25.

Florida's Medicaid program pays for the services that nursing homes provide to children. ECF No. 840 at 10 ¶¶ 23–26. Most Medicaid recipients in Florida receive services through managed-care plans. *Id*. at 8 ¶¶ 9–10. Florida contracts with managed-care plans to provide recipients with access to covered, medically necessary services. *Id*. The plans then contract with providers to render services to plan enrollees. *Id*. at 8 ¶ 11, 9 ¶ 14.

### B.    In-Home Nursing.

For children, Medicaid also covers medically necessary in-home nursing care, known as private duty nursing. *Id*. at 11 ¶¶ 37–39. This service is provided in the home

or other community settings by nurses employed by licensed home health agencies. *Id*. To receive reimbursement, a home health agency must establish, through a prior-authorization process, that in-home nursing is medically necessary for the child. *Id*. at 12 ¶¶ 45–46. A prior authorization of in-home nursing may not exceed 180 days and specifies the number of hours authorized to be provided within the authorization period. *Id*.

On average, 2,750 children receive in-home nursing monthly through Florida's Medicaid program. *Id*. at 13 ¶ 52. In Fiscal Year 2021–22, Florida spent nearly $500 million on in-home nursing for children. *Id*.

Few children utilize all authorized hours of in-home nursing. T3 at 171:6–20. One significant cause of this under-utilization is a critical nationwide nursing shortage across the entire healthcare industry. T8A at 82:11–85:6; T8B at 193:19–195:8; T9A at 80:23–81:9, 139:13–140:1. Other factors are child- and family-specific. Some parents decline some in-home nursing—for example, when the parent is home and able to care for the child without the nurse present. T9A at 32:21–25, 78:17–79:5, 140:15–141:17. Some children spend time in settings, such as hospitals or medical daycares, that provide their own nurses. *Id*. at 32:12–20, 79:6–15, 80:11–19, 141:18–142:2. Some children's conditions improve, rendering in-home nursing unnecessary. T8B at 192:9–15; T9A at 143:23–144:4. Some parents choose to keep a trusted home health agency, even though another could deliver more hours. T8B at 218:1–13; T9A at 84:20–85:17. Some parents reject particular nurses or have specific requirements (such

5

as language compatibility) that make it difficult or impossible to find suitable nurses. T9A at 33:8–13, 82:17–83:5. Sometimes, nurses or home health agencies refuse to serve particular families based on safety concerns or past experiences. *Id*. at 33:1–3, 82:9–83:18, 138:17–139:12.

### C.    This Litigation.

The United States sued Florida in 2013 and asserted a single claim: a failure-to-accommodate claim alleging unlawful institutionalization under Title II of the ADA. In 2019, over Judge Branch's dissent, this Court held that Title II authorizes the United States to sue. *United States v. Florida*, 938 F.3d 1221 (11th Cir. 2019). The Court then denied rehearing en banc, while Judge Newsom dissented. *United States v. Sec'y*, *Fla. Agency for Health Care Admin*., 21 F.4th 730 (11th Cir. 2021). The Supreme Court denied certiorari in the case's then-interlocutory posture. *Florida v. United States*, 143 S. Ct. 89 (2022).

The case proceeded to trial in May 2023. The United States argued that parents are compelled to place children in nursing homes because Florida's Medicaid program delivers insufficient access to in-home nursing. The United States called as witnesses the parents of only 3 of 140 children who live in nursing homes in Florida. No parent testified that he or she wants to transfer a child home, but cannot do so because of Florida. The district court identified seven children who, over ten years, have entered nursing homes because of insufficient in-home nursing. ECF No. 1170 at 36–37. It did

not identify any child who lives in a nursing home today, but should be transferred out.

The United States relied chiefly on the testimony of four expert witnesses.

*First*, Dr. Carolyn Foster reviewed the medical records of the children who live in nursing homes and, based on the children's medical profiles, opined that all children in nursing homes could live in community-based settings. T1 at 163:11–166:24, 172:6–16. Dr. Foster did not, however, assess whether any child's actual home would be an appropriate setting for that child and did not know where any specific child would go if the child were discharged from a nursing home. *Id*. at 176:3–9, 211:13–22, 213:8–214:1.

*Second*, to determine whether the parents oppose community placement for their children, Dr. Amy Houtrow and her colleagues conducted unrecorded interviews of the parents of 45 children (out of 140) who live in nursing homes. T2 at 170:4–180:4. Dr. Houtrow concluded that parents overall do not oppose community placement. *Id*. at 200:6–18. In reaching this conclusion, Dr. Houtrow considered parents who currently want their children to live in nursing homes as "unopposed" to community placement if the parents' opposition is founded on reasons that could someday be overcome. *Id*. at 226:19–229:6. For example, many parents cited housing as the reason they placed their children in nursing homes. *Id*. at 248:18–22. Dr. Houtrow considered this reason "addressable" and thus counted these parents as unopposed to their children's transfer. *Id*. at 247:25–248:12.

*Third*, Emily Sisson, a data analyst, reviewed seven spreadsheets prepared by Medicaid managed-care plans in Florida and, based on a sample of 1,956 children who received in-home nursing between October 2020 and September 2021, found that few children utilized all authorized hours of in-home nursing. T3 at 132:9–133:6, 167:6–167:23, 171:6–16. On average, these children utilized between 70 and 80 percent of all authorized hours. *Id*. at 170:16–18. Ms. Sisson did not examine why children did not utilize more authorized hours, *id*. at 168:3–11, or whether any children were admitted to nursing homes because of the under-utilization, *id*. at 170:3–7. Nor did she assess how many of the 1,956 children were later placed in nursing homes for any reason, *id*. at 171:21–172:2, or how the utilization rate in Florida compares to that in other States, *id*. at 172:6–12.

*Fourth*, Dr. Sally Bachman relied on Ms. Sisson's statistical analysis to suggest changes that Florida could make to its Medicaid program. To enhance the availability of in-home nursing, Dr. Bachman suggested that Florida (1) implement a "more robust data collection and analysis strategy"; (2) "investigate what kinds of network adequacy standards would improve access"; (3) "look at reimbursement rates"; and (4) "develop more robust contract management and accountability mechanisms." T4 at 120:24–121:22.

Dr. Bachman did not, however, propose a particular reimbursement rate, *id*. at 182:15–18, or know what rates Florida or other States pay for in-home nursing, *id*. at

183:3–21. Nor did she assess whether higher rates would attract more nurses to home health or prevent the admission of children to nursing homes. *Id*. at 190:1–25, 193:16–19. Dr. Bachman did not attempt to determine why children do not utilize all authorized hours of in-home nursing, but testified that there are "many causes" and indeed "too many even to hypothesize." *Id*. at 112:12–113:1, 171:12–173:14. She did not evaluate the utilization rate in other States, *id*. at 116:5–12, 178:14–180:6, but agreed that one would not expect to find 100-percent utilization anywhere, *id*. at 179:1–10. She could not say, and did not assess, whether any of her proposals would prevent any particular child's institutionalization. *Id*. at 218:17–219:13. Nor could she name any child who was institutionalized because Florida had not made the modifications she proposed or whose future institutionalization would be prevented by her proposals. *Id*. at 219:14–220:3.

The United States also called the parents of ten children, but only three of those children lived in nursing homes at the time of trial. One of the three children (Cayden Armour) was discharged during trial. T7A at 30:4–9. The second (Karina Rodriguez) lives in a nursing home because of housing instability, the parents' constant exposure to COVID at work, and her mother's insistence that the child remain in a nursing home until the family's home is ready. T4 at 17:10–13, 26:23–27:9, 30:20–32:7. The mother of Dondraya Wilson, the third child, testified that, because of her unstable housing, she does not want to initiate her child's transfer. T3 at 81:12–82:21. The United States did

not call any parents who want to bring their children home, but cannot do so because of Florida.

