# GRAYROBINSON

Andy Bardos | andy.bardos@gray-robinson.com | **D** 850-577-6959
301 South Bronough Street, Suite 600, Tallahassee, Florida 32301 | **T** 850-577-9090 | **F** 850-577-3311

September 21, 2023

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

      Re:    Citation of Supplemental Authority
              *United States of America v. State of Florida*
              No. 23-12331-B (11th Cir.)

Dear Mr. Smith:

      Florida respectfully submits *United States v. Mississippi*, No. 21-60772 (5th Cir. Sept. 20, 2023), as supplemental authority in support of its Motion to Stay, D.E. 16-1 at 16–19, and its Brief, D.E. 22 at 54–61.

      *Mississippi* is a parallel *Olmstead* action brought by the United States. There, as here, the district court issued a systemwide injunction that imposed prescriptive mandates and a monitor on state programs. As here, the district court endorsed the United States' theory that thousands of individuals are "at risk" of institutionalization—and that a mere "risk" of unlawful institutionalization violates the ADA. As here, the district court found that the entire relevant population satisfies the first two *Olmstead* elements, and treated the reasonable-accommodation element as a warrant to redesign state programs without regard to individualized circumstances. Op. at 17–18.

      The Fifth Circuit reversed. *First*, it emphasized that the ADA protects individual rights and criticized the district court's attempt to adjudicate "en masse" thousands of *Olmstead* claims, despite their "patient-specific" elements. *Id.* at 11–16, 19.

      *Second*, it rejected the "vague and standardless" theory that a "risk" of institutionalization is itself a cognizable injury. *Id.* at 19. "Nothing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination." *Id.* at 7. The court concluded that *future* unlawful institutionalization is actionable only when Article III's prerequisites for relief from future injuries are satisfied. *Id.* at 17.

Boca Raton | Fort Lauderdale | Fort Myers | Gainesville | Jacksonville | Key West | Lakeland
Melbourne | Miami | Naples | Orlando | Tallahassee | Tampa | Washington, D.C. | West Palm Beach

**gray-robinson.com**

*Third*, the injunction's systemwide, programmatic focus made clear that the United States' claim was, at bottom, a demand for more funding, which the ADA does not permit. *Id.* at 19.

*Fourth*, the court rejected the injunction as overbroad and contrary to federalism principles. "Sweeping institution-wide directives like those at issue here," the court observed, "are never 'narrowly tailored' to remedy individual instances of discrimination." *Id.* at 23. The injunction far exceeded a permissible scope.

Here, the district court erred for the same reasons: it relied on the meritless "risk" theory to mass-adjudicate the rights of thousands of children and impose systemwide changes untethered to individualized circumstances.

Sincerely,

/s/ *Andy Bardos*

Andy Bardos

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2023

Lyle W. Cayce
Clerk

---

No. 21-60772

---

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

THE STATE OF MISSISSIPPI,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:16-CV-622

---

Before JONES, SOUTHWICK, and HO, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

Title II of the Americans with Disability Act ("ADA") prohibits "discrimination" against "qualified individual[s] with a disability." 42 U.S.C. § 12132. The Act authorizes "any *person* alleging discrimination" to sue. 42 U.S.C. § 12133 (emphasis added). The United States filed suit against the state of Mississippi, alleging that its entire mental health care system violated the "integration mandate" prescribed by 28 C.F.R. § 35.130(d) and reified in the Supreme Court's decision, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S. Ct. 2176 (1999). The district court conducted a trial, upheld the federal government's novel theory of liability,

No. 21-60772

and ordered not only sweeping modifications to the state's system but also the indefinite appointment of a monitor who, along with the federal government and the court itself, would all oversee the system. This novel plan of reconstruction fails on many levels. We REVERSE.

## I.

In February 2011, the United States commenced an investigation of Mississippi's mental health system.[1] This investigation was not prompted any individual instance of discrimination against a person with serious mental illness.[2]

During its investigation, the United States researched several facets of the Mississippi mental health care system. The investigation included interviews with state leaders, employees of community mental health centers, and disabled persons. Various reports were prepared comparing Mississippi's use of community-based services relative to other states' programs.

In December 2011, the United States Department of Justice notified Mississippi that its investigation revealed the state was "unnecessarily institutionalizing persons with mental illness" in violation of the ADA. The letter of findings outlined the steps necessary for Mississippi to meet criteria set out by the Department of Justice. In August 2014, Mississippi replied to the United States in writing and outlined the steps it had taken to comply

─────────────────────

[1] *See* http://www.msh.state.ms.us/DOJ_update.pdf (Aug. 15, 2011).

[2] It is unclear why the federal government's investigation was initiated. Nothing in the record supports the United States' statement in its complaint that it launched the investigation because of a report of discrimination. In any event, the federal government investigated the entire Mississippi mental health system, not the institutionalization or treatment of any individual.

