No. 23-12331-B

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

STATE OF FLORIDA,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

———————————

BRIEF FOR THE UNITED STATES AS PLAINTIFF-APPELLEE

———————————

KRISTEN CLARKE
 Assistant Attorney General

BONNIE I. ROBIN-VERGEER
SYDNEY A.R. FOSTER
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 305-5941

*United States* v. *Florida*, No. 23-12331-B

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The United States files this Certificate of Interested Persons and Corporate

Disclosure Statement pursuant to Eleventh Circuit Rules 26.1-1 to 26.1-3.  In

addition to the persons identified by defendant-appellant's Certificate of Interested

Persons, the following may have an interest in the outcome of this case:

Dermody, Eliza, counsel for the United States

England, Travis W., former counsel for the United States

Esposito, Beth A., counsel for the United States

Johnson, Christopher N., counsel for Florida

Mawhinney, Allison G., counsel for Florida

Scott, Angela, former counsel for the United States

Welan, Joy L., counsel for the United States

Williams, Stuart F., counsel for Florida

The United States is not aware of any publicly traded company or

corporation that has an interest in the outcome of this case.

s/ Sydney A.R. Foster
SYDNEY A.R. FOSTER
Attorney

Date:  November 8, 2023

## STATEMENT REGARDING ORAL ARGUMENT

Because of the importance of the issues presented and the extensive trial record, the United States believes that oral argument is appropriate in this case. This Court has tentatively scheduled argument for the week of January 22, 2024.

## TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

STATEMENT REGARDING ORAL ARGUMENT

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION......................................................... 3

STATEMENT OF THE ISSUES............................................................. 3

PERTINENT STATUTES, REGULATIONS, AND RULES ................................ 4

STATEMENT OF THE CASE................................................................ 4

    *1.*   *Legal Background* .................................................4

    *2.*   *Factual And Procedural Background* .....................................5

    *3.*   *Standard Of Review*.............................................10

SUMMARY OF ARGUMENT ...............................................................11

ARGUMENT

    I   THE DISTRICT COURT PROPERLY FOUND THAT
      THE UNITED STATES ESTABLISHED AN *OLMSTEAD*
      VIOLATION ........................................................14

        *A.*   *The Court Applied The Correct*
            *Appropriateness Standard* .......................................14

        *B.*   *The Court Did Not Clearly Err In Finding That*
            *Parents Overwhelmingly Do Not Oppose Community*
            *Placement* .....................................................19

**TABLE OF CONTENTS (continued):**                                    **PAGE**

       1.   *The Court Applied The Correct Standard* .......................19

       2.   *The Court Did Not Clearly Err In Applying The Standard*...................................................................22

   C.   *The Court Properly Found That The Proposed Modifications Are Reasonable* .................................29

       1.   *The Court Did Not Clearly Err In Finding The Modifications Will Redress Injuries* ..............................29

       2.   *Florida Had Sufficient Notice Of The Modifications* .....33

II   THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN ISSUING THE INJUNCTION ............................37

   A.   *The Court Properly Found Widespread Violations*.................38

       1.   *The Integration Mandate Protects Individuals In The Community* ...........................................................38

       2.   *The Court Did Not Clearly Err In Finding The Violations Pervasive* ........................................................43

          a.   *Private-Duty Nursing* ...........................................43

             i.   *Widespread Unnecessary Institutionalization* .....................................44

             ii.   *Widespread Serious Risk Of Unnecessary Institutionalization* ..............47

          b.   *Care Coordination* ...............................................49

   B.   *The Injunction Respects Federalism Principles* ......................51

   C.   *The Court Acted Within Its Discretion In Determining Florida Can Meet The Nursing Benchmark* ...........................54

**TABLE OF CONTENTS (continued):**                    **PAGE**

III   THE UNITED STATES HAS STATUTORY AUTHORITY
      TO MAINTAIN THIS ACTION ..........................................57

CONCLUSION ................................................................... 61

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF CITATIONS

**CASES:**                                                           **PAGE**

*A.L.* v. *Walt Disney Parks & Resorts U.S., Inc.*,
50 F.4th 1097 (11th Cir. 2022) ........................................................10

*A.R.* v. *Secretary Fla. Agency for Health Care Admin.*,
769 F. App'x 718 (11th Cir. 2019) ..................................................58

*Biden* v. *Nebraska*, 143 S. Ct. 2355 (2023) ..........................................52

*Bill M.* v. *Nebraska Dep't of Health & Hum. Servs. Fin. & Support*,
408 F.3d 1096 (8th Cir. 2005), vacated,
547 U.S. 1067 (2006)......................................................................43

*Brown* v. *District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019)..................... 34, 37

*Brown* v. *Plata*, 563 U.S. 493 (2011) ..................................................55

*Buchanan* v. *Maine*, 469 F.3d 158 (1st Cir. 2006) ..................................50

*Clement* v. *California Dep't of Corr.*, 364 F.3d 1148 (9th Cir. 2004)............. 19, 46

*Collegiate Licensing Co.* v. *American Cas. Co. of Reading*,
713 F.3d 71 (11th Cir. 2013) ................................................... 10-11

*Davis* v. *Shah*, 821 F.3d 231 (2d Cir. 2016)...................................... 38-39

*Disability Advocs., Inc.* v. *Paterson*, 653 F. Supp. 2d 184 (E.D.N.Y. 2009),
vacated *sub nom. Disability Advocs., Inc.* v.
*New York Coal. for Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012) ..........................................................20

*Doe 1-13* v. *Chiles*, 136 F.3d 709 (11th Cir. 1998)..................................... 22, 53-54

*Fisher* v. *Oklahoma Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003) ....... 38, 40

*Frederick L.* v. *Department of Pub. Welfare*,
364 F.3d 487 (3d Cir. 2004) ................................................... 18, 34

**CASES (continued):** **PAGE**

*General Tel. Co. of the Nw., Inc.* v. *EEOC*, 446 U.S. 318 (1980)...........................60

*Katie A.* v. *Los Angeles Cnty.*, 481 F.3d 1150 (9th Cir. 2007)...............................30

*Kisor* v. *Wilkie*, 139 S. Ct. 2400 (2019)....................................................40

*L.C.* v. *Olmstead*, 138 F.3d 893 (11th Cir. 1998), aff'd in part,
    vacated in part, 527 U.S. 581 (1999)................................................ 18, 21, 40

*Lewis* v. *Casey*, 518 U.S. 343 (1996) ............................................... 19, 38

*Local 28 of Sheet Metal Workers' Int'l Ass'n* v. *EEOC*,
    478 U.S. 421 (1986).......................................................................54

*M.R.* v. *Dreyfus*, 697 F.3d 706 (9th Cir. 2012)................................... 38, 40

*Mach Mining, LLC* v. *EEOC*, 575 U.S. 480 (2015) .................................60

*Milliken* v. *Bradley*, 433 U.S. 267 (1977)..................................................53

*O.B.* v. *Norwood*, 838 F.3d 837 (7th Cir. 2016)..........................................30

* *Olmstead* v. *L.C.*, 527 U.S. 581 (1999) .......................................... *passim*

*Pashby* v. *Delia*, 709 F.3d 307 (4th Cir. 2013) ................................. 38, 49

* *Radaszewski* v. *Maram*, 383 F.3d 599 (7th Cir. 2004)..................... 18, 39, 41, 49

*South Carolina* v. *United States*, 907 F.3d 742 (4th Cir. 2018)............................57

*Steimel* v. *Wernert*, 823 F.3d 902 (7th Cir. 2016) ...................... 18, 34, 38

*Thomas* v. *Bryant*, 614 F.3d 1288 (11th Cir. 2010).......................... 42, 55

*Thompson* v. *Secretary of State*, 65 F.4th 1288 (11th Cir. 2023)...........................15

*United States* v. *$242,484.00*, 389 F.3d 1149 (11th Cir. 2004)..............................22

**CASES (continued):** **PAGE**

*United States* v. *Board of Trs.*, 908 F.2d 740 (11th Cir. 1990) ...............................59

\* *United States* v. *Florida*, 938 F.3d 1221 (11th Cir. 2019),
   reh'g en banc denied, 21 F.4th 730 (11th Cir. 2021),
   cert. denied, 143 S. Ct. 89 (2022).......................................................... *passim*

*United States* v. *Garcia*, 447 F.3d 1327 (11th Cir. 2006) .......................................24

*United States* v. *Mississippi*, 82 F.4th 387 (5th Cir. 2023) ....................................41

*United States* v. *Raines*, 362 U.S. 17 (1960) .........................................................43

*United States* v. *Virginia*, 518 U.S. 515 (1996).....................................................37

*United States* v. *W. T. Grant Co.*, 345 U.S. 629 (1953) .........................................42

*Vermont Agency of Nat. Res.* v. *United States ex rel. Stevens*,
   529 U.S. 765 (2000)......................................................................43

*Walters* v. *Reno*, 145 F.3d 1032 (9th Cir. 1998) ....................................................19

\* *Waskul* v. *Washtenaw Cnty. Cmty. Mental Health*,
   979 F.3d 426 (6th Cir. 2020) ........................................................... 38, 40, 49

*Wyatt* v. *Aderholt*, 503 F.2d 1305 (5th Cir. 1974)..................................................54

**STATUTES:**

Americans with Disabilities Act of 1990
   42 U.S.C. 12131................................................................................2
   42 U.S.C. 12131(1)...........................................................................4
   42 U.S.C. 12131(2).........................................................................17
   \* 42 U.S.C. 12132.......................................................................4, 17
   42 U.S.C. 12133........................................................................ 42, 58
   42 U.S.C. 12201(d).........................................................................20

**STATUTES (continued):**                                          **PAGE**

Medicaid Act
    42 U.S.C. 1396a(a)(30)....................................................................30
    42 U.S.C. 1396a(a)(43)................................................................6, 30
    42 U.S.C. 1396d(a)......................................................................6, 30
    42 U.S.C. 1396d(r)(5)..................................................................6, 30

28 U.S.C. 1291.........................................................................................3

28 U.S.C. 1331.........................................................................................3

28 U.S.C. 1345.........................................................................................3

29 U.S.C. 794a.......................................................................................58

42 U.S.C. 2000d.....................................................................................58

42 U.S.C. 2000e-5..................................................................................60

**REGULATIONS:**

28 C.F.R. 35.130(b)..................................................................................4

* 28 C.F.R. 35.130(b)(7)...............................................................5, 34, 52

28 C.F.R. 35.130(b)(7)(i).......................................................................39

* 28 C.F.R. 35.130(d) .......................................................................... *passim*

* 28 C.F.R. 35.130(e) ...............................................................................20

45 C.F.R. 80.7(c)....................................................................................59

45 C.F.R. 80.7(d)...................................................................................59

**RULES:**

Fed. R. App. P. 4(a)(1)(B) .......................................................................3

**RULES (continued):**                                              **PAGE**

Fed. R. App. P. 4(a)(2)..................................................................................3

Fed. R. Evid. 703 .....................................................................................24

**MISCELLANEOUS:**

DOJ, *Statement of the Department of Justice on Enforcement of the*
   *Integration Mandate of Title II of the Americans with Disabilities*
   *Act and* Olmstead v. L.C., Q. 6,
   https://perma.cc/M2UC-22BY ...................................................................40

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 23-12331-B

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

STATE OF FLORIDA,

Defendant-Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

BRIEF FOR THE UNITED STATES AS PLAINTIFF-APPELLEE

_____

## INTRODUCTION

In Florida, approximately 140 children with complex medical needs reside in nursing facilities, where they have little opportunity to be nurtured by their parents, bond with their siblings and friends, or interact with their communities. After a two-week bench trial, the district court concluded that the State of Florida administers its Medicaid system in a manner that leads to the unnecessary institutionalization of these children and a serious risk that other children with medical complexity will be unnecessarily institutionalized in the future. The court found that by making modest changes, Florida could provide medically necessary

- 2 -

services to children with medical complexity in their homes and the community, and it properly determined that Florida is violating the "integration mandate" of Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. 12131 *et seq*. The court acted well within its discretion in entering a narrow injunction remedying the violation.