Dr. Rayna Letourneau, an assistant professor at the University of South Florida and the executive director of the Florida Center for Nursing, testified for Florida as an expert on the nursing workforce. Dr. Letourneau testified that the nursing shortage is national in scope and affects the entire healthcare industry, including hospitals. T8B at 104:3–127:13. Hospitals, which employ 60 percent of the nursing workforce, struggle to hire nurses. *Id*. at 98:23–99:7, 114:9–21, 117:20–118:4. The shortage has multiple causes, including the pandemic, and no single solution. *Id*. at 105:12–106:8, 107:12–110:8, 117:3–19. The district court, the United States, and Dr. Bachman all recognized the existence of the nursing shortage. T3 at 96:17–23; T5 at 237:14–20; T9B at 51:24–25.

Eleven days after trial, the United States submitted a proposed injunction that contained "reasonable accommodations" that were not previously disclosed. ECF No. 914-1. The district court signed the proposed injunction with minor changes. ECF No. 1171.

The court found that Florida is violating the civil rights of nearly 3,000 children: 140 children who live in nursing homes and 2,750 children whom the court found to be "at risk" of nursing-home admission simply because they receive in-home nursing. ECF No. 1170 at 8–9, 34–35, 44–45, 79. It found that all children in nursing homes

could live in community settings, that parents want them to, and that the United States had "suggested the existence of plausible accommodations" to promote that objective. *Id*. at 55, 66.

The court entered a systemwide injunction that orders each child authorized to receive in-home nursing to receive at least 90 percent of all authorized hours. ECF No. 1171 ¶ II.A.[2] The injunction also imposes new mandates regarding transition planning, data collection, forms, trainings, complaint mechanisms, investigations, contracts, documentation, external reviews, prior authorizations, and care coordination for thousands of children. *Id*. ¶¶ II–V. For example, it requires care coordinators to conduct transition planning meetings and prepare written transition plans on a quarterly basis, whether or not the parents want it. *Id*. ¶¶ I.O., IV.A. It requires Florida to create new programs that enable families to visit other families or receive family-to-family peer support, *id*., and makes Florida responsible to resolve the "barriers" that prevent families from bringing children home, even if those barriers (such as housing) have nothing to do with Florida, *id*. ¶ IV(A)–(C).

The injunction imposes a monitor on Florida for at least two years—at Florida's expense. *Id*. ¶¶ VI., VII.E. It vests the monitor with broad powers to supervise compliance with the injunction—to hire staff, demand documents, conduct interviews, report

---

[2] The court excluded from the computation hours that parents refuse and hours forgone during hospital admissions. ECF No. 1171 ¶ I.L.

to the court every two months, and make recommendations for future court action. *Id*. The court authorized the monitor to speak ex parte with the parties and then ex parte with the court, *id*. ¶ VI.D., and granted the monitor "full access to persons, employees, facilities, buildings, programs, services, documents, records, and any other materials," ECF No. 1188 at 2.

## STANDARD OF REVIEW

This Court reviews the entry of a permanent injunction for abuse of discretion. It reviews legal conclusions de novo and factual findings for clear error. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020) (en banc).

## SUMMARY OF ARGUMENT

The district court incorrectly interpreted and applied each of the three elements of *Olmstead* in an impractical, theoretical way, transforming the highly individualized elements of an *Olmstead* claim into abstract, generalized inquiries. Only by adopting its watered-down interpretation of each element was the district court able to adjudicate the civil rights of thousands of non-party children in one stroke, without consideration of their individualized circumstances. In fact, under the district court's interpretation, virtually all nursing-home residents of any age will infallibly satisfy all three elements.

The district court's approach is harmful. It leaves the United States with almost no evidentiary burden in an *Olmstead* action and threatens States with liability for all nursing-home admissions. And by pressuring States to pursue de-institutionalization at

any cost, regardless of individualized circumstances, it endangers the lives of children.

The district court incorrectly found that community placement is appropriate to the needs of all children in nursing homes. The United States failed to carry its burden because it presented no evidence that the real-life settings to which children would be transferred are appropriate to their needs. Instead, its expert conducted a record review and opined that children in nursing homes could live in some conceivable community setting, whether or not it exists and is available to them. This interpretation ensures that the appropriateness element will always be satisfied and wholly subverts that element's animating purpose: to ensure that patients are not transferred to inappropriate settings and that States are not coerced to de-institutionalize patients who have nowhere to go.

The district court also misinterpreted the second element, which asks whether parents are opposed to their children's transfer to the community. There was extensive evidence at trial that parents place their children in nursing homes for diverse reasons unrelated to Florida. The court set aside parental preferences under present-day, real-life circumstances and instead focused on parents' ideal, perfect-world wishes or future aspirations. Under that analysis, a parent who intends to bring a child home someday, but is opposed to doing so today, is deemed unopposed to a transfer, even if the parent's reasons (such as housing) have nothing to do with Florida. That interpretation ensures that the non-opposition element will universally be satisfied and pressures States to de-institutionalize children *before* their parents are ready and willing to bring them home.

The district court erred in concluding that the United States proved the existence of reasonable accommodations. *First*, the United States never tied its proposed accommodations to the circumstances of any child to establish that the accommodation would actually avert any child's unlawful institutionalization, let alone widespread violations. Instead, it treated this element as a generalized, legislative inquiry into plausible policy proposals to improve the delivery of services and promote community living at large. But the ADA requires proof that an accommodation will be effective in preventing an individual's unlawful institutionalization. A probabilistic assumption that a system of remedies is bound to help someone, someday, somewhere is no substitute for evidence. And Article III demands evidence of redressability—not a PowerPoint presentation of plausible policy suggestions, unconnected to the circumstances of individual children.

*Second*, the district court erred in concluding that the United States had proven the reasonableness of its proposed accommodations, since the principal accommodations in the injunction were first disclosed *after trial* when the United States submitted its proposed injunction. The United States proposed one set of accommodations at trial and another set of accommodations after trial. Its decade-long, strategic non-disclosure meant that the United States did not establish the reasonableness of the court-ordered accommodations and that Florida was denied any opportunity to prove its affirmative defense that the proposed accommodations are infeasible or would fundamentally alter its services or programs.

The injunction is flawed for additional reasons as well. *First*, systemwide relief is available only when a plaintiff proves widespread violations. Here, the district court identified only seven children *ever* placed in nursing homes because of insufficient in-home nursing. It did not identify any child who lives in a nursing home today, but must be transferred out. And no parent testified that she wants to bring her child home, but cannot do so because of Florida. The court therefore relied on the thousands of children who receive in-home nursing, but those children do not live in nursing homes. In fact, the only information in the record about these children is the percentage of authorized in-home nursing that they utilized. That is not enough to prove an *Olmstead* violation or, under Article III, a real and immediate threat of future unlawful institutionalization. Without evidence of widespread unlawful institutionalization, an award of systemwide relief was improper.

*Second*, the injunction is a wildly overbroad and disproportionate response that violates principles of federalism. An injunction must be no broader than necessary to redress proven violations—especially when directed at a fellow sovereign in a system of federalism. The injunction here takes no heed of these principles. It imposes an arbitrary and unprecedented mandate that nearly 3,000 children utilize at least 90 percent of their authorized in-home nursing. It layers mandate after mandate on many different branches of Florida's service-delivery system. It directs Florida to establish entirely new programs—which Title II cannot compel a State to do, *Disability Rts. Fla.*, *Inc. v.*

*Palmer*, No. 4:18-cv-342, 2019 WL 11253085, at *5 (N.D. Fla. Aug. 29, 2019)—and makes Florida responsible to overcome barriers to community living, such as housing, that are wholly unrelated to Florida. And it installs a monitor with sweeping powers to supervise all aspects of Florida's delivery of healthcare services to children with complex medical needs, and to make reports and recommendations to the district court. Principles of equity and federalism condemn this overbroad or overbearing injunction.

*Third*, the injunction's principal remedy—the 90-percent utilization mandate—is not an objective action, but rather an arbitrary performance goal that was not shown to be achievable. The record is replete with undisputed evidence of a national nursing shortage, and it reveals that there are many individualized reasons unrelated to Florida why children do not receive all authorized hours of in-home nursing. Nothing in the record shows that 90-percent utilization is achievable or has ever been achieved in any State. The only objective action that the court found might increase utilization—higher reimbursement rates—would require legislative appropriations, which a court may not order. The court thus ordered Florida to achieve a performance goal—not to take well-defined, objective actions—and did so without proof that the goal is even achievable.