No. 21-60772

with the recommendations. Nonetheless, the United States determined that voluntary means were insufficient to secure compliance. In August 2016, Mississippi was notified that a lawsuit would be filed against the state under the ADA and CRIPA.[3]

As with its investigation of Mississippi, the United States' suit was not based on individual instances of discrimination. Rather, the federal government charged that due to systemic deficiencies in the state's operation of mental health programs, every person in Mississippi suffering from a serious mental illness was *at risk* of improper institutionalization in violation of Title II.

To prove its claims, the United States chartered a study with a group of six outside experts comprising two psychiatrists, a clinical social worker, a psychologist, a nurse, and an occupational therapist. A statistician helped, too. The experts interviewed 154 individuals from a pool of 3,951 Mississippians who had been admitted to state hospitals at least once during a two-year period from 2015–17. [4] Based on the interviews and a review of each interviewee's hospital and outpatient records, the experts answered four questions for each interviewee:

1. Would this patient have avoided or spent less time in the hospital if reasonable community-based mental health services had been available?
2. Is this patient at serious risk of further or future hospitalization in a state hospital?

-----

[3] Neither the DOJ nor district court relied on CRIPA as a basis for liability, and we do not discuss that statute further.

[4] Twenty-eight individuals were in state hospitals when the experts interviewed them in 2018.

No. 21-60772

3. Would this patient be opposed to receiving reasonable community-based services?
4. What community-based services are appropriate for and would benefit this patient?

These experts concluded that each interviewee would have avoided, or spent less time in, a state hospital if he or she had been provided reasonable community-based services. The experts further found that of the 122 persons not living in an institution during their interviews in 2018, 103 (85%) were at "serious risk" of being sent back to an institution. Of the 150 persons still living, 149 were not opposed to receiving community-based care. Moreover, based on solicited descriptions of community-based mental health services, the experts found that the people in the sample inadequately utilized community-based mental health services from Mississippi. The experts additionally observed what they called a pattern of "cycling admissions," whereby about half of the 5,070 state hospital admissions from 3,951 patients were repeat.

On September 3, 2019, following a four-week bench trial, the district court held that Mississippi's entire mental health system violated Title II of the ADA because it placed every person with a severe mental illness at risk of unjustified institutionalization. *United States v. Mississippi*, 400 F. Supp. 3d 546, 579 (S.D. Miss. 2019).[5] The district court found that "Mississippi has relatively more hospital beds and a higher hospital bed utilization rate than most states." *Id*. at 564. And the study, which the court considered against the test established by a plurality of the Supreme Court in *Olmstead*,

---

[5] The court was unconcerned that this case was filed by the United States rather than any affected individual plaintiff, as it held the federal government had "standing" to sue.

No. 21-60772

527 U.S. 581, 119 S. Ct. 2176, showed that "Mississippi's system of care for adults with [serious mental illness] violates the integration mandate of the ADA." *Id.* at 576. The district court considered and rejected Mississippi's defense that requiring the state to expand access to its existing community-based services would "fundamentally alter" its mental health system. *Id.* at 576–77.

The court did not immediately enter a remedial order. Instead, it appointed a special master to assist the court and the parties in attempting to reach a settlement. For two years, the parties negotiated, while Mississippi increased the availability of its community-based programs.

Eventually, when pressed by a court order, the parties and the special master each submitted a proposed remedial plan. On July 14, 2021, after a hearing, the district court adopted the special master's proposed remedial plan. In September 2021, the district court issued a remedial injunctive order, appointed a monitor, and entered a final judgment.

The seven-page remedial order begins with this broad mandate: "the State of Mississippi must develop and implement effective measures to prevent unnecessary institutionalization in State Hospitals." The order mainly tasks Community Mental Health Centers with implementing this mandate by identifying those with serious mental illness, screening them, coordinating their care, and diverting them from unnecessary hospitalization.

The district court's order, *inter alia,* dictates the quantity of community-based mental health services, how the mental health agencies should implement them, and outlines several policy priorities the agencies should follow. The order requires the state to fund certain programs, mandates staff increases and budget add-ons, and even seeks influence over state chancery courts.

No. 21-60772

Ostensibly to track Mississippi's compliance, the order requires monthly and annual reports and quarterly hearings. Mississippi must post various data on a publicly available website and submit them to the DOJ and the court-appointed monitor. On top of all these specific measures, Mississippi must create an "implementation plan" with input from the Department of Justice and the monitor.

The remedial order terminates only when Mississippi "has attained substantial compliance" with each paragraph of the seven-page order and "maintain[ed] that compliance for one year as determined by this Court." Mississippi contends it has substantially complied with the court's original liability order. The United States withdrew its response to the state's showings.

Mississippi moved for partial stay of the order pending appeal without opposition. The district court granted the motion. This appeal followed.

## II.

This court reviews the district court's findings of fact for clear error and legal determinations de novo. *See Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 606 (5th Cir. 2020). "When, as here, a court's factual finding 'rest[s] on an erroneous view of the law', its factual finding does not bind the appellate court." *Aransas Project v. Shaw*, 775 F.3d 641, 658 (5th Cir. 2014) (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S. Ct. 1781, 1789 (1982)).