Florida mounts numerous attacks on the court's judgment, most of which take issue with the court's well-supported factual findings or discretionary determinations, and none of which establishes reversible error. This Court should affirm.

Significantly, an affirmance would not require the closure of nursing facilities serving children with medical complexity. Nor would it prohibit families preferring nursing facilities from choosing that option. An affirmance would, however, give families a meaningful choice as to whether the best place for their children to thrive and receive medical care is at home, elsewhere in the community, or in a nursing facility. Most importantly, an affirmance would ensure that children with medical complexity are granted equality and freedom from unwarranted isolation.

## STATEMENT OF JURISDICTION

The United States sued Florida to enforce Title II of the ADA.  Doc. 700, at 1, 21-22 (Am. Compl.).[1]  The district court had jurisdiction under 28 U.S.C. 1331, 1345.  On July 14, 2023, the court issued an opinion finding Florida liable, and it entered an injunction.  Docs. 1170, 1171.  On July 21, 2023, the court entered final judgment for the United States.  Doc. 1175.  Florida filed a timely notice of appeal on July 17, 2023.  Doc. 1172; Fed. R. App. P. 4(a)(1)(B), (a)(2).  This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court properly evaluated the United States' *Olmstead* claim because the court (a) applied the correct appropriateness standard; (b) did not clearly err in finding overwhelming non-opposition; and (c) properly found the proffered modifications reasonable.

---

[1]  "Doc. __, at __" refers to district-court document numbers and page numbers within those documents, respectively.  "PEX __, at __" refers to numbers of the United States' trial exhibits and page numbers within those exhibits, respectively.  "PEX" cites without an accompanying "Doc." cite refer to exhibits transmitted to this Court on a DVD.  "Br.__" refers to page numbers within Florida's opening brief.  Some documents in the record identify children with numbers rather than names to protect the children's privacy.  The names corresponding to each number appear in the sealed attachment to Document 881.

- 4 -

2.  Whether the district court acted within its discretion in issuing injunctive relief because it properly (a) found widespread violations; (b) respected federalism principles; and (c) determined that the actions it mandated are achievable.

3.  Whether the United States has statutory authority to maintain this suit on behalf of all victims of Florida's discrimination rather than only victims who filed administrative complaints.

## PERTINENT STATUTES, REGULATIONS, AND RULES

Pertinent statutes, regulations, and rules are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

*1.  Legal Background*

Title II prohibits discrimination by States:  "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. 12132, 12131(1). States cannot discriminate "directly" or "through contractual" arrangements.  28 C.F.R. 35.130(b).

Under a regulation known as the "integration mandate," States must "administer services" in "the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. 35.130(d).  States also must

make "reasonable modifications" to policies and practices when "necessary to avoid discrimination," unless they "can demonstrate" that the modifications would "fundamentally alter the nature of the service."  28 C.F.R. 35.130(b)(7).

In *Olmstead* v. *L.C.*, 527 U.S. 581, 600 (1999), the Supreme Court held that the "unjustified institutional isolation of persons with disabilities is a form of discrimination" under Title II.  The Court concluded that people with disabilities receiving state services are entitled to community-based services when (1) community-based placement is "appropriate"; (2) they do "not oppose" such placement; and (3) such placement can be "reasonably accommodated."  *Id.* at 607 (plurality opinion).  States may avoid liability, however, if they show the accommodations would fundamentally alter their services.  *Id.* at 603.

2.    *Factual And Procedural Background*

a.  Through its Medicaid program, Florida administers a system of services for children with complex medical needs.  Doc. 1170, at 30-33.  Such children have complex chronic conditions and require long-term care and medical technology, such as ventilators.  *Id.* at 5; Doc. 906, at 136-138.  Guidelines of the American Academy of Pediatrics explain that, "[i]deally," such children "should be cared for by their families in their home[s]."  Doc. 906, at 144-149.  In Florida, over 1800 such children reside at home or elsewhere in the community, but approximately 140 live in nursing facilities.  Doc. 1170, at 5, 33.

- 6 -

The Medicaid Act requires Florida's program to provide eligible children in the community all "medically necessary" private-duty nursing, 42 U.S.C. 1396a(a)(43)(A)-(C), 1396d(a), 1396d(r)(5)—one-on-one skilled care from nurses who come to their homes. Doc. 1170, at 34, 72. Despite that requirement, Florida provides these children an average of only 70-80% of authorized (*i.e.*, medically necessary) hours, with a quarter of children receiving less than 60% of authorized hours. *Id.* at 35.

Florida's Medicaid program also offers children with medical complexity "care coordination" services—an "extremely important" service in which a professional works with families to identify and access needed services and benefits, including by assisting in transitioning children from nursing facilities. Doc. 906, at 141-142; see Doc. 1170, at 38; Doc. 840, at 17. Many care coordinators do not in fact help parents and guardians (whom this brief refers to as "parents") in these ways, as explained below.

Florida provides Medicaid services to children with medical complexity through either a managed-care or fee-for-services program. With respect to managed-care plans (which cover most Medicaid recipients), a state agency contracts with private managed-care organizations to provide "medically necessary" services through a provider network. Doc. 1170, at 31-32.

b.  Many parents of children with medical complexity have faced obstacles in learning about and obtaining community-based Medicaid services in Florida. As a result, some parents have resorted to placing their children in nursing facilities, while others have attempted to cover gaps in services at a steep cost to their families' well-being.  Doc. 1170, at 18-30, 36-37 (describing some families' experiences).

J.H., for example, was a "happy" 15-year-old with cerebral palsy and spastic quadriplegia who initially lived at home with Eve Harris—his grandmother and guardian.  Doc. 907, at 4-6, 14.  The family experienced regular gaps in private-duty-nursing services, causing Harris to miss work and lose her government job. *Id.* at 23-25, 63.  Harris then worked as a home-health companion and addressed some nursing gaps by bringing J.H. to work.  *Id.* at 23-25.  Because of nursing deficits, Harris put J.H. in a nursing facility so she could relocate to another city with better services.  *Id.* at 7-8, 26-29, 62-64.  When Harris tried to bring J.H. home, however, she could not obtain nursing and received unclear information about the training she needed.  *Id.* at 33-35.  Harris entered nursing school to address J.H.'s nursing gaps.  But when J.H. finally returned home after over a year away, Harris withdrew because nursing gaps remained.  *Id.* at 9, 13, 18, 40-41.  For many years, Medicaid care coordinators did not provide any support to Harris, who was "basically doing everything by [her]self."  *Id.* at 46; *id.* at 21-22, 59-60.

- 8 -

As another example, ten-year-old O.P.—a music and nature lover—has many complex conditions, uses a ventilator, and is authorized for round-the-clock private-duty nursing. Doc. 910, at 72-79, 82-84. When O.P. lacks night nursing, a frequent occurrence, her mother, Julie Pagano, tries to stay awake. But because "[no] human can stay awake constantly," Pagano sometimes lies beside O.P. and sets an alarm for every 15 minutes so Pagano can rest while attempting to monitor O.P. *Id.* at 84-85, 103-105. Because O.P. also lacks consistent daytime nursing, Pagano gave up one job and struggles to meet the requirements of her current job, which she needs to pay for housing. *Id.* at 103-108, 112-115. Pagano—whose marriage dissolved after her husband stopped working to cover nursing gaps and the couple experienced financial strain—faces an "ongoing battle just to keep [her] head above water," which is "terrifying." *Id.* at 131-133. Her Medicaid care coordinators frequently fail to tell her about, much less obtain, critical Medicaid services and benefits. *Id.* at 88-89, 94-98.

c. The U.S. Department of Justice (DOJ) received complaints of disability discrimination concerning Florida's administration of services to children with medical complexity. After investigating, DOJ determined Florida is violating Title II, and it filed suit. Doc. 1170, at 11.

More than three years later, the district court sua sponte dismissed the case, holding that Title II does not grant the Attorney General the right to sue. Doc. 543,

- 9 -

at 3.  This Court disagreed and remanded.  *United States* v. *Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019), reh'g en banc denied, 21 F.4th 730 (11th Cir. 2021), cert. denied, 143 S. Ct. 89 (2022).

d.  On remand, the district court granted Florida partial summary judgment on the question whether certain modifications to its waiver and medical-foster-care programs would fundamentally alter its services.  Doc. 882, at 1-2.  The court then conducted a two-week bench trial.  Doc. 1170, at 5.

In a comprehensive 79-page opinion, the court concluded that Florida is violating Title II by administering its Medicaid program in a manner that results in the unnecessary institutionalization of children with medical complexity and that places others at serious risk of such institutionalization.  Doc. 1170, at 5, 79.  In reaching that conclusion, the court agreed with six circuits that Title II bars States from unnecessarily institutionalizing individuals with disabilities *and* placing them at "serious risk" of unnecessary institutionalization.  *Id.* at 8-9.

The court explained that it heard "overwhelming evidence of Florida's failings in administering [its Medicaid] services" for children with medical complexity.  Doc. 1170, at 6.  It found the "lack of access to [private-duty nursing]" is the most "critical problem" and is "causing systemic institutionalization" and the serious risk thereof.  *Id.* at 6, 34-37, 44-45.  The court also found that deficiencies in Florida's care-coordination services—including care

coordinators' frequent failure to help families obtain community-based services—contribute to the same result. *Id.* at 38-41, 44-45. It concluded that the United States established the *Olmstead* elements, and it explained that Florida had "ample opportunity" to present a fundamental-alteration defense as to private-duty nursing but "chose not to do so." *Id.* at 45-67.

The court entered an injunction with an anticipated two-year term, principally requiring Florida to (1) use any tools to provide children 90% of authorized and desired private-duty-nursing hours; and (2) increase oversight over the care-coordination system in particular ways. Doc. 1171, at 3-6, 11; Doc. 1170, at 67-78.

e. Florida appealed, and the district court denied a stay pending appeal. Doc. 1178. Florida renewed its request for a stay in this Court, and its motion remains pending.

3.    *Standard Of Review*

This Court reviews the district court's conclusions of law de novo and its factual findings for clear error—a "highly deferential standard." *A.L.* v. *Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097, 1107 (11th Cir. 2022) (citation omitted). The Court reviews evidentiary rulings and a grant of an injunction for abuse of discretion. *Ibid.*; *Collegiate Licensing Co.* v. *American Cas. Co. of Reading*, 713 F.3d 71, 77 (11th Cir. 2013). That standard "allows for a range of

- 11 -

choices," "so long as any choice made" was not "a clear error of judgment."

*Collegiate Licensing*, 713 F.3d at 77.