Finally, Florida preserves for review its contention that the United States has no authority to enforce Title II of the ADA. But even if the ADA granted that authority, it would not include an action (like this one) to enforce the rights of thousands of children

who never initiated the ADA's administrative enforcement process. In the prior appeal, this Court tethered the United States' enforcement power to an individual's invocation of the United States' assistance through the submission of an administrative complaint. It did not hold that the United States has an unbounded, freestanding right to sue States. Only one child at issue here ever filed an administrative complaint—and that child's claims were resolved in a separate action. This Court's decision in the prior appeal did not permit the United States to parlay one administrative complaint, which has been resolved, into an action to mass-adjudicate thousands of alleged civil-rights violations in bulk.

This Court should reverse the district court's judgment and vacate its injunction.

## **ARGUMENT**

The United States' stated goal in this case was not to vindicate anyone's rights, but rather to "change the policies and practices of the State of Florida." T5 at 239:10–240:18. It said so: "we're not suing on behalf of an individual. We're suing to change the policies and practices of the State of Florida. To the extent that [individuals] may ultimately benefit from that [is] hopefully a result of our enforcement action, but . . . it is not the genesis of our enforcement action." *Id.* The district court's injunction is tailor-made to serve precisely that purpose: to rewrite Florida's healthcare policies without regard to any actual case or controversy. The court erred for the reasons that follow.

I.    THE DISTRICT COURT MISINTERPRETED—AND DILUTED—ALL THREE *OLMSTEAD* ELEMENTS.

   A.    **The Appropriateness Element.**

*Olmstead*'s first element requires a plaintiff to show that "community placement is appropriate" to the individual's needs. 527 U.S. at 587; *accord* 28 C.F.R. § 35.130(d) (requiring public entities to provide services "in the most integrated setting appropriate to the needs" of individuals). Here, the district court misinterpreted the appropriateness inquiry to require only a paper review of medical records and no consideration of the appropriateness of the actual care setting to which the child would be transferred. As a result, it incorrectly found that *all* children in nursing homes satisfy the first *Olmstead* element.

   The appropriateness element serves a crucial and intensely practical purpose: it ensures that individuals are not transferred to settings that are unsuited to their needs. It cannot serve this function absent an assessment of the actual, proposed placement. As *Olmstead* noted, it is not "the ADA's mission to drive States to move institutional-ized patients into an inappropriate setting, such as a homeless shelter." 527 U.S. at 605 (plurality opinion). Over and over, *Olmstead* cautions against the placement of patients in settings not appropriate to their needs. *Id*. at 601–02 (explaining that "nothing in the ADA . . . condones termination of institutional settings for persons unable to handle or benefit from community settings"); *id*. at 604 (plurality opinion) (noting that the ADA does not "impel States to phase out institutions, placing patients in need of close care

18

at risk"); *id*. at 605 (plurality opinion) (noting that, for some individuals, "no placement outside the institution may ever be appropriate"). As Justice Kennedy emphasized in his concurrence, it would be a "tragic event" if the ADA were interpreted to pressure States, "for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." *Id*. at 610.

The United States did not identify the less-restrictive setting to which any child would be transferred, and of course presented no evidence that the setting would be appropriate to the child's needs. Its expert on appropriateness, Dr. Foster, admittedly did not evaluate the appropriateness of any child's proposed care setting. T1 at 211:13–22. She did not know where any child would go if discharged from a nursing home, *id*. at 213:19–214:1, and had no opinion on the appropriateness of any setting to which a child might be transferred, *id*. at 213:8–18. Instead, Dr. Foster reviewed the children's medical records and, based on their medical profiles, opined that each child in a nursing home could live in *some* community setting—without considering whether an appropriate setting actually exists and is available to the child. *Id*. at 165:13–166:24, 172:6–16.

The district court brushed these omissions aside and concluded that *Olmstead* does not require any evaluation of the child's proposed placement. ECF No. 1170 at 46–47. In contrast to *Olmstead*'s practical concerns, the district court concluded that

19

courts need not "take practical issues into account in evaluating appropriateness." *Id*. at 46. To consider the appropriateness of real-life settings would, the court reasoned, be "unmanageable and overtly subjective" and also "unfair" to parents of lesser means, whose homes might be inappropriate to the care of a child with complex medical needs. *Id*. The district court therefore endorsed an interpretation of *Olmstead* that condones the transfer of children to inappropriate care settings. It interpreted "appropriateness" to mean only "*medical* appropriateness," *id*. at 46 (emphasis in original)—a nebulous term found nowhere in *Olmstead*—and reasoned that the appropriateness of the actual placement is not "relevant to *medical* appropriateness," *id*. at 47 (emphasis in original).

The district court excused the United States' failure to present evidence that less restrictive settings are available to the children in nursing homes, or that those settings are appropriate. In doing so, it cleared the way for the mass adjudication of civil-rights violations by the thousands, with no regard to individualized circumstances beyond an expert's inspection of records.

The district court's conclusion contravenes the United States' ADA regulations. Those regulations ask whether the "setting" is "appropriate to the needs" of the child and require services to be provided in "the most integrated setting" that is "appropriate" to those needs. 28 C.F.R. § 35.130(d). Under this regulation, a State has no obligation to make an accommodation until an appropriate and more integrated setting is identified. *Olmstead*'s reference to the appropriateness of "community placement," 527 U.S.

at 587, carries the same connotation: "placement" means "the assignment of a person to a suitable place." Merriam-Webster Dictionary, https://www.merriam-webster.com.

Thus, in *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 612 (7th Cir. 2004), the court considered the appropriateness of the plaintiff's family home, explaining that "his home is an appropriate care setting for" the plaintiff, who had "lived there since the onset of his disabilities," and that the plaintiff "can live at home" and "profits in that environment from the daily interaction with and nurturing by his parents and the access to on-line learning that he has at home." The court considered the plaintiff's unique needs and, as *Olmstead* requires, determined whether the plaintiff can "handle and benefit" from the proposed alternative placement. *See Olmstead*, 527 U.S. at 600.[3]

To support its interpretation, the district court noted that the Supreme Court did not assess the appropriateness of a particular setting in *Olmstead*. ECF No. 1170 at 46. But that issue was not contested in *Olmstead* because the two plaintiffs had resided in the community for years. Br. for Resp't, *Olmstead*, 527 U.S. 581 (1999) (No. 98-536), 1999 WL 144128, at *8. Indeed, appropriateness is often uncontested. But here, where

---

[3] The court below also reasoned that some children in nursing homes were once found eligible for community-based services, which proves that community placement is appropriate. ECF No. 1170 at 52, 54. But this "once appropriate, always appropriate" argument was rejected in *Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1174 n.17 (M.D. Ala. 2010), where the court recognized that the circumstances of individuals with complex medical needs often change. Here, the court did not identify the children, explain how and when those eligibility determinations were made, disclose whether the community setting was assessed, or examine whether the setting or the child's needs have changed.

21

the United States invokes the rights of thousands of children who never complained, it is very much contested.

The ADA does not hold States liable for discrimination in the absence of a real-life community setting that is appropriate to the individual's needs. If it did, then States would be liable in the absence of a remedy—and would be pressured to move children to inappropriate settings to avoid liability. The consequence of discharging children to unsuitable settings—just because an expert was able to imagine an appropriate one—could be disastrous. When the lives and health of children are at stake, the law demands a practical application—not theoretical exercises. Because the United States presented no evidence of the appropriateness of any proposed care setting for any child, the court below erred in concluding that all children in nursing homes satisfy the appropriateness element.

### B.    The Non-Opposition Element.

Next, *Olmstead* requires States to make reasonable accommodations to enable individuals to live in community settings, but only when "the transfer from institutional care . . . is not opposed by the affected individual." 527 U.S. at 587. This element ensures that the decisions of parents are honored—not explained away—and that States are not compelled to transfer children out of nursing homes while their parents are not ready and willing. What matters are the choices of parents under actual conditions and

present-day, real-life circumstances—not, as the United States maintained, their aspirations for the future or the decisions they might make if circumstances were different.