## III.

Mississippi contends that (1) the federal government has not proved a cause of action for discrimination in violation of the ADA; (2) the court erred in rejecting its defense that remediation pursuant to the federal government's claim would require an impermissible "fundamental alteration" of its

No. 21-60772

existing programs, 28 C.F.R. § 35.130(b)(7)(i); and (3) the court's remedial order vastly exceeds the scope of claimed liability. Finding merit in the first and third contentions, we need not address the second.[6]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Pursuant to this provision, a seminal "integration mandate" appears in the regulation that requires a "public entity [to] administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). In a case brought by two people then institutionalized for mental illness who sought to be discharged to community care facilities, the Supreme Court explored the contours of these rules. For present purposes, it suffices to state that according to *Olmstead,* "discrimination" occurs when an individual is "unjustifi[ably]" institutionalized and thereby denied the benefit of the most "integrated setting" available in the community for which the state's treating professionals deem him suited. *Olmstead*, 527 U.S. at 599–600, 119 S. Ct. at 2187.

Nothing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a *risk of institutionalization,* without actual institutionalization, constitutes actionable discrimination. Yet the district

---

[6] The Eleventh Circuit recently debated at length, on denial of rehearing en banc, whether the federal government has any authority under Title II to sue a state, where the statute confers a cause of action only on *any person* alleging disability discrimination. 42 U.S.C. Sec. 12133. *See United States v. Sec'y., Florida Agency for Health Care Admin.,* 21 F.4th 730 (11th Cir. 2021). The court approved the panel decision holding in the affirmative. *United States v. Florida,* 938 F.3d 1221 (11th Cir. 2019). That difficult issue is not presented to us on appeal.

No. 21-60772

court, following the lead of the federal government, premised the state's liability under Title II on a study conducted by an outside team of experts that suggested all citizens suffering from serious mental illness were "at risk" of being institutionalized unjustifiably. *Mississippi*, 400 F. Supp. 3d at 549. And the supporting survey covered only 154 people out of a population of about 4,000 institutionalized in a two-year period.

The federal government defends the district court's bold ruling legally by reference to its interpretation of the statute and regulations, *Olmstead*, and the decisions of other courts. We will discuss its arguments in turn.

Preliminarily, however, the federal government contends as appellee that its case is not based on the "risk" of institutionalization but on the state system's repeated "cycling" of mentally ill patients in and out of state hospitals. Such "cycling," it contends, constitutes discrimination because it causes periodic, unjustified segregation of the affected individuals from their communities in the absence of adequate local treatment programs. But the district court embedded "cycling" in its discussion of the "risk of institutionalization," and that description of the claim is more accurate. If a mentally disabled person is not currently institutionalized (as was the case with over 80% of the individuals surveyed), he is not separated from the community, even though he may have previously been in a state hospital. There is at best a "risk" that he will be re-committed. This "risk" is the bedrock of the government's claim at trial and the district court's ruling.

As noted, the ADA does not define discrimination in terms of a prospective risk to qualified disabled individuals. In stating that no individual shall be "excluded," "denied," or "subjected to discrimination," the statute refers to the actual, not hypothetical administration of public programs. 42 U.S.C. § 12132. Similarly, the integration mandate does not speak to "risks" of maladministration. Nevertheless, the first court of

No. 21-60772

appeals that enabled an "at risk" theory of disability discrimination found the language of the statute no barrier. *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). It concluded that neither the statute nor the regulation "prohibited" a claim that a state's reduction of plaintiffs' drug benefits would place them "at risk" of being institutionalized as the only remaining means to obtain medications. *Id.* at 1181–82.[7] This reasoning gets statutory interpretation exactly backwards. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93–100 (2012) (describing the omitted-case canon). Courts must follow the language Congress has enacted; we may not enhance the scope of a statute because we think it good policy or an implementation of Congress's unstated will. *Id.* Thus, "at risk" claims of ADA discrimination are not within the statutory or regulatory language.

Further, a theory framed on the "risk of unjustified institutionalization" is particularly inapt in the face of Mississippi's legal regime for commitment to hospitals for the mentally disabled. The only way to be admitted to a state mental health hospital in Mississippi is through a judicial commitment proceeding. The chancery court renders its decision after a hearing and evaluation by a court-appointed physician, a medical doctor, and a psychologist.[8] *See generally C.W. v. Lamar Cnty.*, 250 So. 3d

---

[7] Other courts have latched onto this reasoning. *See Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426 (6th Cir. 2020); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004); *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016); *M.R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012).