## SUMMARY OF ARGUMENT

The district court properly concluded that Florida is operating its Medicaid system in a manner that leads to the unnecessary institutionalization of children with medical complexity and a serious risk that other such children will be unnecessarily institutionalized. The court acted well within its discretion in issuing a limited injunction to remedy that Title II violation. Florida implausibly contends that the court erred in myriad ways, but the State ignores the court's factual findings and supporting evidence; fails to grapple with the court's discretion to fashion relief; and misunderstands governing law. This Court should affirm.

*I. Liability.* The district court applied the correct standard for evaluating whether Florida's 140 institutionalized children with medical complexity may appropriately live in the community. The court properly credited an expert pediatrician's opinion that the children are not different from countless other children with medical complexity who live at home with their families. Although Florida contends that the court also should have evaluated the specific homes to which each child might be transferred, such location-specific analysis is not part of the appropriateness inquiry.

- 12 -

On the non-opposition element, the court correctly held that the relevant question is whether parents would accept community-based services if Florida made them available as promised.  The court concluded that parents are overwhelmingly unopposed to community placement, finding that only a minority of parents chose nursing facilities for reasons independent of Florida.  That finding is not clearly erroneous, and Florida's arguments to the contrary ignore or misconstrue critical evidence.

The court also did not clearly err in finding that the United States' proposed modifications are reasonable and would redress the children's injuries.  Florida ignores the court's analysis of the evidence and thus offers no basis for second-guessing it.  The court likewise properly determined that Florida had sufficient notice of the United States' proposed modifications and ample opportunity to put on a fundamental-alteration defense, which it chose not to do at trial.

*II.  Injunction.*  The district court properly concluded that systemic relief is warranted because Florida's violations of the integration mandate are pervasive.  Florida repeatedly claims that its failures have caused the institutionalization of only seven children, none of whom is currently institutionalized.  Those claims are false and ignore a wealth of evidence supporting the court's finding that unnecessary institutionalization is widespread.

- 13 -

Moreover, the integration mandate extends to children with medical complexity residing in the community, as six circuits have concluded.  Here, it is undisputed that Florida is falling far short in its duty to provide those children private-duty nursing—a service critical to maintaining their health.  Based on that and other evidence, the court did not clearly err in finding a widespread serious risk that children with medical complexity in the community will be unnecessarily institutionalized.

Additionally, the court did not abuse its discretion in finding that its limited injunction does not require a legislative appropriation and respects federalism principles.  The court also properly determined that Florida can meet the private-duty-nursing benchmark.  Florida's arguments to the contrary fail to grapple with the court's factual findings and evidence cutting against its position.

*III.  Authority To Sue.*  Finally, the district court correctly held that the United States has statutory authority to maintain this suit on behalf of *all* victims of Florida's discrimination, not just the victims who filed administrative complaints.  Regardless, this suit's scope matches the scope of those complaints, some of which alleged violations against children with medical complexity as a group.

- 14 -

# ARGUMENT

# I

## THE DISTRICT COURT PROPERLY FOUND THAT THE UNITED STATES ESTABLISHED AN *OLMSTEAD* VIOLATION

In *Olmstead*, the Supreme Court held that under Title II's integration mandate, individuals with disabilities are entitled to services in the community—rather than an institution—when (1) "community placement is appropriate" to their needs; (2) they do "not oppose[]" such placement; and (3) the placement can be "reasonably accommodated." 527 U.S. at 587, 607 (plurality opinion). Contrary to Florida's arguments, the district court properly found for the United States on each element.

### A. The Court Applied The Correct Appropriateness Standard

Florida first challenges (Br.18-22) one aspect of the district court's analysis of the appropriateness element, but its argument falls short.

1. The court explained that "community placement is considered 'appropriate'" under *Olmstead* if children "could live in the community with sufficient services for which they would be eligible." Doc. 1170, at 45. The court made two findings. First, in a ruling Florida does not challenge, the court found that children with medical complexity who *already* live in the community—but

who are at serious risk of institutionalization—can appropriately be served in the community.  *Id.* at 55.[2]

Second, in a ruling Florida challenges only in part, the court found that children with medical complexity in nursing facilities can appropriately reside in the community.  Doc. 1170, at 45-55.  In making that finding, the court credited the testimony of Dr. Carolyn Foster, a renowned pediatrician specializing in the care of such children.  *Id.* at 46 n.37, 48 n.40.  Dr. Foster and two other pediatricians reviewed the medical records of all 140 institutionalized children and familiarized themselves with services available in Florida.  Based on that review, the experts concluded that each institutionalized child is stable enough to live in a family-home setting with proper supports.  *Id.* at 48-50 & n.41.

Dr. Foster testified that the "needs of the[se] children" are the same as the needs of the hundreds of children she "routinely" sees "in her own practice."  Doc. 1170, at 49; Doc. 906, at 126-127, 150-151, 158 (explaining her clinic is in a poor area of Chicago and her patients receive services primarily funded by Medicaid).  Significantly, those children "reside at home," like the "vast majority of children with medical complexity" and in accordance with medical guidelines.  Doc. 1170,

---

[2]  This Court should not address any challenges Florida declined to assert in its opening brief, each of which is forfeited.  *Thompson* v. *Secretary of State*, 65 F.4th 1288, 1297 n.6 (11th Cir. 2023).

at 49-51; Doc. 906, at 143-150, 159-160.  The court further credited Dr. Foster's view that children in nursing facilities "are receiving no better or different care than they would at home."  Doc. 1170, at 53-54.[3]

2.  Florida does not take issue with the foregoing analysis except to argue (Br.18) that the court should have evaluated the specific home to which each institutionalized child "would be transferred."  That is incorrect.

To the extent Florida contends that the court should have examined whether parents can *currently* transfer their children to a particular home, notwithstanding the unavailability of community-based services sought in this suit, the argument fails out of the gate.  As the court explained, accepting that standard would require "an evaluation of barriers" that are "outside the families' control" but "*within* the State's control."  Doc. 1170, at 45.  Indeed, if Florida were right, States could (1) decline to provide services individuals need to live in the community; and then (2) defeat an *Olmstead* claim seeking access to those services by arguing community-based placement is *currently* inappropriate.  Florida cites no court that

---

[3]  The district court used the phrase "[m]edical appropriateness" to capture the standard, explaining it may base its appropriateness determination on the assessments of "[m]edical professionals" without evaluating specific locations to which each child might be transferred.  Doc. 1170, at 45-47; accord *Olmstead*, 527 U.S. at 602 (appropriateness determinations may be based on "reasonable assessments" of "professionals").

- 17 -

has accepted that circular argument, which would "defeat the purpose of the law." *Id.* at 46-47.

To the extent Florida instead contends that the court should have evaluated specific homes to which parents hypothetically *would* transfer their children *if* Florida made community-based services accessible, that contention also fails. As *Olmstead* explained, the appropriateness requirement derives in part from statutory text limiting Title II's protections to "qualified individual[s]"—persons who, "with or without reasonable modifications," "mee[t] the essential eligibility requirements" for "services." 527 U.S. at 601-602 (alteration in original) (quoting 42 U.S.C. 12131(2), 12132). That text requires evaluation of individuals' *eligibility* for relevant services, not analysis of specific homes to which institutionalized persons might be transferred.

The appropriateness requirement also derives from the integration regulation, which says States must administer services in "the most integrated setting appropriate to [an individual's] needs." *Olmstead*, 527 U.S. at 602 (emphasis omitted) (quoting 28 C.F.R. 35.130(d)). By using the broad term "setting," the regulation calls for an inquiry into the appropriateness of a *type* of placement, not a particular location. Supporting that understanding, when *Olmstead* applied the appropriateness standard, it did not evaluate the suitability of any specific placement for the plaintiffs. Instead, it relied on professionals'

- 18 -

determination that "community-based treatment would be appropriate." *Id.* at 602-603; *id.* at 600 (focusing on persons "who can handle and benefit from community settings").

No court has adopted Florida's location-specific standard when evaluating appropriateness. Courts, including this one, have instead examined whether individuals can reside in a community-type setting. See, *e.g.*, *L.C.* v. *Olmstead*, 138 F.3d 893, 903 (11th Cir. 1998), aff'd in relevant part, vacated on other grounds, 527 U.S. 581; *Steimel* v. *Wernert*, 823 F.3d 902, 915-916 (7th Cir. 2016); *Frederick L.* v. *Department of Pub. Welfare*, 364 F.3d 487, 493 (3d Cir. 2004). Florida's reliance (Br.21) on *Radaszewski* v. *Maram*, 383 F.3d 599, 608 (7th Cir. 2004), is misplaced, as that decision held only that an individual's history of living at home was *sufficient* to establish appropriateness without suggesting that such location-specific evidence was also *necessary*.

As the district court emphasized, the "safety and suitability" of a child's home is "unquestionably important." Doc. 1170, at 46. But that is to be "addressed in subsequent phases" of a case as part of the transition-planning process. *Id.* at 47. During that process, some parents may decide their children should remain in nursing facilities. *Id.* at 52; cf. *Olmstead*, 527 U.S. at 593, 605 (plaintiff opposed discharge to homeless shelter). Others may need assistance from care coordinators in relocating to accessible housing, setting up their homes

with equipment and services, and obtaining other supports.  Doc. 906, at 157-158, 213.  Either way, it is at the transition-planning stage that specific placements should be evaluated to ensure they meet children's needs.  Doc. 1170, at 47.  This Court should reject Florida's chicken-or-egg standard.

B.    *The Court Did Not Clearly Err In Finding That Parents Overwhelmingly Do Not Oppose Community Placement*

Florida next argues (Br.22-30) that the district court applied an incorrect standard in evaluating whether parents of institutionalized children oppose community-based placement, and it contends that the United States failed to satisfy the correct standard.  Because the United States sought "systemwide relief," it had to show Florida's ADA violations—and thus parents' non-opposition—are sufficiently "widespread," *Lewis* v. *Casey*, 518 U.S. 343, 359 (1996).  That is established where a "substantial number" of parents are unopposed, *Clement* v. *California Dep't of Corr.*, 364 F.3d 1148, 1153 (9th Cir. 2004), or where opposition is the "exception rather than the rule," *Walters* v. *Reno*, 145 F.3d 1032, 1049 (9th Cir. 1998).

The court invoked the correct non-opposition standard and did not clearly err in applying it.

1.    *The Court Applied The Correct Standard*

The court correctly concluded that "[t]he relevant question" when evaluating non-opposition is whether parents would accept community-based services "if they

were actually available and accessible." Doc. 1170, at 56. The non-opposition element derives from a regulation specifying that individuals with disabilities need not "accept an accommodation" that they "choose[] not to accept." *Olmstead*, 527 U.S. at 602 (quoting 28 C.F.R. 35.130(e)(1)); 42 U.S.C. 12201(d). The non-opposition inquiry therefore does not ask whether institutionalized individuals are seeking discharge *now*, notwithstanding a State's failure to provide services they seek as accommodations. Doc. 1170, at 57. Rather, the question is whether individuals would accept community placement if those services were available. *Disability Advocs., Inc.* v. *Paterson*, 653 F. Supp. 2d 184, 260-267 (E.D.N.Y. 2009), vacated on other grounds *sub nom. Disability Advocs., Inc.* v. *New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012). A standard looking only to present-day circumstances "would defeat the purpose of the integration mandate." Doc. 1170, at 57.