The United States failed to satisfy that standard. The evidence overwhelmingly shows that parents place their children in nursing homes for myriad reasons that have nothing to do with Florida or its services or programs. These reasons, detailed above, *see supra* pp. 3–4, 9–10, include unstable or inadequate housing and the parents' desire that children be weaned from medical equipment before coming home. Most parents want to bring their children home someday—but not today. They are simply not ready.

Despite reams of evidence that parents place their children in nursing homes for individualized reasons unrelated to Florida, the district court concluded that virtually all parents are unopposed to transferring their children to the community. It did so because it deemed "unopposed" the many parents whose children live in nursing homes because of personal circumstances unrelated to Florida, but who would not oppose a transfer *someday*—at a *different time* and under *different circumstances*. As the district court explained:

> I take issue with the idea that a parent who is not "ready" to transition their child home is *opposed* to bringing their child home, even if their unreadiness is due to personal circumstances and not the State's failure to provide adequate services. They may want to if they could, and that means they are non-opposed within the meaning of *Olmstead*.

ECF No. 1170 at 61; *accord id.* at 57 (concluding that parents are unopposed "even if they are not presently and actively seeking immediate discharge of their children," and

that "most parents want their children at home, but they face barriers"). Thus, the court deemed Bobbie King unopposed, *id*. at 59, but Ms. King testified that she will transfer her child home only after she moves from Mississippi to Florida, T5 at 219:20–221:8. It also considered Marcelia Dalmou unopposed, ECF No. 1170 at 59, but Ms. Dalmou wants her son to live in a nursing home because she does not "feel comfortable" with the doctors where she lives in the Bahamas, T5 at 231:21–24, 233:12–16. The district court observed that Ms. Dalmou would transfer her son home "if she could relocate to Florida," ECF No. 1170 at 51, but Ms. Dalmou has no plans to move to Florida, T5 at 234:1–7.

In effect, the court asked whether parents would oppose their children's transfer if the reasons for their opposition were taken away—a question designed to yield only one possible answer.

The district court's definition is untenable. It forces States, for fear of liability, to transfer children out of nursing homes prematurely, before the parents are ready and willing, and thus places States and parents at cross-purposes. That is a gross violation of parental rights and of *Olmstead*, which rejected the imposition of community care "on patients who do not desire it." 527 U.S. at 602. While parents like Ms. King and Ms. Dalmou made clear that, at least for now, they do not desire community placement for their children, the court found that Florida violated their children's rights. Courts must accord statutes a "practical interpretation," *United States v. Cruz*, 698 F.2d 1148,

24

1151 (11th Cir. 1983), and the district court's interpretation is not only impractical, but dangerous.

The district court's watered-down definition guarantees that virtually all nursing-home residents of *all ages* satisfy the non-opposition element. An elderly nursing-home resident who opposes a transfer because he has no housing, but who would prefer to live in the community under other circumstances, would be considered unopposed. If choices founded on real-life circumstances can be ignored, then the non-opposition element is a perfunctory, check-the-box exercise, and States can be liable even though the nursing-home resident opposes a transfer for reasons neither caused nor controlled by the State.

Under the district court's definition, the ADA tolerates institutional placement only in the rarest cases: when parents declare unbending opposition to *any* transfer to the community, *ever*. It holds Florida liable *today* if the parent leaves open any chance that someday, under different circumstances, she might bring her child home. That impractical interpretation creates conflict between the present wishes of parents and Florida's obligations and is inconsistent with the cautious and measured spirit of *Olmstead*.

Thus, while it recognized that "some families do choose institutionalization, for various reasons," and that "their decisions should be honored and supported," ECF No. 1170 at 51, the district court ignored those reasons and counted as "unopposed" parents who would transfer their children under hypothetical, nonexistent circumstances. Far

25

from honoring and supporting the decisions of parents like Ms. King and Ms. Dalmou, the court nullified the reasons for their decisions and considered them "unopposed" to a transfer.

In doing so, the court relied on Dr. Houtrow's testimony that parents overall do not oppose community placement. In reaching that conclusion, Dr. Houtrow advanced the erroneous definition of non-opposition that the district court adopted. She deemed any parent who opposes a transfer because of surmountable "barriers" as "unopposed," even if those barriers are outside Florida's control. T2 at 159:14–160:3, 183:14–184:4, 202:2–22, 227:19–229:23, 247:25–248:17. Thus, she opined that a parent who opposes a transfer because of housing is *unopposed* because her housing situation might change someday. *Id*. at 247:25–248:17.

Dr. Houtrow conceded that "a lot of families talked about housing as a barrier." *Id*. at 248:18–22. Of the 45 families she interviewed, 18 cited housing as a reason why their children live in nursing homes. Pl.'s Exs. 5192, 5194, 5196–97, 5199, 5201–03, 5205–06, 5211–12, 5220, 5222, 5230–31, 5235, 5240. Yet Dr. Houtrow deemed all 18 unopposed. *Id*. She testified that one mother who refuses to transfer her child to a trailer is unopposed because she would transfer her child home—if only she did not live in a trailer. T2 at 298:17–300:8. Perhaps because Dr. Houtrow misdefined non-opposition, seven parents whom Dr. Houtrow interviewed and deemed unopposed contradicted her and testified that they want their children to remain in nursing homes. T5 at 215–234;

T6 at 5–18, 33–67, 278–90; Pl.'s Exs. 5198, 5200, 5203, 5214–15, 5240, 5243. The testimony of these seven parents utterly discredits and invalidates Dr. Houtrow's. And tellingly, after ten years, the United States could not find one parent to testify that he or she is ready and willing to bring a child home, but cannot do so because of Florida.

To support her definition, Dr. Houtrow offered a puzzling distinction between opposition to "transitioning" and opposition to "community dwelling." T2 at 272:10–16. She argued that a parent might oppose a transfer but not oppose the abstract idea of community dwelling. *Id*. at 227:19–229:6, 272:10–16. To illustrate the distinction, Dr. Houtrow testified that, though her "dream" is to vacation in Bora Bora, she might decline a plane ticket because her real-life situation forbids it. *Id*. at 227:19–229:6. Dr. Houtrow conceded that she "was not asked to evaluate whether families were opposed or unopposed to transitioning," *id*. at 272:10–14, but whether they oppose the abstract idea of community dwelling.

Dr. Houtrow evaluated the wrong question. The precise inquiry under *Olmstead* is whether the individual opposes "the *transfer* from institutional care." 527 U.S. at 587 (emphasis added). *Olmstead* focuses on present wishes with respect to an objective action—the child's transfer—not on perfect-world aspirations or envisioned scenarios

27

abstracted from real-life circumstances. It does not require expert witnesses to specu-

late about the decisions that parents *would* make under circumstances that do not exist.[4]

The district court's definition of non-opposition is also contrary to this Court's

precedents. In all failure-to-accommodate contexts—whether under the ADA, the Fair

Housing Act, or the Rehabilitation Act—this Court has consistently required plaintiffs

to demonstrate that they made a "specific demand" for an accommodation, which was

refused. *E.g.*, *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333–

36 (11th Cir. 2022); *Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492–93 (11th Cir.

2020). If a State has no obligation to make an accommodation before one is demanded,

then of course it has no obligation to make an accommodation before a parent is even

ready and willing to transfer a child from a nursing home to a less restrictive placement.

The district court reasoned that insufficient in-home nursing is the chief reason

why parents place their children in nursing homes, ECF No. 1170 at 57, but it identified

only *seven* children who, over *ten years*, were admitted to nursing homes because of

insufficient in-home nursing, *id*. at 36–37. Likewise, in interrogatory answers that were

admitted into evidence at trial, the United States identified only *seven* children who it

---

[4] Dr. Houtrow's testimony was also hearsay. Dr. Houtrow interviewed parents to determine their wishes and then relayed the parents' putative wishes to the court. T2 at 170:4–180:4. When an expert merely summarizes hearsay and presents a synthesis of out-of-court statements as the expert's "opinion," the expert is a conduit for hearsay. *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013). The hearsay rule did not permit the United States to funnel parents' testimony through a paid expert.

claimed had ever been admitted to nursing homes because in-home nursing was insufficient. ECF No. 1122-9. Yet 140 children live presently in nursing homes, while 2,750 receive in-home nursing. ECF No. 840 at 10 ¶ 26, 13 ¶ 52. The district court assumed without evidence that these seven instances are representative of all children in nursing homes and generalized from these few cases to find widespread unlawful institutionalization.