[8] The chancery court must decide whether clear and convincing evidence exists that the individual is a person with a mental illness or intellectual disability. Miss. Code Ann. § 41-21-73(4), § 41-21-61(f) and § 41-21-61(g). The court must also determine if institutionalization is the least restrictive means to meet the patient's needs, § 41-21-73(4),

No. 21-60772

1248, 1251 (Miss. 2018). After commitment, the director of the commitment facility can discharge the individual upon certifying to the court that the patient no longer poses a substantial threat to himself or others, that the patient may be treated in a less restrictive environment, or that adequate facilities or treatment are unavailable. Miss. Code. Ann. § 41-21-87. The individual himself can move for discharge through a petition for writ of habeas corpus. § 41-21-89. The "least restrictive environment" for and individual's treatment is a significant component of these statutes. This carefully crafted structure—ignored by the district court and the federal government—makes it hubristic for a federal court to predict the "risk" that an "unjustified" civil commitment process will commence against any individual, much less that the decisions either to institutionalize or discharge would ultimately be discriminatory under the ADA.[9]

The federal government and the district court also purport to rely on a guidance document originally adopted by the DOJ in the wake of *Olmstead,* which asserted that the "serious risk of institutionalization" is sufficient to establish an ADA claim. U.S. Dep't of Justice, Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and *Olmstead v. L.C.*, https://www.ada.gov/olmstead/q&a_olmstead.htm. This argument fails entirely. In its own terms, the guidance was "not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified . . . ." *Id. See also Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C.

---

list each alternative disposition and explain why they are unsuitable, § 41-21-73(6), and state its facts and conclusions of law, § 41-21-73(6).

[9] The district court  agreed that this was a "valid point," but failed to address its ramifications, noting only that the state could nonetheless "advocate for a change in the commitment process and secure state hospital clinicians a right to appeal." *Mississippi*, 400 F. Supp. 3d at 572 n.34.

No. 21-60772

Cir. 2007) (Non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding."). The guidance never underwent notice and comment under the APA to become a binding regulation. As Judge Readler persuasively explained, it is too late in the day for courts to hold that any agency guidance document is owed *Auer* deference. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 470 (6th Cir. 2020) (Readler, J. concurring in part and dissenting in part). On the contrary, the Supreme Court recently made plain that "the possibility of deference [to an agency's interpretation of its own regulation] can arise only if a regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). As a result, several court decisions that upheld such claim largely based on the guidance document have been superseded by *Kisor*.[10]

For a number of reasons, the *Olmstead* decision supplies no basis for an at-risk claim like that litigated en masse in this case.[11] Considering the text of Title II and the integration mandate, the Supreme Court held that "unjustified isolation" of an individual in an institution could constitute discrimination under the ADA and the integration mandate. 527 U.S. at 587, 119 S. Ct. at 2181.[12] But the case is significantly different on its facts. The *Olmstead* plaintiffs had been voluntarily institutionalized in Georgia for mental disabilities, but although each of their treating physicians had recommended their release to community care facilities, the state failed to

---

[10] *See Steimel*, 823 F.3d at 911; *Davis*, 821 F.3d at 263; *Pashby*, 709 F.3d at 322; *Dreyfus*, 663 F.3d at 1117–18.

[11] Justice Kennedy's concurrence in the judgment on narrower grounds supplied the judgment's fifth and controlling vote. *See Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977).

[12] The petitioner did not challenge, and the Court did not address, the validity of the Attorney General's regulations. *Olmstead*, 527 U.S. at 592, 119 S. Ct. at 2183.

No. 21-60772

release them.  Here, not one individual's treating physician testified about the "justifiability" of that person's past institutionalization,[13] much less a "risk" that the person would be "unjustifiably institutionalized" in the future.    The *Olmstead* case turns on actual "unjustifiable institutionalization," not on hypothetical future events.  On that score alone, *Olmstead* does not support the federal government's theory of the case.

*Olmstead* also bears scrutiny because Justice Kennedy's special concurrence supplied the decisive fifth vote for the judgment. Justice Kennedy did not disapprove the plurality's three-part test for discrimination on the basis of "unjustifiable isolation."  The three-part test asks whether (1) "the State's treatment professionals have determined that community placement is appropriate" for the individual;[14] (2) the "affected individual" agrees with the treating professional's recommendation for community care; and (3) the reasonableness of mandating an accommodation, "taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 587, 119 S. Ct. at 2181.  A claim of system-wide risk of institutionalizing some

---

[13] As to the individuals covered by the federal government's expert survey who were institutionalized at the time of suit, there was also no opinion from a state or treating physician about them.

[14] *See also Olmstead,* 527 U.S. at 602, 97 S. Ct. at 2188 ("[T]he State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program."); *Id.* at 610, 2192 (Kennedy, J. concurring); *cf. Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022) (finding no clear error at the preliminary injunction stage for the district court to consider the opinion of plaintiff's doctors when evaluating the state professional's credibility).

No. 21-60772

unspecified group of patients is incompatible with these factors, the first two of which are necessarily patient-specific.[15]

But Justice Kennedy's views on the first prong of the test emphasize the plurality's quotation that "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." *Id.* at 581, 2191 (internal citation omitted).  Justice Kennedy rightly observes that "for a person with severe mental illness who has no treatment the most dreaded of confinements can be the imprisonment inflicted by his own mind . . . ." *Id.* at 610, 2191.  He goes on:

> It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act of 1990 (ADA) to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision.  The opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference. . . . Justice GINSBURG's opinion takes account of this background. . .

> It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers.

*Id.* at 610, 2191–92.

---

[15] Indeed, the experts' conclusion that the surveyed individuals who were *not* then institutionalized "agreed" they would prefer community-based services proves very little.