The non-opposition standard the court articulated is therefore *not* one that "tolerates institutional placement" only when "parents declare unbending opposition to *any* transfer to the community, *ever*," as Florida claims (Br.25). Rather, opposition is established when parents do not want their child transferred

- 21 -

for personal reasons that would control even if Florida provided all community-based services sought in a lawsuit.[4]

To be sure, parts of the court's opinion seem to embrace a broader non-opposition standard. *E.g.*, Doc. 1170, at 61 ("tak[ing] issue with the idea that a parent who is not 'ready' to transition their child home is *opposed*," even if "their unreadiness is due to personal circumstances"). But even if the court evaluated the evidence under a broader standard, it *also* evaluated the evidence under the standard described above, which both parties embraced in district court (Doc. 869, at 58-59; Doc. 910, at 163-164). Indeed, after articulating a broader standard, the court explained that, "[a]lternatively, even if [it] were to accept the State's interpretation" of the non-opposition standard, Florida "could only prevail" if enough parents had "personal reasons (*outside* the State's failure to provide services) for choosing nursing facilit[ies]" to "render the group as a whole to be 'opposed.'" Doc. 1170, at 57. Applying that standard, the court found "as a

---

[4] Florida mistakenly argues (Br.28) that an *Olmstead* claim cannot proceed unless affected individuals "specific[ally] demand" an accommodation. Neither decision Florida cites involves Title II's integration mandate, which places an affirmative duty on States to "administer services" in "the most integrated setting" appropriate. 28 C.F.R. 35.130(d); cf. *Olmstead*, 138 F.3d at 901. *Olmstead* accordingly held that individuals need only be "[un]opposed" to community treatment, 527 U.S. at 602-603, not affirmatively request it. Indeed, it would be particularly inappropriate to require a specific demand for community-based services where, as here, many parents were not even aware that was an option. See, *e.g.*, Doc. 1170, at 19-21.

factual matter" that parents opposing community-based placement "for reasons unrelated to the availability of Medicaid services" are "outliers." *Ibid.*; *id.* at 61.

As explained below, that factual finding is not clearly erroneous. This Court should affirm the court's non-opposition ruling on that basis.[5]

2.    *The Court Did Not Clearly Err In Applying The Standard*

a.   For starters, Florida does not challenge the district court's commonsense finding that parents of the 1800+ children at serious risk of institutionalization (Doc. 1170, at 5) are unopposed to community placement.[6] Significantly, that finding, together with the court's other *Olmstead* determinations regarding that group, justifies systemic relief here. See *Doe 1-13* v. *Chiles*, 136 F.3d 709, 722 n.23 (11th Cir. 1998) (violations affecting "hundreds" are systemwide).

b.   Additionally, the court did not clearly err in finding that parents of institutionalized children are overwhelmingly unopposed under the standard discussed above. Doc. 1170, at 57, 61. The court relied in part on the "credible

---

[5]   The district court emphasized that even though parents opposing community placement are outliers, their "choice should be honored." Doc. 1170, at 51-52. Nothing in the court's decision or injunction requires such parents to transfer their children from nursing facilities.

[6]   That finding is implicit in the court's determination that the United States established its *Olmstead* claim with respect to these children (Doc. 1170, at 45, 79). See *United States* v. *$242,484.00*, 389 F.3d 1149, 1154-1155 (11th Cir. 2004) (en banc). Regardless, Florida has forfeited any challenge to the lack of an explicit finding.

- 23 -

and convincing" testimony of Dr. Amy Houtrow—an expert in qualitative research, medical decision-making, and the care of children with medical complexity. *Id.* at 55 & n.47, 61. Dr. Houtrow, Dr. Foster, and another pediatrician used qualitative-research methods to conduct and analyze "semi-structured interviews" with parents of institutionalized children. *Id.* at 57-58. After the 21st interview, they reached a point of data "saturation"—meaning they had confidence they had a "robust" understanding of participants' experiences and no new "themes regarding the families' views" were likely to emerge—but they interviewed 45 children's parents. *Ibid.*; Doc. 907, at 191, 262-263; see Doc. 907, at 170-192 (methodology).

Based on that analysis, Dr. Houtrow opined that, overall, parents of the 140 institutionalized children are unopposed to community placement. Doc. 1170, at 58, 61; Doc. 907, at 295. Setting aside one couple opposed for unique reasons (Doc. 907, at 201-202), Dr. Houtrow identified three "themes" arising from her analysis. Doc. 1170, at 58 n.49. First, many parents were "actively seeking their children's discharge" and thus were unopposed. Doc. 907, at 202. Second, some parents were unopposed because they were amenable to placement in a "community dwelling" other than "their own home." *Ibid.*

Third, many parents "desired their children to be at home but believe[d] that they had insurmountable barriers." Doc. 907, at 202. Parents frequently face three

- 24 -

"major barriers":  (1) the "lack of access to reliable [private-duty] nursing"; (2) the lack of "effective discharge planning," including "getting services arranged within the communit[y]"; and (3) "incomplete or inaccurate information."  *Id.* at 203, 209, 229.  These barriers are within Florida's control, given its Medicaid program is responsible for providing private-duty-nursing and care-coordination services.  See p. 6, *supra*.  Indeed, they are the barriers addressed by the district court's narrowly tailored injunction.  Doc. 1171, at 4-7.  Parents who would transfer their children but for those barriers are therefore unopposed to community placement.

Given Dr. Houtrow's rigorous analysis and other corroborating evidence (*e.g.*, Doc. 1170, at 59-60; pp. 44-46, *infra*), the district court did not clearly err in finding that parents of institutionalized children are overwhelmingly unopposed to community placement.  Florida offers four retorts, none persuasive.

First, Florida argues (Br.28 n.4) that Dr. Houtrow's testimony is hearsay.  But Dr. Houtrow relied on interviews of a type reasonably relied on by other medical researchers and applied her clinical and research expertise in performing her analysis.  Doc. 1170, at 55-58 & nn.47-48; Doc. 907, at 136-207.  The district court therefore acted within its discretion in admitting her testimony under Federal Rule of Evidence 703 (Doc. 907, at 196-197).  See *United States* v. *Garcia*, 447 F.3d 1327, 1336-1337 (11th Cir. 2006).

Second, Florida claims Dr. Houtrow "evaluated the wrong question" because she did not analyze whether families were "unopposed to transitioning."  Br.27 (quoting Doc. 907, at 272).  But, as Dr. Houtrow explained, some families that "want [their] child [home]" may not "want[] at this time" to "work[] towards [a] transition" home when the "transition process isn't going to lead to an acceptable outcome, which is adequate nursing" and "that sort of thing."  Doc. 907, at 273-274; *id.* at 183-184, 228-229.  Dr. Houtrow appropriately deemed such families unopposed.

Third, Florida questions whether Dr. Houtrow drew the right conclusions from her interviews, although it cites only 18 of the 45 interviews that it claims she mistakenly analyzed.  According to Florida, those interviews revealed "housing" barriers "outside Florida's control," and thus the parents were incorrectly deemed unopposed.  Br.26.  That argument founders on multiple grounds.

For starters, some obstacles Florida references in the 18 interviews are either not barriers to community living or are plainly within Florida's control.  For example, two children's parents deemed *their own homes* unsuitable but were properly found unopposed because they were open to *family-based alternatives*.  Doc. 987, PEX 5201, at 2-3; Doc. 1010, PEX 5240, at 2-3.  Other "housing" barriers Florida cites concerned *accessibility* (*e.g.*, Doc. 987, PEX 5212, at 2; Doc. 987, PEX 5222, at 2-3), which Florida could address through its iBudget waiver

program that provides certain home-modification benefits (Doc. 1170, at 41-43, 64).  Still other "housing" barriers involved *misinformation*, which Medicaid care coordinators can address.  For example, C.A.'s parents were told their home was insufficient because it lacked a separate space for C.A.  Doc. 1010, PEX 5199, at 2-3; Doc. 906, at 118-119; Doc. 987, PEX 5196, at 2 (similar for H.A.).  Because that is wrong (Doc. 907, at 248), Dr. Houtrow correctly deemed C.A.'s parents unopposed.  Confirming her categorization, C.A. came home after his parents learned their home was sufficient and overcame longstanding barriers in obtaining nursing and training.  Doc. 1170, at 21-22, 40 n.32 (C.A. institutionalized *nine years*).

True, some of the 18 families told the experts they needed to make other housing adjustments, but nearly all also cited barriers indisputably within Florida's control, such as the lack of nursing.  If Florida removed those barriers, such parents may overcome housing obstacles because they would have reason to do so.  For example, K.B.'s mother explained a lack of nursing and other services prevented K.B. from returning home, and once those services were in place, the family would merely need to "figure out how to set up [their home's] space."  Doc. 1010, PEX 5197, at 1-2.  Similarly, a parent Florida highlights (Br.26) is trying to move from a trailer so her child can come home, but she emphasized that nursing would be

unavailable even if she moves.  Doc. 987, PEX 5220, at 2; Doc. 907, at 301; see also, *e.g.*, Doc. 1010, PEX 5202, at 2.

In any event, Florida ignores Medicaid housing benefits its managed-care plans offer, and care coordinators can assist parents in obtaining housing assistance available in the community.  Doc. 899, at 16-17, 72, 132-133, 148-149; Doc. 907, at 235, 248; Doc. 913, at 22; Doc. 952, PEX 318, at 11031773-75, 11031780-81 (managed-care contract providing for (1) yearly "[h]ousing [a]ssistance"; and (2) "[t]ransition [a]ssistance" when moving from nursing facility to community). And even if Florida's arguments raised questions about whether Dr. Houtrow properly categorized a smattering of the 45 children's parents, that would not undermine the district court's finding that parents of the 140 institutionalized children are "*overall*" unopposed to community placement.  Doc. 1170, at 61.[7]

Florida's final attack on the court's factual finding fails for similar reasons. It claims (Br.3-4, 9-10, 23) certain testimony shows 24 families chose nursing facilities for reasons having "nothing to do with Florida."  But even if all 24

---

[7]  Florida is incorrect (Br.26-27) that "seven parents whom Dr. Houtrow interviewed and deemed unopposed" later "contradicted her" assessment when they testified for the State.  Compare, *e.g.*, Doc. 987, PEX 5214, at 1-2 (interview summary), with, *e.g.*, Doc. 894, at 64 (interviewed parent's testimony). Regardless, by the time these parents testified, many believed the United States sued to close Florida's nursing facilities—a misimpression the district court reasonably found "may have affected the way they described their experiences." Doc. 1170, at 18 n.16.

families were opposed, that would not "diminish" the "more dominant [contrary] sentiment" of the 140 parents, much less establish clear error. Doc. 1170, at 61. Regardless, the cited testimony does not show the families of all 24 children are opposed.

For 15 children, Florida cites testimony by nursing-facility employees providing a snapshot of the *employee's* understanding of the child's status. Br.3-4 (citing Doc. 896, at 101-157; Doc. 912 at 238-268). The court was entitled to discount those snapshots in favor of Dr. Houtrow's study relying on well-established techniques to elicit reliable information from parents (Doc. 1170, at 57-58 & n.48; Doc. 907, at 160-192). Moreover, evidence showed nursing-facility employees sometimes inaccurately reported parents were uninterested in community placement. For example, Florida cites (Br.4) an employee's testimony that five-year-old K.R.'s mother "will think about transitioning" K.R. when the mother and her new baby "are settled" (Doc. 912, at 264). But K.R.'s father testified he and his wife have wanted—and been ready—to bring K.R. home since at least mid-2022 but lacked assistance obtaining private-duty nursing and other supports. Doc. 909, at 4-6, 18-20, 24, 31, 34-37; Doc. 1170, at 26-27.[8]

---

[8] Florida elsewhere incorrectly cites (Br.9) this testimony for the proposition that K.R. currently "lives in a nursing home" because of her parents' "housing instability," "exposure to COVID at work," and desire to "ready" their home.