The district court offered no explanation to support its claim that parents who oppose a transfer for reasons unrelated to Florida are "atypical" or "outliers." ECF No. 1170 at 57. On the contrary, the United States failed to prove that *any* child is "stuck" in a nursing home today. Of the 140 children who reside in nursing homes, the United States called the parents of *three*, and not one testified that she wants to bring her child home, but cannot do so because of Florida. *See supra* pp. 6, 9–10. The many instances of children who live in nursing homes for reasons unrelated to Florida greatly outnumber the few nursing-home admissions over the last decade that the court imputed to Florida.

*Olmstead* requires States to respect the decisions of parents—not to ignore those decisions in zealous pursuit of a de-institutionalization agenda. An abstract, inchoate, or unexpressed wish to transfer a child home someday, under different circumstances, does not compel Florida to make accommodations that the parent does not want today.

The district court's finding of widespread non-opposition relied on a misinterpretation of law and should be reversed.

### C.    The Reasonable-Accommodation Element.

*Olmstead*'s third element asks whether Florida can reasonably accommodate the transfer. This inquiry merges with that of remedies: in a failure-to-accommodate case, the accommodation *is* the remedy. The plaintiff must prove the existence and reasonableness of an accommodation. *Willis v. Conopco*, *Inc*., 108 F.3d 282, 283–86 (11th Cir. 1997); *see also L.C. by Zimring v. Olmstead*, 138 F.3d 893, 904 (11th Cir. 1998), *vacated in part on other grounds*, 527 U.S. 581 (1999) (citing *Willis* and concluding that the plaintiffs had "demonstrated" the existence of a reasonable accommodation). And like any remedy, the accommodation must redress a legally cognizable injury—here, unlawful institutionalization. For multiple reasons, the United States failed to carry its burden.

### 1.    The District Court Ordered "Accommodations" Without Evidence of Redressability.

As a matter of statutory interpretation and Article III standing, an accommodation under the ADA must be effective. An accommodation that is ineffective does not "accommodate" anyone and is not an "accommodation" at all. *US Airways*, *Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (explaining that the word "accommodation" "conveys the need for effectiveness" and that an "ineffective 'modification' . . . will not accom-

modate a disabled individual's limitations"). An accommodation must also be "necessary" to avoid discrimination, 28 C.F.R. § 35.130(b)(7)(i)—here, unlawful institutionalization—and an accommodation that is ineffective is, of course, also unnecessary, *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014) ("The necessity element . . . examines whether the requested accommodation or modification would redress injuries . . . ."). And under Article III, a plaintiff must always establish that it is "likely"—not merely "speculative"—that a favorable decision will redress a legally cognizable injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The United States treated the reasonable-accommodation element as an abstract legislative discussion about ideas that might promote community living at large—an opportunity to rethink Florida's programs. It did not tie its proposed accommodations to any child's circumstances or show how those accommodations would prevent any child's unlawful institutionalization. It recognized no burden to do so. No one knows which accommodation, if any, will make a difference for any child. It is impossible to say whether any of the accommodations will prevent even a single instance of unlawful institutionalization—and if so, whose.

Dr. Bachman, who proposed the United States' accommodations, could not say and did not evaluate whether any of her proposed modifications to Florida's programs would avert any child's unlawful institutionalization—let alone widespread violations. T4 at 218:17–219:13. She approached her testimony from a programmatic perspective:

31

Q.      Okay. So you can't tell me which of your modifications, if any, would make a difference for any particular child?

A.      That's not the way Medicaid programs approach this.

Q.      So no?

A.      Right.

*Id*. at 219:9–13; *accord id*. at 218:25–219:1 ("So the work that I do, I don't look at the individual names of individual children."). Nor could Dr. Bachman name a single child who was *ever* institutionalized because Florida had not made the "accommodations" she proposed, or whose future institutionalization would be averted by those "accommodations." *Id*. at 219:14–220:3. Dr. Bachman treated the courtroom like a healthcare policy roundtable, offering a menu of policy proposals untethered to the circumstances of any individual. *Id*. at 171:12–173:5, 173:12–14, 182:2–13, 192:7–18, 218:17–220:3.

Neither the district court nor the United States could identify a single child who will be discharged from a nursing home because of the injunction. Nowhere in its 79-page opinion did the district court offer even one example of a child who is unlawfully in a nursing home, and whose institutionalization the injunction will likely avert. ECF No. 1170 at 67–78. Instead, it relied on the probabilistic assumption that an injunction laden with so many detailed mandates is sure to help someone, someday, somewhere.

With no evidence in the record that the injunction's accommodations will avert widespread violations—or even one child's unlawful institutionalization—the remedy is insupportable under the ADA and Article III. It does not accommodate anyone and

is not "necessary" to avoid unlawful institutionalization. Nor does the record indicate it is "likely," rather than "speculative," that one or more of the "accommodations" in the injunction will afford redress and prevent any child's unlawful institutionalization.

The district court waved away this fundamental failure of proof, concluding that the United States was not required to prove that its proposed accommodations are the "silver bullet" for any child. ECF No. 1170 at 18. But it does not follow that the United States did not bear a burden to prove the effectiveness and necessity of the accommodations, and a likelihood that civil-rights violations will be redressed on a widespread basis.

Just like the first two elements, the district court's interpretation of *Olmstead*'s third element is watered down to the point of futility. The near-total dilution of these elements ensures that they will always be satisfied. The United States can always prove that (1) nursing-home residents can conceivably live in some community-based setting that might or might not actually exist; (2) but for the real-life circumstances that made them choose nursing homes in the first place, nursing-home residents would prefer to live in the community; and (3) States can do more to promote community living. By diluting all three elements beyond recognition, the United States manufactured a new strain of *Olmstead* claim that looks nothing like the original, enabling federal courts to mass-adjudicate thousands of civil-rights violations against absent non-parties at once.

33

*Olmstead* concerned the desire of two individuals to avoid institutionalization by enrolling in an existing, community-based program with available capacity, and for which they were eligible. 138 F.3d at 904. This case bears no resemblance to *Olmstead*. The United States pursued a legislative inquiry and presented the district court with a palette of policy recommendations that it believed might promote community living. But a trial is not a healthcare symposium. Without any evidence that its policy changes will redress unlawful institutionalization, the United States' proposed accommodations are not judicial remedies for the violation of individual civil rights. Because the court placed Florida in federal receivership without evidence that the injunction will redress widespread unlawful institutionalization (or even one child's injury), this Court should reverse.

### 2.    The District Court Ordered "Accommodations" That Were First Disclosed After Trial—and Thus Never Subjected to Evidentiary Testing.

The district court's injunction erroneously requires Florida to make "accommodations" that the United States never disclosed during ten years of litigation or at trial. These accommodations were first disclosed in a proposed injunction filed eleven days after the conclusion of trial, ECF No. 914-1, and the district court entered the proposed injunction with minimal changes, ECF No. 1171. By ordering accommodations never disclosed in discovery or at trial, the court relieved the United States of its burden to

34

establish the reasonableness, effectiveness, and necessity of its proposed accommodations. It also denied Florida its right to plead and prove, as an affirmative defense, that the proposed accommodations are infeasible or would fundamentally alter its services or programs.

*First*, the United States could not have carried its burden under the reasonable-accommodation element if the accommodations it sought and the district court ordered were first disclosed after trial.