No. 21-60772

On the third *Olmstead* factor, as the plurality noted, the ADA does not "require[] States to provide a certain level of benefits to individuals with disabilities" or impose on "States a 'standard of care' for whatever medical services they render." *Id.* at 603 n.14, 2188 n.14 (internal quotation marks and citations omitted); *Id.* at 597, 2185 (reiterating that it "recognize[s] . . . the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand"). Justice Kennedy added that, "[g]rave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs." *Id.* at 612-13, 2193 (Kennedy, J., concurring).

Together, Justice Kennedy's concurrence and the plurality opinion acknowledge how hard it is to assess and provide "appropriate" treatment with an "even hand" toward all beneficiaries of mental health care in systems with finite resources. Because *Olmstead*'s facts produced a facially easy, individualized case for discrimination under the Court's test, it is difficult to extrapolate to the institution-wide challenges levied by the federal government against Mississippi's system. Without further parsing these complex opinions, however, a couple of relevant conclusions present themselves. Justice Kennedy emphasizes the importance of obtaining treating or state physicians' opinions for each individual, and the federalism costs inherent in federal courts' second-guessing or overseeing states' allocation of resources. The plurality emphasizes that the regulation promoting "reasonable modifications" of services means "reasonable." Federal courts must tread lightly when evaluating a claim of "unjustified isolation" of the mentally disabled.

The state is thus correct in contending that *Olmstead* cannot support a mandate for court-superintended institution-wide changes based on the

No. 21-60772

"risk of institutionalization" from a survey "generalizing" from about 150 mentally ill individuals to a group of nearly 4,000.[16]    Although "generalizations" drawn from a patient survey may be relevant to a state in assessing its own programs, they do not suffice to prove that individuals suffered "unjustified isolation" en masse.    But the district court and the federal government extended *Olmstead* in reliance on decisions from a number of circuits.    Are all those cases wrong?    We need not say, because they are all distinguishable or unreliable legally.

All of the previous "at risk" cases consider plaintiffs' individual or class claims for personal care services or medically necessary items pursuant to Medicaid.    Various plaintiffs alleged that changes to state programs might cause recipients to be deprived of subsidized personal care providers,[17] or drug prescriptions,[18] or items required for mobility,[19] and they might find themselves "at risk" of institutionalization.    Not one of these cases was brought by the federal government with the intent of completely reworking state benefit programs.    And tragic as some of these fact patterns may be, none involved the difficult questions about "appropriate" individualized mental health treatment that were discussed in *Olmstead* and that are present here.    Likening those cases factually to the present case involves a category error:    what a physically disabled person needs to maintain life and health is

---

[16] In fact, while the United States' study included twenty-eight individuals in state hospitals, this suit was not commenced based on any instances of discriminatory treatment in contravention of Title II, nor was individualized proof of "unjustified isolation" offered.

[17] *Pashby*, 709 F.3d at 313; *Waskul*, 979 F.3d at 435; *Radaszewski*, 383 F.3d at 600; *Steimel*, 823 F.3d at 906; *Dreyfus*, 663 F.3d at 1102.

[18] *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1177–78 (10th Cir. 2003).

[19] *Davis*, 821 F.3d at 242.

Case: 21-60772    Document: 146-1    Page: 16    Date Filed: 09/20/2023
USCA11 Case: 23-12331    Document: 24    Date Filed: 09/21/2023    Page: 18 of 29

No. 21-60772

not subject to the unpredictable and varied symptoms and needs of a patient who manifests serious mental illness. The consequences of providing personal care services for eight hours a day versus twenty-four hours, or providing or withholding compression stockings, as in some of the former cases, are susceptible of quantification and indeed, generalization. "Appropriate" treatment of those with serious mental illness, as *Olmstead* clearly understood, must be individualized. Thus, even if there is a bona fide claim for Title II disability discrimination based on a "risk of isolation" despite the absence of explicit statutory or regulatory support, these other cases are significantly factually distinguishable.

Legally, nearly all of the cases rely heavily, but mistakenly, on the DOJ guidance promoting "at risk" Title II discrimination claims.[20] *See Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016) (applying the pre-*Kisor* standard to defer to the DOJ's guidance document); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) (same) (DOJ's guidance interpreting the integration mandate "is controlling unless plainly erroneous or inconsistent with the regulation" (internal quotation marks omitted))[21]; *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("[W]e are especially swayed by the DOJ's determination that 'the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings.'" (quoting the guidance

---

[20] The one case the district court cited that does not rely on the nonbinding guidance holds, with little elaboration, that "there is nothing in the plain language of the regulations that limits protection to persons who are currently institutionalized." *Fisher*, 335 F.3d at 1181. As explained previously, this reasoning is at odds with sound statutory interpretation. Title II unambiguously covers only those "subjected to discrimination by any such entity," not those who might be at risk of that discrimination.

[21] Pursuant to *Kisor*, 139 S. Ct. at 2414, there is no question that the guidance *extends,* rather than *enforces* the otherwise unambiguous statute and regulations.