Florida's claim that it had nothing to do with why the 24 families chose nursing facilities fails for other reasons, too. For example, Florida references (Br.4, 9-10) a parent who was previously homeless and now has unstable housing. The State ignores, however, the parent's testimony that care coordinators neither told her about available Medicaid housing benefits, nor discussed community placement in a group home, which she was interested in exploring because she preferred a home setting for her child, D.W. Doc. 908, at 35-36, 52-53, 59-64, 82-86.

In short, the court heard overwhelming evidence that parents of institutionalized children are overall unopposed to community placement. The vast majority are seeking their children's discharge, want their children home but face obstacles within Florida's control, or are open to alternative community dwellings. Florida has not come close to establishing clear error on this record.

C.    *The Court Properly Found That The Proposed Modifications Are Reasonable*

1.    *The Court Did Not Clearly Err In Finding The Modifications Will Redress Injuries*

Florida asserts (Br.30-34) that the United States did not show that its proposed modifications would redress any child's injuries. It contends that those changes are accordingly not "reasonable modifications" and that Article III

redressability is lacking.  The district court did not clearly err in rejecting Florida's

factual contention.  Doc. 1170, at 16-18, 61-66.

a.  Take the private-duty-nursing modifications, for example.  As the court

explained, the Medicaid Act requires Florida to ensure that Medicaid-enrolled

children in the community receive *all* medically necessary private-duty nursing.

Doc. 1170, at 72.  That requirement is set forth in parts of the Medicaid Act

addressing the "early and periodic screening, diagnostic, and treatment services"

(EPSDT) benefit available to children.  See 42 U.S.C. 1396a(a)(43)(A)-(C),

1396d(a), 1396d(r)(5); see *O.B.* v. *Norwood*, 838 F.3d 837, 841-843 (7th Cir.

2016); *Katie A.* v. *Los Angeles Cnty.*, 481 F.3d 1150, 1158-1159, 1162 (9th Cir.

2007).[9]

Florida is contravening that mandate, however, because "[m]ost families are

receiving nowhere near the number of [nursing] hours they require."  Doc. 1170, at

6.  The court found that "deficit" is resulting in the widespread unnecessary

---

[9]  Florida is mistaken (Br.40 n.5) that the Medicaid Act does not "demand 100-percent accessibility" here.  Even if the general provision Florida cites applied, it directs States to take certain actions to ensure services are available "*at least* to the extent" they "are available to the general population in the geographic area." 42 U.S.C. 1396a(a)(30)(A) (emphasis added).  The EPSDT provisions—which Florida ignores—require States to exceed that floor for children.  Indeed, Florida's managed-care contracts require the "100% provision of [private-duty nursing]" to children.  Doc. 1170, at 72; Doc. 840, at 9, 11.

- 31 -

institutionalization of children with medical complexity and the serious risk thereof.  *Id.* at 6, 34-37, 44-45.

The United States proposed multiple methods by which Florida could make the commonsense modification of expanding access to private-duty nursing, and the court heard considerable evidence bearing on their effectiveness.  Doc. 1170, at 62-66.  In particular, Dr. Sara Bachman—a "leading expert[] in Medicaid program policy, structure, and financing" (*id.* at 30)—testified about certain "very effective" tools other States "routinely" use to increase access to services, and she was "[e]xtremely confident" their implementation in Florida would "enabl[e] more children to live at home."  Doc. 909, at 121-123, 166-167.

For example, Dr. Bachman recommended that Florida pay Medicaid private-duty nurses more, and the court "heard credible testimony that—not surprisingly—increasing nurses' pay would result in more available nurses."  Doc. 1170, at 17, 63.  Not only did Dr. Bachman and others testify to the efficacy of increasing pay, but also managed-care organizations in Florida have found that strategy effective, using so-called "single-case agreements" to "entice" private-duty nurses to take particular cases "based on an increased reimbursement rate."  *Id.* at 30, 63; see also *id.* at 17, 63 nn.52-53 (discussing other evidence, including Florida's low rates).

Dr. Bachman also urged Florida to fine-tune its "network-adequacy standards"—standards Florida includes in contracts with managed-care plans

- 32 -

mandating that plans' networks include a minimum number of providers of various types (such as home-health agencies, which typically provide private-duty nursing). Doc. 1170, at 31, 62; Doc. 894, at 175. Florida's contracts generally require managed-care organizations to have at least two home-health agencies in each county. Doc. 1170, at 31; Doc. 894, at 179-180. Dr. Bachman testified that, instead, Florida should, for example, set the minimum for each county "based on the number of children who need [private-duty nursing]." Doc. 1170, at 62. Florida's expert likewise recommends that managed-care plans exceed the State's current standard to "ensure network adequacy." Doc. 897, at 107.

As a final example, Dr. Bachman recommended that Florida employ existing contractual enforcement mechanisms, including corrective-action plans and liquidated damages, when managed-care plans fail to comply with their "extremely detailed and demanding" contracts with Florida requiring "100% delivery" of all medically necessary private-duty nursing (Doc. 1170, at 17, 72). *Id.* at 31-33, 65, 76-78. Florida's expert likewise generally supports using those mechanisms for contractual violations, and he reported that Florida has not imposed liquidated damages in the past five years for not delivering medically necessary services. Doc. 897, at 46, 113-116; Doc. 912, at 52, 77-78.

Based on this and other evidence, the court found that the United States' proposed private-duty-nursing modifications were reasonable, and thus it

necessarily determined they would be effective.  Doc. 1170, at 66.  The court

likewise found redressability established.  *Id.* at 17-18.  And the court similarly

analyzed the other modifications the United States sought.  *Id.* at 18, 38-41, 44-45,

62-67, 73-76.

b.  Florida does not take issue with this evidence and analysis except to

complain (Br.31-32) that Dr. Bachman "could not say" whether her proposals

would avert any particular child's unlawful institutionalization or risk thereof.  But

that is because Dr. Bachman looks at gaps affecting larger "population[s]" of

children, not "individual children."  Doc. 909, at 218-219 (Medicaid programs take

similar approach).  Although Dr. Bachman did not evaluate the circumstances of

any individual child, she was "[e]xtremely confident" Florida's implementation of

her proposals would "enabl[e] more children to live at home."  Doc. 909, at 166-

167.  Florida offers no basis for second-guessing that well-supported

determination.

## 2. *Florida Had Sufficient Notice Of The Modifications*

Finally, Florida contends (Br.34-38) that the injunction requires it to make

certain modifications the United States improperly proposed for the first time in its

post-trial brief addressing remedies.  As the district court explained, Florida

"conflates the 'reasonable accommodations' element" of an *Olmstead* claim with

the court's "determination of injunctive relief."  Doc. 1170, at 67.

With respect to the former, an *Olmstead* plaintiff does more than enough where, as here, it proposes a particular reasonable modification and proffers multiple means for implementing it.  See, *e.g.*, *Steimel*, 823 F.3d at 916.  If a defendant does not satisfy its burden of showing the modification would amount to a fundamental alteration, liability is established.  28 C.F.R. 35.130(b)(7); *Frederick L.*, 364 F.3d at 492 n.4.  The district court then turns to crafting a remedy, at which point it "retains its usual discretion to enter the appropriate declaratory or injunctive relief." *Brown* v. *District of Columbia*, 928 F.3d 1070, 1083 n.10 (D.C. Cir. 2019).

Here, as the district court concluded, the United States' "pretrial disclosures regarding recommended accommodations were detailed enough to put the State on notice and enable it to plan its defense."  Doc. 1170, at 67.

a.  As to private-duty nursing, those disclosures repeatedly (1) advised Florida it should meet its obligation under the Medicaid Act to provide all medically necessary nursing (see p. 30, *supra*); and (2) identified multiple concrete means for achieving that goal, such as increasing nurses' pay and enforcing contracts with managed-care organizations.

For example, Dr. Bachman's expert report—which the United States incorporated into an interrogatory response (Doc. 789, Ex. 17, at 15)—opined that Florida can "improve access" to private-duty nursing, thereby "implementing what

- 35 -

is already clearly delineated in Florida's Medicaid State Plan," and the report identified multiple means for doing so.  Doc. 785-6, at 9, 12, 16-19, 23.  The United States' partial-summary-judgment motion likewise explained Florida should "expand[] existing in-home nursing services" by "meeting the State's existing obligation under federal Medicaid law," and it proposed tools for accomplishing that end.  Doc. 773, at 18, 30-31.  The motion argued that "because [Florida] already must make medically necessary services accessible" under the Medicaid Act, "meeting this obligation is inherently reasonable."  *Id.* at 32; see Doc. 869, at 13, 41, 59-61, 71 (pre-trial brief) (same); see also Doc. 789, Ex. 17, at 8-10, 16-17 (interrogatory response); Doc. 709, at 15 (opposition to motion to dismiss); Doc. 840, at 3 (pretrial stipulation); accord Doc. 906, at 17 (opening statement at trial).

Accordingly, if Florida believed it would be a fundamental alteration to expand access to private-duty-nursing services—including by ensuring children with medical complexity receive up to 100% of their authorized private-duty-nursing hours, as the Medicaid Act requires—it had "ample opportunity" to put on a defense to that effect.  Doc. 1170, at 67.  As the court explained, "the State's failure to provide adequate [private-duty nursing] was the cornerstone of this case from its inception."  Doc. 1178, at 4.

When Florida failed to establish such a defense, the court properly turned to fashioning a remedy.  Florida "refused," however, "to engage in efforts to craft any meaningful solutions" (Doc. 1170, at 78), and thus the court appropriately exercised its remedial discretion by requiring Florida to provide children 90% of all private-duty-nursing hours authorized by Medicaid and desired by parents. Doc. 1171, at 3-5.  In doing so, the court afforded Florida flexibility many States would welcome, allowing it to use not just the tools the United States proposed for increasing access, but also any other means to reach the benchmark. *Ibid.*; Doc. 1170, at 72.  Florida can hardly complain that it did not know the benchmark would be set at 90% when the United States proposed an even more restrictive modification—expansion of nursing services in a manner that complies with the Medicaid Act.

b.  Florida fares no better in arguing (Br.35) that certain other injunctive provisions are similarly infirm.  It contends, for example, that the United States did not provide adequate notice that it was seeking certain changes to how Florida oversees Medicaid care-coordination services and the process for planning children's transition out of nursing facilities.  Br.35 (citing Doc. 1171, at 3, 5-7 (Sections I(O), III(B)-(G), IV(A), IV(C))).  Not so.  See, *e.g.*, Doc. 785-6, at 14-16, 20; Doc. 789, Ex. 17, at 13-17; Doc. 773, at 19, 31; Doc. 863, at 3-5, 13-14; Doc. 869, at 20, 44-45, 59, 71; accord Doc. 906, at 17.  Indeed, Florida did not even

mount an unfair-surprise argument in district court with respect to Parts III(B)-(D) of the injunction, thus forfeiting any such challenge. Doc. 925, at 14-15. Moreover, the parties presented substantial evidence at trial about care-coordination and transition-planning services, underscoring that both sides knew they were at issue. See Doc. 1170, at 38-41, 64, 73-76.