The injunction's undisclosed requirements include Parts I.O. (mandating a new "Transition Planning Process"), II.A. (requiring all children to receive at least 90 percent of authorized in-home nursing hours); II.D.4.–5. (requiring home health companies to pass reimbursements onto nurses, and incentivizing them to co-staff children's cases), II.F. (requiring 90-percent utilization upon discharge from a nursing home until the child turns 21), III.B.–G. (various changes to health plans' provision of care coordination, including training, reporting, complaint processes, and interaction with nursing-facility staff), IV.A. (initiation of individualized Transition Planning Process for all nursing-facility children), IV.C. (dictating contents of a Transition Plan, including information provided to parents, barriers to transition identified by parents, and measures taken to overcome those barriers), and VII.B. (requiring Florida to ensure no parent feels "pressured" to decline community-based services and prohibiting "retaliat[ion]").

Dr. Bachman did not mention any of these "accommodations" in her testimony. None of these accommodations was disclosed either in discovery or at trial. Even the 90-percent utilization mandate—the cornerstone of the injunction—was not mentioned at trial. The United States did not therefore meet its affirmative burden under *Olmstead* to establish the reasonableness of these accommodations through evidence presented at trial.

*Second*, in ordering accommodations that the United States first disclosed after a decade of litigation and a trial, the district court stripped Florida of its right to plead and prove a fundamental-alteration defense. In *Olmstead* cases, a defendant may assert, as an affirmative defense, that a proposed accommodation would fundamentally alter its services. 28 C.F.R. § 35.130(b)(7)(i); *Olmstead*, 527 U.S. at 603 (plurality opinion) (explaining that States may "resist modifications that entail a fundamental alteration of the States' services" (internal marks omitted)). Florida was denied any opportunity to rebut the injunction's chief remedy—the 90-percent utilization mandate—because the United States never proposed any utilization mandate in discovery or at trial. When a party is barred from presenting an affirmative defense, it is denied its fundamental right to be heard. *Nat'l Union Fire Ins. Co. of Pitt. v. City Sav.*, *F.S.B.*, 28 F.3d 376, 394 (3d Cir. 1994).

This result could have been avoided. Over the years, Florida repeatedly sought to discover the United States' proposed accommodations so that it could prepare a full

36

defense and avoid ambush at trial. T8B at 85:21–88:12; *accord* ECF No. 793 at 22–23; ECF No. 740 at 3–4, 6; ECF No. 739 at 6; ECF No. 703 at 12. Florida's fears were realized after trial, when the United States first disclosed the accommodations it *really* sought. Florida was deprived of the opportunity to present evidence in opposition to the reasonableness, effectiveness, or necessity of the undisclosed accommodations, or to establish as an affirmative defense that these new accommodations would be either infeasible or a fundamental alteration. Stunningly, despite the United States' decade-long record of strategic non-disclosure, the district court accused *Florida* of choosing to "lie in wait and present none of this defensive evidence" at trial. ECF No. 1178 at 6.

But the existence of a reasonable accommodation is an element of a plaintiff's claim. The plaintiff must plead and prove it. Once the accommodations are identified, the defendant may assert a fundamental-alteration defense. Until then, a defendant has nothing to respond to.

Through Dr. Bachman, the United States proposed various accommodations at trial, including increases to Medicaid reimbursement rates. Thus, Florida's evidence was directed to reimbursement rates. These accommodations were properly before the Court. After trial, however, the United States proposed a new set of accommodations. Florida had no chance to present evidence in opposition to these new accommodations.

Rather than reprimand the United States for evading disclosure and hiding the ball for ten years, the court signed the United States' injunction and blamed Florida's

failure to divine the accommodations the United States did not timely disclose. ECF No. 1170 at 67. It then concluded that Florida could not possibly have established a fundamental-alteration defense, even if the court had allowed it an opportunity to try. *Id*.

This was error. Because it first disclosed most of its proposed accommodations after trial, the United States failed to carry its burden. And if a plaintiff may propose one set of accommodations at trial and another after trial, then a fundamental-alteration defense is meaningless. A plaintiff then need only propose a limited accommodation at trial as a decoy, and then reveal its fundamental alterations after trial. The district court erred when it imposed accommodations that the United States saved for post-trial briefing.

## II.    THE DISTRICT COURT'S SYSTEMWIDE INJUNCTION IS AN INAPPROPRIATE REMEDY.

### A.    The United States Failed to Prove Widespread Unlawful Institutionalization.

Systemwide relief is inappropriate unless violations are "widespread," *Lewis v. Casey*, 518 U.S. 343, 349, 359 (1996), or "pervasive," *Doe 1–13 by & through Doe, Sr. 1–13 v. Chiles*, 136 F.3d 709, 722 n.23 (11th Cir. 1998). The district court identified only *seven* children who were ever admitted to nursing homes because of insufficient in-home nursing—or any other purported action or omission by Florida. ECF No. 1170

38

at 36–37. The district court erred in finding widespread unlawful institutionalization of children.

Seven instances do not establish widespread violations. *See Doe 1–13*, 136 F.3d at 722 n.23 (finding "hundreds, perhaps even thousands" of violations sufficient). Nor can the naked assumption that these few cases are generalizable to and representative of the entire population bridge the evidentiary gap and establish violations of the civil rights of 140 children in nursing homes and 2,750 children who live in the community.

The district court relied on data showing that most children who are authorized to receive in-home nursing in the community do not receive 100 percent of authorized hours. ECF No. 1170 at 34–36. But the evidence that this under-utilization of in-home nursing *causes* unlawful institutionalization was sparse, totaling seven instances. The United States' expert, Ms. Sisson, did not assess how many of the children who utilized less than all authorized in-home nursing were placed in nursing homes for any reason. T3 at 171:21–172:2. These few examples—out of the thousands who receive in-home nursing—are not enough to show widespread violations and entitlement to systemwide relief.

39

Without a causal link to unlawful institutionalization, the under-utilization of a Medicaid service does not prove an *Olmstead* violation. The United States brought this action to enforce the ADA—not the Medicaid Act.[5]

The district court nevertheless concluded 2,750 children who receive in-home nursing suffer *Olmstead* violations because their reliance on that service places them "at risk" of admission to nursing homes. ECF No. 1170 at 8–9, 34–35, 44–45, 79. But the record contains virtually no evidence about these children. It contains only seven spreadsheets showing that, for unknown reasons, and like similar populations in other States, most of these children utilized fewer than all authorized hours of in-home nursing. Pl.'s Exs. 2604–10. No evidence even remotely suggests that these children stand on the brink of institutionalization or need accommodations. Simply put, a spreadsheet showing a child's rate of utilization of in-home nursing does not establish an *Olmstead* violation—or even the "risk" of an *Olmstead* violation.

Nor does the ADA prohibit a "risk" of unlawful institutionalization. It prohibits unlawful institutionalization itself. *Olmstead*, 527 U.S. at 600 (concluding that "unjustified institutional isolation" is a "form of discrimination"). After all, a "risk" of future

---

[5] Even the Medicaid Act does not demand 100-percent accessibility of services. It requires Medicaid recipients to receive the same access to services that is available to the general population in the same geographic area. 42 U.S.C. § 1396a(a)(30)(A). The United States offered no evidence that, in the midst of a critical shortage of nurses, the general population has better access to in-home nursing than Medicaid recipients do.

injury does not present a case or controversy, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), and courts that have addressed Article III's intersection with *Olmstead* have recognized as much, *Bill M. v. Neb. Dep't of Health & Hum. Servs.*, 408 F.3d 1096, 1099 (8th Cir. 2005), *vacated on other grounds*, 547 U.S. 1067 (2006) (concluding that a "risk" of institutionalization "does not constitute an actual or imminent harm" under Article III); *Dykes v. Dudek*, No. 4:11-cv-00116-RS-WCS, 2011 WL 4904407, at *2–3 (N.D. Fla. Oct. 14, 2011) ("Plaintiffs are incorrect in their standing analysis to the extent that they claim that the threat of institutionalization confers standing."). Article III permits federal courts to redress only future injuries that are "imminent" or "certainly impending," *Clapper*, 568 U.S. at 409–10, or "real and immediate," *Shotz v. Cates*, 256 F.3d 1077, 1081–82 (11th Cir. 2001) (applying the real-and-immediate standard to a claim under Title II of the ADA). The United States offered no evidence that thousands of community-dwelling children would meet Article III's prerequisites. And even if a statute could confer a cause of action on plaintiffs who face only a "risk" of injury, nothing in Title II hints that Congress intended to do so. 42 U.S.C. § 12132.[6]

The district court's blanket finding that thousands of children suffer *Olmstead*

---

[6] In fact, the original drafts of Title II of the ADA contemplated suits by a person "who believes that he or she is being or *about to be subjected to discrimination*." H.R. 2273, 101st Cong. § 305 (1989); S. 933, 101st Cong. § 305 (1989) (emphasis added). Similar language exists in Title III as enacted, 42 U.S.C. § 12188(a)(1), but not in Title II.

violations based solely on service utilization rates expands *Olmstead* and Article III's case-or-controversy requirement beyond recognition. Article III exists to limit federal courts to their proper function and to prevent their adjudication of abstract disputes, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021), which is precisely what the district court did when it found that Florida violated the civil rights of 2,750 children.