No. 21-60772

document)); *M.R. v. Dreyfus*, 663 F.3d 1100, 1117–18 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012) ("DOJ's interpretation is not only reasonable; it also better effectuates the purpose of the ADA to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." (internal quotation marks omitted)).

More recently, the Sixth Circuit joined the others explaining that it, too, was persuaded by the DOJ guidance that the "risk of" institutionalization could be discriminatory. *Waskul*, 979 F.3d at 461. The court found "a contrary interpretation is unreasonable because the integration mandate's 'protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation.'" *Id.* (quoting *Fisher*, 335 F.3d at 1181). Yet, as Judge Readler points out, "the more customary practice is that a definitive harm, not just the 'risk' of one, is needed before legal action is ripe. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–49 (2016). At the very least, the risk of harm must be 'certainly impending.'" *Id.* at 471 (Readler, J. concurring in part and dissenting in part) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013)). Not only that, but the court majority's characterization essentially concedes that those plaintiffs were *not* currently "forced into isolation" and therefore were *not* subjected to discrimination at the time they filed suit.

Citing all of the above authorities for all the wrong propositions, the district court held that the United States satisfied each of the *Olmstead* factors. It found that the outside experts (1) "determined that the individuals they interviewed would be appropriate for community-based services;" (2) "found that everyone they interviewed, except for one individual, was not opposed to treatment in the community;" and

No. 21-60772

(3) "showed that providing community-based services can be reasonably accommodated within Mississippi's existing mental health system." *Mississippi*, 400 F. Supp. 3d at 575–76.

The court also acknowledged that the state has continuously made progress toward improving its community-based treatment programs. But critically, it found that Mississippi violated Title II by moving too slowly to adjust its mental health system toward community care. Moreover, when determining to appoint a special master to oversee timely compliance with the changes the court foresaw, the court stated, "[t]he discrimination will end only when every Mississippian with SMI has access to a minimum bundle of community-based services that can stop the cycle of hospitalization." Both of these rationales—that the state was moving too slowly, and that only an added bundle of community services will stop the cycle—are inapposite.

In the first instance, the court cited only one case to chastise the state's timing of reforms. But there, the state of Pennsylvania *had not disputed* that the patients satisfied an *Olmstead* claim because they were residing in a state hospital (many class members *for over ten years*). *Frederick L. v. Dep't. Pub. Welfare, Pa.,* 364 F.3d 487, 493 (3d Cir. 2004). "Timing" only became an issue because years *after conceding* the requirement to move patients to community placements, the state had made little progress. In this case, of course, the state did not concede liability, so "timing" could not even begin to be an issue unless the district court's liability judgment were to become final.

Further, the court's pushing deinstitutionalization as *the* solution for all afflicted Mississippians is contrary to *Olmstead.* The Supreme Court explicitly held that remedying Title II discrimination does not require deinstitutionalizing mentally disabled people *except where*, in the opinion of treating or state physicians, that is "appropriate." *Olmstead*, 527 U.S. at 587,

No. 21-60772

119 S. Ct. at 2181. No evidence in this record establishes any individual was "inappropriately" committed or held in a hospital beyond the opinion of the state's or treating physicians.

Finally, because the federal government's suit seeks to rework the entire Mississippi mental health system rather than protect individuals from "unjustified isolation" based on the opinion of state or treating physicians, the government's "at risk" theory effectively demands a certain standard of care with a certain level of benefits. *See id.* at 612–13, 2193 (Kennedy, J., concurring) (warning against courts making "political judgments" on "how much to allocate to treatment of [certain] diseases and disabilities" because "[g]rave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs"). As the next section of this opinion demonstrates, the "remedy" ordered by the district court, were liability to be upheld, radically modifies the state's *facilities, resources,* and *procedures,* but says nothing about afflicted individuals. Divorced from the individualized determination of discrimination that *Olmstead* approved, this "at risk" theory "at bottom, is simply a request for more . . . funding, something the ADA does not permit." *Waskul,* 979 F.3d at 471 (Readler, J. concurring in part and dissenting in part) (citing *Radaszewski ex rel. Radaszewski v. Maram,* 383 F.3d 599, 608 (7th Cir. 2004) (internal citation to *Olmstead,* 527 U.S. at 603 n. 14, 119 S. Ct. 2188 n. 14)).

The possibility that some un-named individual with serious mental illness or *all* such people in Mississippi could be unjustifiably institutionalized in the future does not give rise to a cognizable claim under Title II. Nor does such a vague and standardless theory license courts under the ADA to rework an entire state's mental health system. The government did not prove that the state of Mississippi violated Title II pursuant to the

No. 21-60772

statute, regulations, or *Olmstead* as properly construed.  The district court was wrong to hold otherwise.

## IV.

Even if the United States proved a discrimination claim under Title II, the district court's institutional reform injunction was overly broad.

"Injunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) (citing *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (holding that the district court's injunction preventing enforcement of executive order prohibiting local governmental entities from imposing mask mandates was overly broad to remedy harms inflicted on seven plaintiffs); *see also Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S. Ct. 713, 715 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood").[22] "This means that an injunction cannot 'encompass more conduct than was requested or exceed the legal basis of the lawsuit.'" *Paxton*, 19 F.4th at 769 (quoting *Schedler*, 826 F.3d at 214); *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S. Ct. 2749, 2758 (1977) ("[F]ederal court decrees exceed

---

[22] Federal Rule of Civil Procedure Rule 65(d) requires: "Every order granting an injunction and every restraining order . . . (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

appropriate limits if they are aimed at eliminating a condition that does not violate the [law] or does not flow from such a violation.").[23]

Title II imposes a single obligation on Mississippi: It may not discriminate against individuals with mental disabilities. This means Mississippi cannot unjustifiably isolate those with mental disabilities. *Olmstead*, 527 U.S. at 587, 119 S. Ct. at 2181. As we have established, there is no evidence that Mississippi discriminated against anyone. But had it done so, the district court's institutional reform injunction far exceeded what could conceivably be necessary to comply with the statute.

Program by program, the seven-page single-spaced decree dictates in paragraphs two through eleven the quantity of community-based services to be provided by each of nine separate types of mental health agencies and how they should be implemented. For example, as to fourteen separate service regions in Mississippi, the order requires "one Mobile Crisis Team in each Region," but one Region "will sustain two Mobile Crisis Teams."

In many instances, the order requires the state to fund certain programs and sets minimum staffing levels. For example, in paragraph five it orders the state to "fund Crisis Residential Services" in one of the regions, which must "have the capacity to serve at least 12 persons at any given time." Similarly, in paragraph eleven it states that "Mississippi [must] fund an additional 250 . . . housing vouchers in FY 22 and an additional 250 . . . housing vouchers in FY 23 and sustain funding for these services." In

---

[23] *See also ODonnell v Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (*ODonnell I*) (overruling in part an overbroad district court institutional injunction); *ODonnell v. Goodhart*, 900 F.3d 220, 224–26 (5th Cir. 2018) (*ODonnell II*) (overruling further the overbroad institutional injunction); *Daves v. Dallas Cnty.,* 22 F.4th 522, 540 (5th Cir. 2022) (en banc) (overruling *ODonnell I* in part); *and Daves v. Dallas Cnty.,* 64 F.4th 616, 631 (5th Cir. 2023) (en banc) (overruling *ODonnell I*).

No. 21-60772

paragraph twelve, it requires Mississippi to allocate $200,000 annually for a medication-assistance fund. In paragraph eight, the order mandates staffing increases: "Mississippi will fund and sustain 35 full time [Intensive Community Support Specialists]."

In paragraph thirteen, the order demands that Mississippi attempt to divert civilly committed individuals from state hospitals. In paragraph fourteen, the order turns *Olmstead* on its head. It essentially requires Mississippi defer to the federal government's outside professionals instead of the patients' treating physicians: It requires Mississippi to contact each of the 150 individuals in the experts' survey, screen each for eligibility for community-based services, and offer each appropriate services for which they are eligible.

In paragraphs fifteen and seventeen, the order requires Mississippi to implement several new measures when *discharging* patients from state hospitals. Paragraph sixteen requires that Mississippi take additional steps for patients readmitted to state hospitals even though admission to a state hospital requires state chancery courts to enter civil commitment orders. And paragraph nineteen requires Mississippi to "provide technical assistance to providers including competency-based training, consultation, and coaching."

The order even seeks influence over state chancery courts, whose adjudications constitute the exclusive means of civil commitment to state hospitals. In paragraph eighteen, the order requires the state to "provide the chancery courts in each county with an annual overview of mental health services provided in their area, including alternatives to civil commitment to State Hospitals."

To track Mississippi's compliance, the order, in paragraphs twenty through twenty-two, requires monthly and annual reports, quarterly

No. 21-60772

hearings, and an analysis of compliance status. Paragraph twenty-four requires Mississippi to post various data on a publicly available website and submit them to the DOJ and the court-appointed monitor. Paragraph twenty-three requires Mississippi to "design, with the participation of the DOJ and the Monitor, a Clinical Review Process to assess the adequacy of services received by a small sample (e.g., 100-200) of individuals receiving Core Services and/or State Hospital care."

On top of all these specific measures, paragraphs twenty-five and twenty-six require Mississippi to create an "implementation plan" with input from the Department of Justice and the monitor.

Sweeping institution-wide directives like those at issue here are never "narrowly tailored" to remedy individual instances of discrimination. *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) ("[I]nstitutional reform injunctions are disfavored, as they 'often raise sensitive federalism concerns' and they 'commonly involve[ ] areas of core state responsibility.'") (quoting *Horne v. Flores*, 557 U.S. 433, 450, 129 S. Ct. 2579, 2593 (2009)) (holding injunction mandating sweeping changes to Texas's foster care system overly broad); *cf. Valentine v. Collier*, 956 F.3d 797, 806 (5th Cir. 2020) ("[M]icromanagement, enforced upon threat of contempt, does not reflect the principles of comity commanded by the PLRA"). Indeed, individual instances of discrimination were not proven here.