Furthermore, as the court explained, that some of the "remedial language" in the injunction "is more detailed" does not mean Florida could not mount a fundamental-alteration defense. Doc. 1170, at 67. And, of course, once a court finds a violation of the statute, it has discretion to order commonsense remedies to address it. See, *e.g.*, *United States* v. *Virginia*, 518 U.S. 515, 547 (1996); *Brown*, 928 F.3d at 1083 n.10. Here, for example, regardless of the United States' notice, it was within the court's discretion to require Florida to initiate a process to determine whether and how each institutionalized child can go home or to the community—relief that is necessary to right the wrong here.

## II

## THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN ISSUING THE INJUNCTION

Florida next contends that even if it violated Title II, aspects of the district court's injunction are infirm. The State has not, however, established any abuse of discretion.

- 38 -

*A.    The Court Properly Found Widespread Violations*

Florida first argues that its statutory violations were not "widespread"

enough to justify "systemwide relief" under *Lewis*, 518 U.S. at 359.  In making

that argument, Florida contends in passing (Br.40-41) that Title II prohibits

unjustified institutionalization, but not the "risk" of such institutionalization, and it

argues (Br.38-42) that the record did not show widespread violations either way.

The district court correctly held that a "serious risk" of institutionalization is

actionable (Doc. 1170, at 8-9), and it did not clearly err in rejecting Florida's

factual contentions (*id.* at 18, 34-45, 68 n.55).  Indeed, Florida's factual

arguments—including its claims that it is responsible for the institutionalization of

only seven children—overlook extensive contrary evidence.

*1.    The Integration Mandate Protects Individuals In The Community*

As six circuits have concluded, Title II and the integration regulation

prohibit not only the unnecessary institutionalization of individuals with

disabilities, but also the "serious risk" of such institutionalization.  See *Davis* v.

*Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Pashby* v. *Delia*, 709 F.3d 307, 322 (4th

Cir. 2013); *Waskul* v. *Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460-

461 (6th Cir. 2020); *Steimel*, 823 F.3d at 914 (7th Cir.); *M.R.* v. *Dreyfus*, 697 F.3d

706, 734-735 (9th Cir. 2012); *Fisher* v. *Oklahoma Health Care Auth.*, 335 F.3d

1175, 1181-1182 (10th Cir. 2003).

- 39 -

That conclusion follows from the integration regulation's text, which specifies that States "shall administer services" in the "most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. 35.130(d).  Significantly, that text does *not* say "institutionalization is a prerequisite to enforcement" of the integration mandate.  *Davis*, 821 F.3d at 263 (citation omitted).  Rather, where, as here, a State deprives qualified individuals with disabilities who live in the community of services that are critical to maintaining their health—and thereby creates a serious risk that they will be forced to seek care in institutions—the State fails to "administer [its] services" in the "most integrated setting appropriate to [their] needs."  28 C.F.R. 35.130(d); accord *Radaszewski*, 383 F.3d at 607-608, 611, 614-615.  When a reasonable accommodation would fix the problem, the State additionally fails to "avoid discrimination," as required by the reasonable-modification regulation.  28 C.F.R. 35.130(b)(7)(i).

Persons at serious risk of unnecessary institutionalization are subjected to discrimination under the statute as well.  In *Olmstead*, the Supreme Court concluded that unnecessary institutionalization is a form of unlawful discrimination because, "to receive needed medical services," individuals with disabilities must "relinquish participation in community life they could enjoy given reasonable accommodations," while persons without disabilities "can receive the

medical services they need without similar sacrifice." 527 U.S. at 601. The

children facing a "serious risk" of unnecessary institutionalization here are

likewise subjected to unlawful discrimination: unlike individuals without

disabilities, they must "choose between forgoing necessary medical services while

remaining in the community or receiving necessary medical services while

institutionalized." *Waskul*, 979 F.3d at 460; see also *Olmstead*, 138 F.3d at 899;

*M.R.*, 697 F.3d at 735.

Thus, "while it is true that the plaintiffs in *Olmstead* were institutionalized at

the time they brought their claim, nothing in the *Olmstead* decision supports a

conclusion that institutionalization is a prerequisite to enforcement of the ADA's

integration requirements." *Fisher*, 335 F.3d at 1181. For these reasons, DOJ

issued guidance in 2011 stating that "the ADA and the *Olmstead* decision extend to

persons at serious risk of institutionalization." DOJ, *Statement of the Department

of Justice on Enforcement of the Integration Mandate of Title II of the Americans

with Disabilities Act and* Olmstead v. L.C., Q. 6, https://perma.cc/M2UC-22BY.

Although, the United States believes the integration regulation is unambiguous,

DOJ's longstanding, authoritative, expertise-based, and considered guidance is at

least a reasonable interpretation of DOJ's regulation and warrants deference under

*Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2414-2418 (2019).

Only one circuit—the Fifth—has reached a contrary conclusion, but its decision is wrong and inapplicable in any event.  In *United States* v. *Mississippi*, 82 F.4th 387, 392-398 (5th Cir. 2023), that court held that, on the record there, a serious risk that individuals with serious mental illness would be unnecessarily hospitalized was not actionable.  In reaching that incorrect conclusion, however, *Mississippi* did not grapple with the statutory and regulatory arguments advanced above, and it misunderstood certain circuit decisions.  See, *e.g.*, *id.* at 392 (incorrectly stating *Fisher* found at-risk claims cognizable because they are not "prohibited" by statute or regulation).

Regardless, *Mississippi* concluded that it "need not say" whether its six sister circuits were "wrong" to hold that Title II prohibits the "serious risk" of unnecessary institutionalization, stating their decisions are "significantly factually distinguishable."  82 F.4th at 396.  The Fifth Circuit observed that those decisions involved "claims for personal care services or medically necessary items," including claims seeking private-duty nursing.  *Id.* at 396 & n.17 (citing *Radaszewski*, 383 F.3d at 600).  *Mississippi* emphasized that the "consequences of providing personal care services" for only part of the day are "susceptible" to "quantification" and "generalization," *id.* at 396—analysis that applies equally to the private-duty-nursing gaps here.  In the court's view, however, the same is not true of a failure to provide services to individuals with serious mental illness.  *Ibid.*

*Mississippi* was gravely mistaken in relying on that distinction.  But given its narrow holding and explicit distinguishing of the type of service sought here, an affirmance would not conflict with *Mississippi*.

Florida offers two counterarguments, both flawed.  First, Florida finds it significant that Title II's text does not say that individuals "*about to be subjected to discrimination*" may sue.  Br.41 n.6 (citation omitted).  As explained, however, Florida is *already* discriminating against children with medical complexity in the community by denying them critical medical care promised in an institution and thereby placing them at serious risk of unnecessary institutionalization.  Regardless, the governing statutory text is broad, providing remedies to "any person alleging discrimination."  42 U.S.C. 12133.[10]

Second, Florida contends that children at "risk" of unnecessary institutionalization do not satisfy Article III's injury-in-fact requirement (Br.40-41), ignoring that the district court found that the children here are at "*serious* risk" of unnecessary institutionalization (Doc. 1170, at 18, 45, 79 (emphasis added)).

---

[10]  Even if a serious risk of unnecessary institutionalization were not itself actionable under Title II, the relief the district court granted the at-risk children would still be appropriate to *prevent* the unnecessary institutionalization *Olmstead* indisputably proscribes.  See, *e.g.*, *United States* v. *W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (explaining "[t]he purpose of an injunction is to prevent future violations" and such relief is appropriate where there is a "cognizable danger of recurrent violation"); *Thomas* v. *Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010).

Regardless, Florida's deprivation of medically necessary services in the community—not to mention the dire consequences flowing from that deprivation (see pp. 47-48, *infra*)—inflicts an Article III injury on the children. *Bill M.* v. *Nebraska Dep't of Health & Hum. Servs. Fin. & Support*, 408 F.3d 1096, 1099 (8th Cir. 2005), vacated on other grounds, 547 U.S. 1067 (2006). Moreover, this suit was brought by the *United States*, which has suffered an "injury to its sovereignty arising from violation of its laws" sufficient to satisfy Article III standards. *Vermont Agency of Nat. Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); see *United States* v. *Raines*, 362 U.S. 17, 27 (1960).

   2.   *The Court Did Not Clearly Err In Finding The Violations Pervasive*

   The district court did not clearly err in finding that children with medical complexity are unjustifiably "institutionalized or at serious risk of being so because of a combination of the State's systemic failings," including its shortcomings in providing private-duty nursing and overseeing care-coordination services. Doc. 1170, at 18, 34-45. The court therefore properly determined that Florida's Title II violations are widespread enough to warrant systemic relief. *Id.* at 68 n.55.

   *a. Private-Duty Nursing.* Florida does not dispute the widespread nature of its substantial shortfalls in providing private-duty nursing to children with medical complexity. Doc. 1170, at 34-39, 68 n.55; Doc. 909, at 104. That is significant because, as Dr. Foster explained, private-duty nursing is a "vital" service in which

- 44 -

a skilled nurse administers medications, monitors children for medical problems, and otherwise "execute[s]" a doctor's "plan of care."  Doc. 906, at 140 (children "use technology to keep them alive"); see also Doc. 913, at 35-36.  Given that and other record evidence, the district court did not clearly err in finding that Florida's pervasive private-duty-nursing failings have resulted in widespread unnecessary institutionalization and a serious risk thereof, despite parents' "heroic" efforts to keep their children home.  Doc. 1170, at 6, 36-37, 44-45.

*i. Widespread Unnecessary Institutionalization.*  Starting with the court's institutionalization finding, Florida is wrong (Br.38-39) that the court relied *solely* on evidence that seven children were placed in nursing facilities as a direct result of inadequate private-duty nursing, although that evidence was compelling.  Doc. 1170, at 36-37.  The court *also* cited two other families' testimony that insufficient nursing delayed their children's transfers and a nursing-facility official's testimony that "the lack of around-the-clock nursing was the biggest obstacle to discharging children."  *Id.* at 37.

Other evidence confirms these families' experiences are not unique.  When Dr. Houtrow analyzed the experiences of institutionalized children's parents, she found that the "lack of access to reliable nursing" was an "incredibly frequent and incredibly intense" theme that was a "reason so many of these children are residing

- 45 -

in nursing facilities."[11]  Doc. 907, at 203, 205, 207; see Doc. 913, at 24.  Indeed,

even a witness handpicked by Florida testified she placed her daughter in a nursing

facility because of insufficient private-duty nursing.  Doc. 894, at 18, 21, 26, 29-31

(D.O.).  Additional record documents tell the same story for other families.  *E.g.*,

Doc. 1007, PEX 1243, at 11064381, 11064391 (documenting K.G.'s placement in

facility and explaining nursing was "[in]consistent" and parents could not "safely"

care for her "without consistent service").  The medical director of one of the

nursing facilities—another witness Florida called—likewise testified that, in his

experience, the lack of private-duty nursing can require children to go to a hospital

or nursing facility.  Doc. 896, at 7-8, 11-12, 53.  And an expert for Florida

explained that if more private-duty nurses were available, more children in nursing

facilities could go home.  Doc. 911, at 12, 20-21.[12]

---

[11]  To the extent Florida challenges that determination, it is amply supported by the experts' interview notes.  Docs. 987 & 1010, PEX 5192-5243.