Because the evidence did not reveal widespread unlawful institutionalization, it does not support systemwide relief.[7] This Court should therefore vacate the injunction.

### B.    The Injunction Is Overbroad and Offends Federalism Principles.

The injunction is a wildly overbroad and disproportionate response to the evidence presented at trial—especially in light of federalism principles. Any remedy must be tailored to the violation proven at trial. And when the defendant is a State, principles of federalism counsel strongly against overbroad and overbearing injunctions that are more expansive than strictly necessary. Here, the court found only seven children who had ever been admitted to nursing homes because in-home nursing was insufficient. It

---

[7] The same analysis applies to the district court's conclusion that Florida's care-coordination services cause widespread institutionalization. The record does not come close to supporting that finding; it does not identify a single child who was ever admitted to a nursing home because care coordination was ineffective. Moreover, the United States' challenge to care coordination was predicated on the alleged inadequacy or ineffectiveness of care coordination—a challenge that is not cognizable under the ADA. *Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006) (concluding that a challenge to a case manager's services is not cognizable under *Olmstead*). Just as the ADA does not permit a plaintiff to sue for a better doctor—or impose liability on a State when a doctor fails to make a diagnosis—it does not permit a plaintiff to sue for a "better" care coordinator.

exceeded the limits of permissible relief when it ordered 2,750 children to be provided with at least 90 percent of all authorized hours of in-home nursing; when it imposed new regulatory mandates on a broad array of state activities, such as care coordination, transition planning, and data collection; and when it installed an all-powerful monitor.

The ADA requires only "reasonable" accommodations. 527 U.S. at 581. It does not require States to "employ any and all means" within their power. *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004). The United States' own regulations recognize that Title II of the ADA compels only "reasonable modifications." 28 C.F.R. § 35.130(b)(7)(i). "Modify" means "to change moderately or in minor fashion." *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (quoting *MCI Telecommc'ns Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994)). There is nothing moderate or minor about the changes ordered by the district court; they sweep across the range of Medicaid program administration, from the provision of in-home nursing to care coordination, transition planning, and data collection. The injunction's requirements far exceed "reasonable modifications."

Remedies "should be limited to the inadequacy that produced the injury in fact that the plaintiff has established and no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (cleaned up). Here, that principle would require, at a minimum, tailoring any injunction—at most—to the seven children whom the district court found were institutionalized because of insufficient in-home nursing.

43

Yet the United States repeatedly disclaimed any intention to seek individualized relief, ECF No. 760 at 2–4; ECF No. 741 at 2; ECF No. 740 at 6, and the court accordingly seized control of Florida's administration of services to children with complex medical needs.

The injunction wholly ignores principles of federalism, which limit the scope of relief awarded against States. *Consumer Party v. Davis*, 778 F.2d 140, 146 (3d Cir. 1985). Such relief may "intrude into state affairs no more than is absolutely necessary," *Morrow v. Harwell*, 768 F.2d 619, 628 (5th Cir. 1985), and must "be narrowly tailored to enforce federal constitutional and statutory law only," *Clark v. Coye*, 60 F.3d 600, 603–04 (9th Cir. 1995). Courts "should refrain from micromanaging the state and its agencies." *United States v. Missouri*, 535 F.3d 844, 851 (8th Cir. 2008). Orders that "bristle with interpretive difficulties and invite protracted federal judicial supervision" of state functions must "be reserved for extreme cases of demonstrated noncompliance with milder measures. They are last resorts, not first." *ACORN v. Edgar*, 56 F.3d 791, 798 (7th Cir. 1995).

In *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court invoked federalism principles to disapprove a broad injunction like the one at issue here. In *Rizzo*, the district court identified a "statistical pattern" of misconduct by Philadelphia police, *id*. at 375–76, and ordered expansive relief that it believed had the "potential for prevention" of future misconduct, *id.* at 366 (quoting *Goode v. Rizzo*, 506 F.2d 542, 548 (3d Cir. 1974)). The

Supreme Court reversed. It noted the absence of any evidence that the statistical pattern was unique to Philadelphia. *Id.* at 375. It emphasized that "important considerations of federalism" weighed against broad relief and that "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Id.* at 378–79.

Here too, the court below relied on a statistical pattern of service utilization rates and ordered comprehensive relief that it believed had the potential for prevention of unlawful institutionalization. But it ignored evidence that a national nursing shortage places all States in the same position and accorded no weight to federalism principles.

The injunction not only encumbers Florida's programs with onerous mandates found nowhere in federal law, but also coerces Florida into seeking appropriations for a rate increase in hopes that higher rates will enable Florida to achieve the 90-percent mandate during a national nursing shortage. While the district court claimed that the injunction does not require Florida to increase its reimbursement rates, ECF No. 1170 at 72 ("Nothing in my injunction requires Florida to seek appropriations to achieve this goal."), it does, indirectly. The *only* means that the court found would be effective in increasing utilization of in-home nursing is higher reimbursement rates. ECF No. 1170 at 17–18, 38–39, 63. But increased rates require legislative appropriations, T6 at 198–99, 208–209; T7A at 68–69, 76–91, 96–98; T8 at 68–70, 144, 146, 148; ECF No. 1170 at n.53; ECF No. 925 at 10–11, and a federal court may not order a legislature to enact

45

legislation. *Smith Lee Assocs.*, *Inc. v. City of Taylor*, 102 F.3d 781, 796–97 (6th Cir. 1996). So the district court ordered a goal—90-percent utilization—that is unachievable without new appropriations. It sought to do indirectly what it could not do directly. In doing so, it failed to accord appropriate weight to sensitive questions of federalism. *See Horne v. Flores*, 557 U.S. 433, 448 (2009) ("Federalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities."); *Olmstead*, 527 U.S. at 612 (Kennedy, J., concurring) ("No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities."); ECF No. 868 at 44–45 (explaining that courts in *Olmstead* actions are cautious to avoid interference with state budgets and state budget priorities).

The district court's imposition of an all-powerful, state-funded monitor further degrades Florida from its proper station in a well-balanced system of federalism. The court empowered the monitor to oversee all aspects of Florida's efforts to comply with the injunction and to hire a team of staff and consultants at Florida's expense. ECF No. 1171 at 9. It authorized the monitor to communicate ex parte with the parties and then with the court. *Id*. It granted the monitor "full access to persons, employees, facilities, buildings, programs, services, documents, records, and any other materials." ECF No. 1188. And it directed the monitor to submit written reports every two months and to make recommendations for future court action. ECF No. 1171 at 10. The injunction's monitor provisions reduce Florida to federal management—in disregard of federalism.

46

In a parallel *Olmstead* action, Georgia has paid a monitor the breathtaking sum of $3.3 million (and counting) over 13 years. Dkt., *United States v. Georgia*, No. 1:10-cv-00249 (N.D. Ga.).

Because equitable principles and federalism condemn the district court's broad injunction, the injunction should be vacated.

### C.    The Injunction's Cornerstone Provision Does Not Prescribe Objective Actions, But an Arbitrary and Unachievable Performance Goal.

The United States failed to establish that the injunction's principal remedy—an arbitrary 90-percent utilization mandate for all 2,750 children who receive in-home nursing—is even achievable. The record is replete with evidence of a nursing shortage. And even apart from the shortage, as Dr. Bachman recognized, there are many reasons why children do not receive all authorized hours of in-home nursing. Yet the injunction fails to specify the objective actions that Florida must take to achieve compliance with the 90-percent utilization "goal." ECF No. 1170 at 72. An injunction that, without evidence of achievability, sets a goal but does not require objective actions violates Rule 65.