Furthermore, the order has a broad mission with an elusive target. The remedial order commences by requiring that "the State of Mississippi . . . develop and implement effective measures to prevent unnecessary institutionalization in State Hospitals."[24]   According to paragraph twenty-

---

[24] The order designates the Community Mental Health Centers as the entity responsible for preventing discrimination in each region.

No. 21-60772

seven, the order terminates only when Mississippi "has attained substantial compliance" with each paragraph of the order and "maintain[ed] that compliance for one year as determined by this Court." This utterly vague language could "commit [the district] Court to the near-perpetual oversight of an already-complex" state-run mental health system. *M. D. by Stukenberg*, 907 F.3d at 271 (quoting *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 157 (D. Mass. 2013), *aff'd*, 774 F.3d 45 (1st Cir. 2014)). It is important to note this injunction was entered despite Mississippi's having spent over ten million dollars to comply with the United States' demands, and it remains in effect despite Mississippi's significant expansion of community-based services throughout all of the state's service regions. The district court's injunction here goes well beyond what is necessary to comply with the statute and is far from narrowly tailored.

The remedial order also requires the district court, with its monitor, to play a role essentially indistinguishable from the role ordinarily played by executive officials. That scenario naturally "raise[s] sensitive federalism concerns." *Flores*, 557 U.S. at 448, 129 S. Ct. at 2593. Indeed, the Framers worried "that the equity power would" so empower federal courts that it "would result in . . . the 'entire subversion of the legislative, executive and judicial powers of the individual states.'" *Missouri v. Jenkins*, 515 U.S. 70, 128–29, 115 S. Ct. 2038, 2069 (1995) (Thomas, J., concurring) (quoting Brutus XI). That is why "Hamilton sought to narrow the expansive Anti-Federalist reading of inherent judicial equity power" and "described Article III 'equity' as a jurisdiction over certain types of cases rather than as a broad remedial power." *Id.* at 130, 115 S. Ct. at 2069 (describing The Federalist No. 83). And it is one reason why "institutional reform injunctions are disfavored." *Stukenberg*, 907 F.3d at 271. The district court's structural injunction typifies these concerns.

No. 21-60772

The district court's sweeping injunction is "intrusive and unworkable," and requires far more than what might have been required to comply with Title II, had the district court limited itself to requiring the state to assure the best interests of institutionalized *individuals* with serious mental illness pursuant to *Olmstead*. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 500, 94 S. Ct. 669, 678 (1974). Because the district court's injunction was not based on what is necessary to comply with the law, the district court abused its discretion.

## V.

For the foregoing reasons, the judgment of the district court is REVERSED.

No. 21-60772

Jᴀᴍᴇs C. Hᴏ, *Circuit Judge*, concurring:

Involuntary hospitalization may be necessary when a person poses a substantial threat of physical harm to himself or others due to mental illness. But it's a severe deprivation of liberty. So in Mississippi, as elsewhere, there must be a proceeding in a chancery court before a person can be committed.

There's no guarantee, however, that courts will always get it right. Judges are human. We make mistakes. We can seek guidance from experts. But they can't say for certain who does and doesn't pose a future threat, either. We should be humble about the ability of judges and experts to predict human behavior. Because it's one thing to impose legal consequences based on record evidence of a person's past conduct—it's quite another thing to deny fundamental liberties based on our ability to see the future.[1]

So I get where the Justice Department is coming from. I get the concern that Mississippi is institutionalizing too many people without basis. But as our court today explains, the Americans with Disabilities Act is premised on actual violations, not statistical risks. In the Title VII context, the Supreme Court has unanimously "disapprove[d]" the "novel project"

---

[1] This problem is not unique to involuntary commitment. Judges can order forced medication of criminal defendants based on predictions about future competence to stand trial. *See, e.g.*, *United States v. James*, 938 F.3d 719 (5th Cir. 2019). *See also, e.g.*, 18 U.S.C. § 922(g)(8) (relying on civil courts to determine who is a future threat to physical safety); *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023).

A number of scholars have expressed sincere concerns about relying on predictions of future behavior to protect public safety. *See, e.g.*, Camille Carey & Robert A. Solomon, *Impossible Choices: Balancing Safety and Security in Domestic Violence Representation*, 21 Cʟɪɴɪᴄᴀʟ L. Rᴇᴠ. 201, 244 (2014) ("The history of predicting criminal behavior is, at best, a cautionary tale."). *Cf.* Mɪɴᴏʀɪᴛʏ Rᴇᴘᴏʀᴛ (20th Century Fox 2002) ("[F]or Precrime to function, there can't be any suggestion of fallibility. . . . [But] those accused of a Precrime might, just might, have an alternate future."); Mark C. Niles, *Preempting Justice: "Precrime" in Fiction and in Fact*, 9 Sᴇᴀᴛᴛʟᴇ J. Sᴏᴄ. Jᴜsᴛ. 275, 278 (2010).

No. 21-60772

of "Trial by Formula," which relies on statistical analysis, rather than individualized evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). This case presents similar difficulties. I concur.