[12]  Florida repeatedly claims (Br.9-10, 15, 29) that (1) parents of only three institutionalized children testified for the United States; and (2) no children are currently institutionalized because of Florida.  In fact, the parents of *five* institutionalized children testified for the United States, and all explained how Florida's actions contributed to their children's institutionalization.  Doc. 906, at 249-250, 259-262, 268-271, 277 (J.M.); Doc. 1194-4, at 17-21 (C.N.); pp. 26, 28, 29, *supra* (C.A., K.R., D.W.); see also Doc. 1170, at 37 (discussing J.M., C.N., C.A., and K.R., the second, fourth, fifth, and sixth children mentioned); *id.* at 19-22, 26-27 (C.A., K.R.).  Moreover, Florida ignores the other evidence discussed above and the testimony of Brenda Legge, who identified children in her nursing facility due to nursing gaps.  Doc. 1170, at 37.

Florida observes (Br.28-29) that one of the United States' interrogatory responses identified only seven children admitted to nursing facilities because of inadequate private-duty nursing, but that response only underscores the pervasiveness of the problem. *Five* of the seven children listed are not among those discussed above (Doc. 1122-9, at 4-8), making it clear that the United States presented some—but far from all—of its evidence at the time-limited trial. Moreover, the universe of children evaluated in that interrogatory response was relatively small: it consisted of children known by the United States to have been transferred to nursing facilities since 2019 after experiencing gaps in nursing *in the community*. Doc. 1122-9, at 2-3. The United States did not list any children admitted to facilities *from hospitals*—children who make up a majority of the nursing-facility population (Doc. 896, at 16-17, 104-105), and whose admission can also result from parents' inability to establish the private-duty nursing they need so their children can come home (*e.g.*, Doc. 894, at 20-21; Doc. 907, at 237-238).

The evidence the United States presented, together with corroborating evidence Florida itself introduced, was therefore more than enough to support the court's finding that Florida's private-duty-nursing failings have resulted in widespread unlawful institutionalization. See, *e.g.*, *Clement*, 364 F.3d at 1153 ("substantial number" enough). Florida has not established clear error.

*ii. Widespread Serious Risk Of Unnecessary Institutionalization.*  The court also did not clearly err in finding that Florida's private-duty-nursing failings have contributed to a widespread serious risk that children in the community will be unnecessarily institutionalized.  All eight parents who testified about caring for their children at home in the face of nursing gaps described "horrific stories" about their "desperat[ion]" as they struggled to cover those gaps—struggles that have resulted in lost jobs and homes, diminished sleep and health, fears for their children's safety, and other perilous circumstances.  Doc. 913, at 46-47 (court's characterization); see, *e.g.*, Doc. 1170, at 22-25, 28-30; Doc. 906, at 234-235, 238-239, 264-268; Doc. 907, at 76-81, 92-96, 101-104; Doc. 1194-1, at 20-22; pp. 7-8, *supra*.  Three care coordinators likewise testified about the substantial impacts nursing gaps can have on families, including the death of children.  Doc. 908, at 112-113; Doc. 899, at 100, 160-163.  Significantly, Florida did not call *any* witnesses to testify that these families' experiences are unusual.

Nor could it have done so.  Families of Medicaid-eligible children are poor, and many have only a single parent.  See, *e.g.*, Doc. 909, at 45.  As a result, they live on the edge as they attempt to cover significant nursing gaps while also (1) holding down jobs (when feasible) to pay for housing and other needs; and (2) caring for other family members and attending to their own health, both of which can present unpredictable challenges.  See, *e.g.*, Doc. 1194-3, at 7-9 (parent

explaining negative "domino effect" of lack of nursing on his jobs, health, and son's care).  Because of these precarious circumstances, parents may become unable at any time to cover nursing gaps, and yet the care in question is critical to keeping children with medical complexity alive.  Such children are accordingly at a serious risk, and perpetually on the brink, of entering nursing facilities to obtain life-sustaining care.  Florida is plainly failing to "administer [its] services" in the "most integrated setting appropriate."  28 C.F.R. 35.130(d).

Still other evidence supports that conclusion.  For example, the fact that many children have *already* been institutionalized because of a lack of private-duty nursing (see pp. 44-46, *supra*), underscores the serious risk of institutionalization facing children in the community experiencing similar nursing gaps.  Indeed, some parents reluctantly acknowledge that if they cannot continue covering those gaps, they may have no choice but to institutionalize their children "as a last resort."  Doc. 910, at 114-115; Doc. 1194-1, at 26.  That accords with recommendations of some care coordinators that parents facing nursing gaps should move their children to facilities.  *E.g.*, Doc. 1194-3, at 21-22; Doc. 910, at 115.  It is thus no surprise that one care-coordinator manager acknowledged the "serious risk" of institutionalization posed by inadequate nursing (Doc. 896, at 212-213, 235) and that Dr. Bachman likewise testified that nursing gaps place children at risk (Doc. 909, at 100).

After hearing all this evidence, the court reached the commonsense conclusion that pervasive gaps in providing children critical private-duty nursing have resulted in a widespread serious risk of unnecessary institutionalization. Florida wholly ignores that evidence and thus comes nowhere close to establishing that the court clearly erred.[13]  See *Waskul*, 979 F.3d at 461-462 (deeming individuals facing similarly precarious circumstances at serious risk); *Radaszewski*, 383 F.3d at 608, 614-615 (claim that lack of private-duty nursing "portends" institutionalization may proceed); see also *Pashby*, 709 F.3d at 322.

 *b. Care Coordination.*  The court likewise did not clearly err in determining that Florida's pervasive failures in overseeing Medicaid care-coordination services contribute to widespread statutory violations.  Doc. 1170, at 38-41, 44-45, 68 n.55.  In analysis Florida ignores (Br.42 n.7), the court described, for example, undisputed evidence that (1) care coordinators routinely fail to obtain necessary private-duty nursing for children; and (2) Florida's data collection does not allow it to have a "comprehensive picture" of care coordinators' failures in this and other regards, making it difficult for Florida to take corrective action.  Doc. 1170, at 38-

---

[13]  As the discussion above makes clear, Florida is quite wrong (Br.40) that the only evidence about children with medical complexity in the community is found in "seven spreadsheets."  Moreover, contrary to Florida's implication, the cited spreadsheets are themselves compelling, as they document Florida's substantial nursing gaps on a child-by-child basis.  See, *e.g.*, PEX 2610.

- 50 -

41 & n.33.  The court also explained that even though care coordinators are tasked with informing parents about alternatives to nursing-facility placement, testimony by both sides' witnesses "was replete" with examples of parents "being given no information or misinformation."  *Id.* at 40; see also *id.* at 19-21, 25-29 & n.21 (describing substantial delays in transfers from facilities because of misinformation or lack of information); Doc. 907, at 209, 229; Doc. 1194-1, at 16.

Quite plainly, Florida's pervasive failures in overseeing the care-coordination system deprive parents of information and resources needed to establish and maintain services needed for their children to live in the community.  The court thus did not clearly err in finding those failures contribute to Florida's widespread violations of the integration mandate.

Florida's only response is to observe (Br 42. n.7) that quality-of-medical-care challenges are not cognizable under the ADA.  As the court explained, however, the United States does not claim that Florida's care-coordination services *themselves* violate the ADA.  Doc. 1178, at 2 n.1.  Rather, the United States' claim is that Florida is violating the integration mandate by not providing *nursing and other medically necessary services* to children in an integrated setting, and it contends that Florida's failures in overseeing care coordination contribute to that result.  That claim is cognizable, and Florida points to no contrary case law.  See *Olmstead*, 527 U.S. at 603 n.14; cf. *Buchanan* v. *Maine*, 469 F.3d 158, 173-175

(1st Cir. 2006) (not recognizing adequacy-of-treatment claim but emphasizing case did not concern integration mandate).

## B.    The Injunction Respects Federalism Principles

As the district court explained, its injunction "flows from the evidence," is "tailored to make essential changes," and is "mindful of federalism concerns." Doc. 1170, at 68.  Florida nonetheless contends that the remedy violates federalism principles for three reasons, none of which withstands scrutiny.

1.  First, the State argues (Br.44-45) that the court "seized control of Florida's administration of services to children with complex medical needs" and "encumber[ed]" its Medicaid program with "onerous mandates found nowhere in federal law."  Tellingly, Florida offers no examples of offending provisions.

In fact, the injunction is limited.  It principally requires Florida to use any tools it chooses to provide children 90% of private-duty nursing hours authorized by Medicaid and desired by parents.  Doc. 1171, at 3-5.  Significantly, that remedy requires even *less* than the 100% coverage Florida must already provide under the Medicaid Act.  See p. 30, *supra*.  Moreover, Florida's legislature has already "recognized the need to improve the delivery of [private-duty nursing] and attempted to take steps to address it," underscoring the lack of federalism concerns here.  Doc. 1178, at 4; Doc. 1170, at 69-72.

The injunction's only other requirements are that Florida (1) increase oversight over the care-coordination system in a handful of specified ways; (2) follow particular steps—many of which are already required by state regulation and contract—to facilitate the transition of children from nursing facilities to the community when desired by families; and (3) collect certain data to facilitate the foregoing tasks.  Doc. 1171, at 3-8; see Doc. 1170, at 67-78.  Florida fails to explain how those modest requirements are unduly "onerous" or "seize[] control" of its service system.  Br.45.[14]

2.  The State next claims (Br.45) that the injunction's private-duty-nursing remedy improperly "coerces Florida into seeking appropriations" to increase nurses' pay.  Florida appears to recognize that the injunction allows it to use any tools to attain the 90% benchmark, but it argues (Br.45) that the "*only* means that the court found would be effective" is "higher reimbursement rates."  Not so.  As explained (at 31-33), the court deemed multiple tools for expanding access to private-duty nursing effective.  Florida does not contend that those alternative

---

[14]  Relatedly, Florida invokes (Br.43) *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2368 (2023) (citation omitted), which interpreted the word "modify" in a student-loan statute to mean "change moderately or in [a] minor fashion."  But Florida offers no reason to import *Biden*'s interpretation into the Title II context—a context in which 28 C.F.R. 35.130(b)(7)'s fundamental-alteration defense provides an avenue for addressing concerns about substantial changes.  Regardless, the injunction's modifications are moderate.

- 53 -

approaches—or the additional means the court suggested (Doc. 1170, at 68-72, 76-78; Doc. 1171, at 3-5)—require appropriations.

Regardless, the record does not establish that appropriations are required to increase nurses' pay. Indeed, Florida cites (Br.45) only three pages out of the voluminous trial record addressing nurses' pay that could even *potentially* support its argument. Doc. 897, at 69, 144; Doc. 1107, PEX 4509, at 1. Even if those pages suggested appropriations are necessary rather than merely sufficient, Florida ignores Dr. Bachman's testimony that an appropriation would *not* necessarily be required because, for example, "the money could come from efficiencies that result from an improved system of care." Doc. 909, at 186-189; see also Doc. 897, at 21-26, 90, 97.