"An injunction should clearly let the defendant know what he is ordered to do or not do and should be phrased in terms of objective actions . . . ." *United States v. Askins & Miller Orthopaedics*, *P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) (quoting *SEC v. Globe*, 682 F.3d 934, 950 (11th Cir. 2012) (internal marks omitted)). Thus, in

*Hughey v. JMS Development Corp.*, 78 F.3d 1523 (11th Cir. 1996), this Court vacated an injunction that mandated an outcome—stop stormwater discharges—but "failed to specify how" the defendant could or should achieve that goal. *Id.* at 1531–32 (emphasis added). This failure "to specifically identify the acts [the defendant] was required to do or refrain from doing" indicated that the district court "was incapable of fashioning an operative command capable of enforcement." *Id.* In vacating the injunction, this Court emphasized that the acts an injunction compels must be achievable. *Id.* at 1532 ("The injunctive relief issued by the district court . . . was improper [because] compliance with its terms was impossible."); *accord Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007) (reversing an injunction to the extent it imposed obligations not within the defendant's "power to perform"); *NLRB v. Bell Oil & Gas Co.*, 98 F.2d 405, 406 (5th Cir. 1938) (noting that mandatory injunctions "should not be hedged about by conditions and qualifications which cannot be performed").

Like the district court in *Hughey*, the court below ordered Florida to achieve 90-percent utilization amid a nationwide nursing shortage, without proof of achievability or specification of objective actions that Florida must take. The omission is especially problematic because the achievement of a 90-percent utilization rate depends on many variables beyond Florida's control: a national nursing shortage and countless decisions

of parents and private providers, such as nurses and home health agencies, throughout the State.

The United States presented no evidence that 90-percent utilization is feasible and never explained how it arrived at the 90-percent figure. Nor could it have. The 90-percent figure is wholly arbitrary—it is based on no data or analysis—and the nursing shortage is real. The district court and the United States both recognized its existence. T5 at 237:14–20; T9B at 51:24–25. Florida's expert, Dr. Letourneau, testified that the shortage is national in scope and affects the entire healthcare industry. T8B at 104:3–127:13. Hospitals and nursing homes struggle to find nurses. T8B at 114:13–21, 248:9–18. Another expert, Gary Jessee, testified that the average utilization rate for one home health agency that does business in seven states is below 70 percent. T8A at 42:10–25. In contrast, Dr. Bachman had no information about utilization rates in other States, T4 at 178:14–180:6, and did not evaluate whether her proposed "accommodations" would increase service utilization at all, T4 at 190:1–4, 192:7–12, 193:16–19, 195:24–196:4.

A 90-percent utilization mandate is tantamount to an mandate to overcome the nursing shortage. No State has done so. The United State offered no evidence that 90-percent utilization has ever been achieved anywhere, let alone during a critical nursing shortage. And even apart from the nursing crisis, 90-percent utilization for *each* child will never be achieved. Dr. Bachman agreed that *many* reasons account for the under-utilization of in-home nursing. T4 at 171:12–173:14. These reasons are case-specific

49

and diverse, *see supra* pp. 3–4, 9–10, 24, and no evidence suggests they can be over-come as to all 2,750 children.

Neither Dr. Bachman nor the United States attempted to determine why children do not utilize all authorized hours—or the extent to which different reasons account for the under-utilization of in-home nursing. T3 at 168:3–19; T4 at 171:12–173:14. Dr. Bachman acknowledged that, without this information, it is impossible to evaluate the effectiveness of any remedy intended to increase utilization, confirming the absence of any evidence that the 90-percent utilization mandate is achievable. T4 at 191:1–192:12.

The district court found that higher reimbursement rates would attract nurses to home health and increase service utilization, ECF No. 1170 at 17–18, 38–39, 63, but it did not find that higher rates would increase utilization to 90 percent. Nor can a court order the enactment of legislation, which increased rates would require. *See supra* Part II.B.

Apart from rate increases, the injunction suggests two possible tools: to enhance network-adequacy standards and offer undefined incentives for home health agencies to staff cases jointly. ECF No. 1171 ¶ II.D.3. & 5. Setting aside the vagueness of these suggestions, the district court made no finding that they would be effective—and the record furnishes no such evidence. Dr. Bachman did not assess whether enhanced net-work-adequacy standards would increase utilization of in-home nursing and could not identify any State that had employed network-adequacy standards for that purpose. T4

at 195:24–196:4, 198:6–10. And Dr. Bachman said nothing about incentives for home health agencies, which the United States first proposed after trial. ECF No. 914-1 at 5.

Rather than order clearly defined objective actions, the district court established an arbitrary performance measure without evidence of achievability. It erred in doing so.

## III. THE UNITED STATES LACKS AUTHORITY TO ENFORCE THE RIGHTS OF CHILDREN WHO NEVER INITIATED THE ADA'S ADMINISTRATIVE ENFORCEMENT PROCESS.

In an earlier appeal, this Court concluded that, while not mentioned in Title II, a federal enforcement action is among the remedies that Title II confers on individuals who file administrative complaints with the United States to enlist the United States' aid. *United States v. Florida*, 938 F.3d 1221, 1234–35, 1239–42 (11th Cir. 2019). While this Court is bound by the prior panel's decision, Florida reaffirms and preserves for review its contention that Congress did not authorize the United States to enforce Title II.

But even if Congress conferred that authority, it did not grant the United States an unbounded, freestanding right to enforce the rights of thousands of children. Central to this Court's conclusion that the United States may enforce Title II was an administrative enforcement process that begins when an aggrieved individual files an administrative complaint with the United States to invoke its assistance in the vindication of his or her rights. This Court did not hold that, once an individual files an administrative

complaint, the United States has unfettered discretion to enforce the rights of countless other individuals who never initiated the enforcement process. *See id*.; *United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 733 (11th Cir. 2021) (J. Pryor, J., respecting denial of rehearing en banc) (explaining that the administrative enforcement process "may culminate in suit by the Attorney General on the person's behalf").

Here, only one child (C.M.) whose rights the United States purports to enforce ever filed an administrative complaint, T5 at 241:14–243:1; ECF Nos. 881-1, 1122-12, and this Court resolved his claim in a separate proceeding four years ago, *A.R. v. Sec'y Fla. Agency for Health Care Admin.*, 769 F. App'x 718 (11th Cir. 2019). To permit the United States to parlay that one complaint—which has been resolved—into an action to enforce in perpetuity the rights of thousands of children who never enlisted the aid of the United States would expand the United States' authority far beyond this Court's rationale in the earlier appeal. Nor does the bundle of remedies that the ADA confers on C.M. include a federal enforcement action to vindicate the rights of other children. Because the ADA does not grant the United States *carte-blanche* enforcement powers, but rather tethers its enforcement authority to an administrative enforcement process, the United States cannot enforce the rights of children who never invoked that process.

Title II confers only personal rights; it does not create any cause of action, such as a pattern-or-practice claim, with an aggregate or systemwide focus. To hold that the United States may enforce the rights of *any and all* children whenever it receives *one*

administrative complaint would conflict with this Court's prior decision. Even if it may enforce Title II, the United States may not extend that power to the boundless scope of this action.

## <u>CONCLUSION</u>

This Court should reverse the district court's judgment and vacate its injunction.

Dated September 18, 2023.                    Respectfully submitted,

/s/ *Andy Bardos*

Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
James Timothy Moore, Jr. (FBN 70023)
tim.moore@gray-robinson.com
Ashley H. Lukis (FBN 106391)
ashley.lukis@gray-robinson.com
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090
*Attorneys for Appellant, the State of Florida*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), undersigned counsel certifies, in reliance on the word count of the word-processing system used to prepare this document, that this document contains 13,000 words and therefore complies with the type-volume limitation set forth in Federal Rule of Appellate Rule 27(d)(2).

Undersigned counsel further certifies that this document was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font and therefore complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.

54