Given Florida's scant evidence on this issue, Dr. Bachman's persuasive testimony, and the multiple means available to Florida for achieving the 90% benchmark, the court acted well within its discretion in finding that its injunction does not require appropriations. Doc. 1170, at 72; Doc. 1178, at 5. And even if the injunction pressured Florida to seek an appropriation, it would still be consistent with federalism principles. See *Milliken* v. *Bradley*, 433 U.S. 267, 288-291 (1977) (holding injunction requiring State to expend funds to comply with federal law was consistent with federalism principles). Indeed, "[i]nadequate state appropriations do not excuse noncompliance" with federal law. *Doe 1-13*, 136

- 54 -

F.3d at 722 (brackets in original; citation omitted); see also *Wyatt* v. *Aderholt*, 503 F.2d 1305, 1317-1318 (5th Cir. 1974) (giving state legislature opportunity to appropriate funding for remedy and thereby avoiding federalism-based questions that might arise concerning alternative intrusive remedies).

3. Finally, Florida claims (Br.46) that the injunction's "monitor provisions reduce [it] to federal management."  But the prescribed monitor has no control over Florida's activities; instead, he merely issues reports "evaluating the State's compliance" with the injunction.  Doc. 1171, at 9-10; Doc. 1170, at 78; see *Local 28 of Sheet Metal Workers' Int'l Ass'n* v. *EEOC*, 478 U.S. 421, 482 (1986).  Florida complains (Br.46) that the monitor has "full access" to "persons," "documents," and the like, but the State neglects to mention that such authority must be exercised in a "reasonable" manner and only as "necessary to assess the State's compliance."  Doc. 1188, at 2.  In short, Florida's federalism-based challenges are meritless.

C.    *The Court Acted Within Its Discretion In Determining Florida Can Meet The Nursing Benchmark*

Finally, Florida challenges (Br.47-51) the feasibility of the injunction's requirement that it provide children 90% of all authorized and desired private-duty-nursing hours—a benchmark Florida will work towards on a reasonable timetable.  Doc. 1171, at 3-5.  The district court did not, however, abuse its discretion in finding the 90% benchmark "well within [Florida's] capabilities."  Doc. 1170, at

- 55 -

68; see also Doc. 1178, at 4 (explaining Florida "had a full and fair opportunity" to raise its "alleged inability to comply" by presenting a fundamental-alteration defense, which it "chose not to put on").[15]

As explained (at 31-33), the court found Florida has numerous reasonable tools at its disposal for expanding access to private-duty nursing.  Florida observes (Br.49-50) that Dr. Bachman did not evaluate whether those tools would "increase [nursing] service utilization" in Florida and never "determine[d] why children [in Florida] do not utilize all authorized hours."  But Dr. Bachman did not conduct that analysis because Florida's data did not allow for it—an informational deficit she recommended the State correct by collecting better data.  Doc. 909, at 112-113; Doc. 1170, at 62.  Moreover, data that *were* available were sufficient for Dr. Bachman to conclude that Florida's children have an access-to-care problem.  And she was "[e]xtremely confident" Florida could address that problem with the "very effective" tools she recommended, which other States "routinely" use.  Doc. 909, at 104, 113-115, 121-123, 166-167, 195; Doc. 1170, at 35, 36 n.30.  Given that and other corroborating evidence, the court did not clearly err in finding Dr. Bachman's approaches effective.

---

[15]  Florida appears to recognize that courts may issue injunctions that set performance goals and allow defendants a "choice of means" to attain compliance. *Brown* v. *Plata*, 563 U.S. 493, 500-502, 509-510 (2011); *Thomas*, 614 F.3d at 1325.

The court accordingly properly exercised its discretion in finding Florida can meet the 90% benchmark, which is *less* stringent than the Medicaid Act requirement. Doc. 1170, at 68, 72. Other evidence confirms the 90% benchmark is within reach once Florida acts to increase access. On average, children with medical complexity already receive 70-80% of authorized private-duty-nursing hours. *Id.* at 35. Moreover, three managed-care plans have succeeded in delivering an average of 84-89% of authorized hours. PEX 2604, 2607-2608. Significantly, those figures reflect hours undelivered for *any* reason. Doc. 909, at 171-175. By contrast, the court's benchmark is based on a more State-friendly ratio that excludes certain unused hours: (nursing hours delivered) / (authorized hours *minus* hours undelivered because of hospitalization or parental refusals). Doc. 1171, at 3; see Doc. 1170, at 72; Doc. 1178, at 3 n.3.

Florida resists, arguing (Br.47-49) that the 90% benchmark is unachievable because of a nationwide nursing shortage. But Florida points to no evidence that the shortage precludes it from expanding access to private-duty-nursing services. Moreover, Dr. Bachman opined—based on her careful analysis of data about nursing-service gaps in Florida—that "a national nursing shortage is not primarily responsible for th[ose] gaps," and Florida's expert expressed a similar view. Doc.

1170, at 35; Doc. 909, at 109.[16]  Florida does not argue that the court clearly erred in crediting those opinions, which are reinforced by evidence already discussed.

The court therefore did not abuse its discretion in determining Florida can reach the 90% benchmark.  See, *e.g.*, *South Carolina* v. *United States*, 907 F.3d 742, 764-765 (4th Cir. 2018) (affirming injunction when defendant did not show compliance was "truly impossible").  But should the court's well-supported predictions turn out to be unduly optimistic, Florida can always move to modify the injunction or, if needed, raise impossibility as a defense to a contempt proceeding.  See *id.* at 765 (relying on this consideration in affirming).

## III

## THE UNITED STATES HAS STATUTORY AUTHORITY TO MAINTAIN THIS ACTION

Finally, Florida argues (Br.51-53) that the United States lacks statutory authority to pursue this suit.  The district court correctly disagreed.  Doc. 1170, at 14-15.

In the first appeal, this Court held that Title II authorizes the Attorney General to sue.  *Florida*, 938 F.3d at 1250.  Specifically, Title II's enforcement

---

[16]  As Florida notes (Br.49), its expert testified that one private-duty-nursing company's average utilization rate in seven states is less than 70%.  Doc. 897, at 42.  Significantly, the low rate was due *not* to "staffing shortages" but to "lots of other reasons."  *Id.* at 42-43.

provision grants "person[s] alleging discrimination" the "remedies, procedures, and rights" set forth in the Rehabilitation Act and Title VI of the Civil Rights Act of 1964. 42 U.S.C. 12133 (incorporating 29 U.S.C. 794a(a)(2), which incorporates 42 U.S.C. 2000d *et seq.*). This Court explained that one of the incorporated statutes' "remedies, procedures, and rights" is the ability to file an administrative complaint that may result in an investigation and enforcement action by the Attorney General. *Florida*, 938 F.3d at 1229-1238. Thus, this Court held, Title II's "express" language adopts the same "remedial structure." *Id.* at 1244-1245, 1248, 1250.

Florida argues (Br.52) that if the United States can sue, it may seek relief benefitting only some victims of the State's discrimination—children who submitted administrative complaints prompting DOJ's 2011 investigation (Doc. 1170, at 11). Florida acknowledges there is one such child who has not died, moved out of Florida, or aged out of obtaining relief—C.M.[17] Florida's construction of Title II—which would delay the enforcement of critical statutory

---

[17] According to Florida (Br.52), "this Court resolved [C.M.'s] claim." That is misleading. C.M. was a plaintiff in another action, but this Court concluded the plaintiffs' *Olmstead* claims asserted only a narrow challenge to four state policies that were subsequently changed, mooting the claims. *A.R.* v. *Secretary Fla. Agency for Health Care Admin.*, 769 F. App'x 718, 721-727 (11th Cir. 2019).

rights and waste the resources of courts, federal agencies, and parties—is faulty for

multiple reasons.

Florida's "theory of how § 12133 works fails" because it "diverges from

how the enforcement statutes on which § 12133 relies function." Doc. 1170, at 14-

15. Under those statutes, the federal government is *not* limited to seeking relief on

behalf of complainants alone—a conclusion that follows directly from the

regulations and cases this Court analyzed in *Florida*, 938 F.3d at 1229-1238. See,

*e.g.*, 45 C.F.R. 80.7(c)-(d) (Title VI regulation) (administrative investigations

should identify any "failure to comply with [the law]"). For example, in *United

States* v. *Board of Trustees*, 908 F.2d 740, 742, 752 (11th Cir. 1990), the United

States' Rehabilitation Act suit was prompted by one student's complaint

challenging the denial of a sign-language interpreter, and yet this Court affirmed an

order generally barring a university from denying all disabled students auxiliary

aids.

Because *Florida* held that Title II adopts the remedial mechanisms of the

Rehabilitation Act and Title VI, 938 F.3d at 1250, it follows that Title II likewise

permits the United States to seek judicial relief benefitting complainants *and* other

victims of the same discrimination. Indeed, *Florida* recognized as much when it

acknowledged that "government enforcement" does not allow complainants to

"seek personal redress" but nonetheless benefits them because it "[e]nsur[es]"

- 60 -

States "comply with stat[utes]," thereby "ultimately vindicat[ing] individuals' personal rights." *Id.* at 1238.

The Supreme Court's interpretation of the "analogous enforcement scheme" in Title VII of the Civil Rights Act of 1964 "further undermines [Florida's] constrained view." Doc. 1170, at 15. Like Title II, Title VII prescribes an administrative process that generally begins when an individual files a complaint—there, a "charge" with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C. 2000e-5(b). Subsequent "EEOC enforcement actions," however, "are not limited to the claims presented by the charging parties." *General Tel. Co. of the Nw., Inc.* v. *EEOC*, 446 U.S. 318, 331 (1980). Rather, the EEOC may seek relief on behalf of *all* persons affected by alleged discrimination. *Id.* at 320-321, 324, 333; *Mach Mining, LLC* v. *EEOC*, 575 U.S. 480, 484, 494-495 (2015). Florida does not explain why a different result should obtain here.

Regardless, even if the United States' enforcement action must match the scope of the administrative complaints, this suit *still* would be authorized. That is because some administrative complaints alleged *Olmstead* violations against children with medical complexity as a group. Doc. 789, Ex. 17, at 3-6; Doc. 1122-12. Florida's statutory-authority argument is meritless.

- 61 -

## CONCLUSION

This Court should affirm.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Sydney A.R. Foster
BONNIE I. ROBIN-VERGEER
SYDNEY A.R. FOSTER
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-5941

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,996 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Sydney A.R. Foster
SYDNEY A.R. FOSTER
Attorney

Date:  November 8, 2023

**ADDENDUM**

# ADDENDUM:  TABLE OF CONTENTS

**PAGE**

**STATUTES:**

42 U.S.C. 12131 ................................................................. A-1

42 U.S.C. 12132 ................................................................. A-1

42 U.S.C. 12133 ................................................................. A-1

**REGULATION:**

28 C.F.R. 35.130 ............................................................... A-2

**RULE:**

Fed. R. Evid. 703 ............................................................... A-4

**STATUTES:**

**42 U.S.C. 12131.  Definitions**

As used in this subchapter:

(1) Public entity

The term "public entity" means—

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

(2) Qualified individual with a disability

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

**42 U.S.C. 12132.  Discrimination**

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

**42 U.S.C. 12133.  Enforcement**

The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

**REGULATION:**

**28 C.F.R. 35.130  General prohibitions against discrimination.**

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate

or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

    (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

    (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

    (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

    (i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

    (ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

(7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(ii) A public entity is not required to provide a reasonable modification to an individual who meets the definition of "disability" solely under the "regarded as" prong of the definition of "disability" at § 35.108(a)(1)(iii).

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

* * * *


**RULE:**

**Fed. R. Evid. 703.  Bases of an Expert's Opinion Testimony**

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.