No. 23-12331

———————

# In the United States Court of Appeals for the Eleventh Circuit

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF FLORIDA,

Defendant-Appellant,

———————

On Appeal From the United States District Court
for the Southern District of Florida

———————

**REPLY BRIEF OF THE STATE OF FLORIDA**

———————

Andy Bardos
James Timothy Moore, Jr.
Ashley H. Lukis
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
tim.moore@gray-robinson.com
ashley.lukis@gray-robinson.com
*Attorneys for Appellant, the State of Florida*

*United States of America v.*
*State of Florida*, No. 23-12331

## <u>CERTIFICATE OF INTERESTED PERSONS</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1, the State of Florida furnishes a complete list of the following (with additions underscored):

1. Agency for Health Care Administration, State of Florida.

2. Agency for Persons with Disabilities, State of Florida.

3. <u>Agrawal, Rishi K., MD, MPH, *Amicus Curiae*</u>.

4. Altonaga, Cecilia M., United States District Judge, Southern District of Florida.

5. <u>American Academy of Pediatrics, *Amicus Curiae*</u>.

6. <u>American Association of People with Disabilities, *Amicus Curiae*</u>.

7. <u>Anderson, Rachel T., counsel for *Amici*</u>.

8. Bardos, Andy, counsel for the State of Florida.

9. Bond, Rebecca B., counsel for the United States.

10. Boudet, John, counsel for the State of Florida.

11. <u>Burnim, Ira A., counsel for *Amici*</u>.

12. <u>Center for Public Representation, *Amicus Curiae*</u>.

13. <u>Child Neurology Foundation, *Amicus Curiae*</u>.

14. Clarke, Kristen, counsel for the United States.

15. <u>Davis, Tiberius T., counsel for *Amici*</u>.

16. Department of Children and Families, State of Florida.

17.    Department of Health, State of Florida.

18.    Dimitrouleas, William P., United States District Judge, Southern District of Florida.

19.    <u>Exceptional Families of the Military, *Amicus Curiae*</u>.

20.    Fletcher, James, counsel for the United States.

21.    <u>Florida Chapter of American Academy of Pediatrics, Inc., *Amicus Curiae*</u>.

22.    Foster, Sydney A.R., counsel for the United States.

23.    Geddes, Janelle, counsel for the United States.

24.    <u>Gillespie, Nataliia A., counsel for *Amici*</u>.

25.    Gonzalez, Juan Antonio, counsel for the United States.

26.    GrayRobinson, P.A., counsel for the State of Florida.

27.    Harrell-James, Veronica, counsel for the United States.

28.    Hooper, Dylan, counsel for the State of Florida.

29.    Hunt, Patrick M., Magistrate Judge, United States District Court, Southern District of Florida, Fort Lauderdale Division.

30.    <u>Judge David L. Bazelon Center for Mental Health Law, *Amicus Curiae*</u>.

31.    <u>Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., counsel for *Amici*</u>.

32.    LaPointe, Markenzy, counsel for the United States.

33.    Lenson, Jillian, counsel for the United States.

34.   Little Lobbyists, *Amicus Curiae*.

35.   Lukis, Ashley Hoffman, counsel for the State of Florida.

36.   McDonald, Elizabeth E., counsel for the United States.

37.   Mental Health America, *Amicus Curiae*.

38.   Meros, George N., Jr., counsel for the State of Florida.

39.   Middlebrooks, Donald M., United States District Judge, Southern

District of Florida, West Palm Beach Division.

40.   Moore, James Timothy, Jr., counsel for the State of Florida.

41.   Muscular Dystrophy Association, *Amicus Curiae*.

42.   National Federation of Families, *Amicus Curiae*.

43.   National Health Law Program, *Amicus Curiae*.

44.   Onyekweli, Nonney, counsel for the United States.

45.   PACER Center, *Amicus Curiae*.

46.   Panner, Aaron M., counsel for *Amici*.

47.   Park, H. Justin, counsel for the United States.

48.   Pearlstein, Amanda Brooke, counsel for the United States.

49.   Perkins, Martha Jane, counsel for *Amici*.

50.   Powell, Lauren Latterell, counsel for the United States.

51.   Price, Tara R., counsel for the State of Florida.

52.   Protopapadakis, Anastasia, counsel for the State of Florida.

53.     Raish, Anne S., counsel for the United States.

54.     Robin-Vergeer, Bonnie I., counsel for the United States.

55.     Rosenbaum, Robin S., Former United States District Judge, Southern District of Florida.

56.     <u>Schuller, Megan E., counsel for *Amici*.</u>

57.     <u>Schwartz, Steven J., counsel for *Amici*.</u>

58.     Seltzer, Barry S., Former United States Magistrate Judge, Southern District of Florida.

59.     Sheeran, Andrew T., counsel for the State of Florida.

60.     Shelton, Chantel Doakes, counsel for the United States.

61.     Shutts & Bowen LLP, counsel for the State of Florida.

62.     Snow, Lurana S., United States Magistrate Judge, Southern District of Florida.

63.     State of Florida, Defendant/Appellant.

64.     Street, Leslei G., counsel for the State of Florida.

65.     Thomas, Victoria, counsel for the United States.

66.     United States of America, Plaintiff/Appellee.

67.     United States Department of Justice, counsel for the United States.

68.     Weinstock, Lindsey, counsel for the United States.

69.     Zeitler, Nicole K., counsel for the United States.

70.    Zloch, William J., United States District Judge, Southern District of Florida.

## CORPORATE DISCLOSURE STATEMENT

The State of Florida certifies that no publicly traded company or corporation has an interest in the outcome of the case. The entities listed above are not publicly traded and do not have stock ticker symbols.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................C-5

TABLE OF CITATIONS .................................................................. ii

ARGUMENT ..................................................................................1

I.    A RISK OF INSTITUTIONALIZATION IS NOT DISCRIMINATION........................1

II.   THE DISTRICT COURT MISINTERPRETED—AND DILUTED—ALL THREE OLMSTEAD ELEMENTS................................................................4

   A.    The Appropriateness Element. ...............................................4

   B.    The Non-Opposition Element. ...............................................7

   C.    The Reasonable-Accommodation Element...........................12

      1.    The District Court Ordered "Accommodations" Without Evidence of Redressability...........................................12

      2.    The District Court Ordered "Accommodations" That Were First Disclosed After Trial...........................................15

III.  THE DISTRICT COURT'S SYSTEMWIDE INJUNCTION IS AN IMPROPER REMEDY. ..........................................................................17

   A.    The United States Failed to Prove Widespread Unlawful Institutionalization...........................................................17

   B.    The Injunction Is Overbroad and Offends Federalism Principles.........19

   C.    The Injunction's Cornerstone Provision Does Not Prescribe Objective Actions, But an Arbitrary and Unachievable Performance Goal..........22

IV.   THE UNITED STATES LACKS AUTHORITY TO ENFORCE THE RIGHTS OF CHILDREN WHO NEVER INITIATED THE ADA'S ADMINISTRATIVE ENFORCEMENT PROCESS. .........................................................24

CONCLUSION...............................................................................26

CERTIFICATE OF COMPLIANCE.....................................................28

i

## <u>TABLE OF CITATIONS</u>

<u>**Cases**</u>

*Bowe v. Public Storage*,

    No. 1:14-cv-21559, 2015 WL 10857339 (S.D. Fla. June 2, 2015)........................12

*Brown v. Plata*,

    563 U.S. 493 (2011) ................................................................................24

\* *Clapper v. Amnesty International USA*,

    568 U.S. 398 (2013) ..................................................................................2

*Everett v. Cobb County School District*,

    138 F.3d 1407 (11th Cir. 1998)................................................................25

*Fisher v. Oklahoma Health Care Authority*,

    335 F.3d 1175 (10th Cir. 2003)..................................................................3

*Florida Association of Rehabilitation Facilities, Inc. v. State of Florida Department*

    *of Health and Rehabilitative Services*,

    225 F.3d 1208 (11th Cir. 2000)................................................................24

*Frederick L. v. Department of Public Welfare*,

    364 F.3d 487 (3d Cir. 2004)......................................................................6

*General Telephone Company of the Northwest v. Equal Employment Opportunity*

    *Commission*,

    446 U.S. 318 (1980) .......................................................................... 24, 25

*Hoag Memorial Hospital Presbyterian v. Price*,

    866 F.3d 1072 (9th Cir. 2017) ..................................................................14

*In re 3M Combat Arms Earplug Products Liability Litigation*,

    No. 3:19-md-02885, 2021 WL 684183 (N.D. Fla. Feb. 11, 2021) ........................11

*Kisor v. Wilkie*,

    139 S. Ct. 2400 (2019) .....................................................................2, 3

*L.C. by Zimring v. Olmstead*,

    138 F.3d 893 (11th Cir. 1998) ...............................................................6

* *Olmstead v. L.C. ex rel. Zimring*,

    527 U.S. 581 (1999) ................................................................... passim

*PGA Tour, Inc. v. Martin*,

    532 U.S. 661 (2001) .......................................................................25

*Steimel v. Wernert*,

    823 F.3d 902 (7th Cir. 2016) .................................................................6

*United States v. Board of Trustees*,

    908 F.2d 740 (11th Cir. 1990) ..............................................................25

*United States v. Florida*,

    938 F.3d 1221 (11th Cir. 2019) .............................................................26

* *United States v. Mississippi*,

    82 F.4th 387 (5th Cir. 2023) .................................................................3

*Vermont Agency of National Resources v. United States ex rel. Stevens*,

    529 U.S. 765 (2000) ................................................4

*Younger v. Harris*,

    401 U.S. 37 (1971) ................................................21

## Constitutional Provisions

Art. VII, § 1(c), Fla. Const. ................................................21

## Statutes

42 U.S.C. § 12101(2) ................................................1

42 U.S.C. § 12101(3) ................................................1

42 U.S.C. § 12101(5) ................................................1

42 U.S.C. § 12132 ................................................25

42 U.S.C. § 12133 ................................................26

42 U.S.C. § 1396a(a)(30)(A) ................................................ 14, 20

42 U.S.C. § 1396d(a)(4)(B) ................................................14

42 U.S.C. § 1396d(r)(5) ................................................14

42 U.S.C. § 2000e-2 ................................................25

42 U.S.C. § 2000e-3 ................................................25

42 U.S.C. § 2000e-5(a) ................................................25

42 U.S.C. § 2000e-5(f) ................................................25

42 U.S.C. § 2000e-6(a) ................................................25

**Regulations**

28 C.F.R. § 35.130(d)................................................................2, 6

28 C.F.R. pt. 35, app. B.................................................................6

**Other Authorities**

Medicaid Program, Methods for Assuring Access to Covered Medicaid Services,

   80 Fed. Reg. 67,576 (Nov. 2, 2015).......................................................14

## **ARGUMENT**

The United States still has not identified any child who lives in a nursing home today and whose parents—though ready and willing—cannot transfer their child home because of Florida. The United States' arguments fail for this and many other reasons.

## I.    A RISK OF INSTITUTIONALIZATION IS NOT DISCRIMINATION.

Throughout its brief, the United States leans heavily on its theory that a "serious risk" of institutionalization is itself discrimination prohibited by the ADA. This theory allows the United States to treat thousands of children as a homogeneous mass and to argue that Florida must modify its healthcare policies to reduce the amorphous "risk" that these unidentified children purportedly face. But the United States' efforts to find a legal footing for its theory are futile, and this Court should endorse the Fifth Circuit's well-reasoned rejection of that theory in a parallel *Olmstead* action against Mississippi.

Nothing in the ADA's text supports the "at risk" theory. While Congress found that "segregation" and "institutionalization" are "forms of discrimination," 42 U.S.C. § 12101(2), (3), (5), it said nothing about *potential* segregation or institutionalization.

*Olmstead* found that unjustified institutionalization is a form of discrimination, 527 U.S. at 600, but it too said nothing about a risk of institutionalization. It concluded that unjustified institutionalization is discrimination because it perpetuates a stereotype that disabled people are "incapable or unworthy of participating in community life" and because institutionalization "severely diminishes . . . everyday life activities." *Id*.

at 600–01. Neither of these rationales applies to individuals who live in the community.

The integration regulation does not help the United States either. It directs States to "administer services" in "the most integrated setting" appropriate to the individual's needs. 28 C.F.R. § 35.130(d). A mandate to administer services "in the most integrated setting" is violated when services are administered *elsewhere*—in a setting that is not the most integrated. To the extent the United States suggests the regulation mandates a certain level of services, its argument defies *Olmstead*, which explained that the ADA does not mandate "a certain level of benefits." 527 U.S. at 603 n.14 (plurality opinion).

The United States next quotes its own guidance document—which is expressly non-binding—and asks for deference. Br. 40. But an agency's interpretation of its own regulation merits deference only when the regulation is "genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). The United States does not claim its regulation is genuinely ambiguous.

Article III also stands in the United States' way. Any theory that treats the "risk" of a future event as an actionable injury presents a grave danger of circumvention of Article III principles. For good reason, Article III allows redress for future injuries only when those injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). If a risk is an injury, then the Article III standard can easily be evaded, and federal courts can adjudicate every manner of future, speculative, abstract claims.

The Fifth Circuit correctly held that a mere risk of institutionalization is not itself discrimination. *United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023). It reviewed the ADA's language and the integration regulation and explained why the United States is not entitled to deference. *Id*. at 392–94. It explained that the United States' theory is "vague and standardless" and a mere lever to demand more public funding. *Id*. at 398.

The circuits that have endorsed the "at risk" theory relied primarily on deference to the United States. But as the Fifth Circuit explained, *Kisor* has curtailed that deference. They also insisted that the integration mandate would be "meaningless" if individuals at risk of institutionalization could not sue immediately, *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003), but never fully explained why Article III's "certainly impending" standard, coupled with a motion for preliminary injunction, is good enough to protect against *all* future injuries *except* unlawful institutionalization.

The United States alternatively contends that the 2,750 children who receive in-home nursing categorically satisfy Article III's "certainly impending" standard. Br. 43. But the record reveals nothing of substance about these children other than their rates of utilization of in-home nursing, which ranged from 0 to 100 percent for reasons the record does not disclose. *See* Pl.'s Exs. 2604–10. The record does not begin to establish that thousands of children face "certainly impending" institutionalization. After all, the number of children who receive in-home nursing is 20 times greater than the number who for *any* reason live in nursing homes. Any general risk that children will be placed

in nursing homes because of insufficient in-home nursing is therefore *extremely minor*. Nor can the testimony of a few parents hand-selected by the United States be generalized to 2,750 children, as the United States does. Br. 47–48. There is nothing fungible about the diverse circumstances of children with complex medical needs. ECF No. 501 at 31–32.

The United States contends that Article III is satisfied because its sovereignty is injured when federal laws are violated, but a sovereignty injury supports standing only in a criminal lawsuit. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

This Court should reject the unfounded "at risk" theory and the blanket finding that Florida violated the *Olmstead* rights of thousands of children who do not even live in nursing homes.

## II.    THE DISTRICT COURT MISINTERPRETED—AND DILUTED—ALL THREE OLMSTEAD ELEMENTS.

### A.    The Appropriateness Element.

As explained in Florida's principal brief, the appropriateness element serves an essential, practical function: it protects the well-being of individuals with disabilities. *Olmstead* cautioned against any application of the ADA that countenances the transfer of individuals to settings unsuited to their needs. The United States' contention that the actual, proposed setting is irrelevant—and that the appropriateness box can be checked by an expert's abstract conclusion that a child could live in "a community-type setting"

4

that might or might not exist in real life—cannot be reconciled with *Olmstead*. Br. 18.

Consider Dondraya Wilson. Dondraya's mother testified that, until two months ago, she was "homeless and bouncing from place to place." T3 at 37:8–25. Now, she rents a single room and has no permanent home. *Id*. When asked whether she wants to initiate her child's discharge, she appropriately responded: "Where would I put her?" *Id*. at 81:17–25.

If Dondraya's mother had wanted her daughter to be discharged anyway, then, under the United States' rule of theoretical appropriateness, the ADA would require Florida to accommodate the transfer—perhaps to a homeless shelter. That is the exact result that *Olmstead* sought to avoid when it condemned the transfer of patients to "an inappropriate setting, such as a homeless shelter." 527 U.S. at 605 (plurality opinion).

The United States concedes that a proposed setting's "safety and suitability" are important, but insists that those crucial determinations be made in "subsequent phases" of litigation. Br. 18 (quoting ECF No. 1170 at 46). This kick-the-can approach not only contravenes *Olmstead*'s plain command, but also makes little practical sense. It would mean that a State could be held liable for civil-rights violations but then, in "subsequent phases," be found to have done nothing wrong and to owe the plaintiff no relief. Most litigation, moreover, does not involve "phases" after the court enters a final judgment. And States must navigate and comply with the ADA outside of litigation. If a State can be liable despite the inappropriateness of the proposed setting, then States will have no

leeway to decline to make accommodations where the setting is plainly inappropriate.

The integration regulation supports Florida's and not the United States' position. That regulation requires States to administer services "in the most integrated setting appropriate" to the individual's needs, 28 C.F.R. § 35.130(d), and therefore expressly contemplates an assessment of the appropriateness of the proposed setting. The United States asserts that "setting" refers to the "type of placement"—*i.e.*, whether the setting is a "community-type setting" or an institutional setting. Br. 17–18. But the regulation does not say "type of setting" or "type of placement." It refers to the "setting" that is the most integrated but also appropriate. *See Steimel v. Wernert*, 823 F.3d 902, 911–12 (7th Cir. 2016) (explaining that "setting" does not refer to a "crabbed binary" between "two kinds of physical structures: an institution or a location in the community"). The regulations further explain that the "most integrated setting" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible"—and thus contemplate a granular, venue-specific, comparative assessment. 28 C.F.R. pt. 35, app. B.

The United States' cases are inapposite. In *Frederick L. v. Department of Public Welfare*, 364 F.3d 487, 493 (3d Cir. 2004), and *Steimel*, 823 F.3d at 915, appropriateness was undisputed. It was also undisputed in *Olmstead*, since the plaintiffs had lived in community settings for some time. *Olmstead*, 527 U.S. at 594 n.6; *L.C. by Zimring v. Olmstead*, 138 F.3d 893, 895 n.2 (11th Cir. 1998), *aff'd in part*, 527 U.S. 581 (1999).

### B.    The Non-Opposition Element.

The United States now concedes that a parent who opposes a child's transfer to the community for reasons unrelated to Florida is properly considered *opposed* to the transfer, even if the parent *would* bring the child home if circumstances were different. Br. 19–22. That critical concession compels reversal because the district court applied a wholly different standard: it considered the parent described above to be *unopposed*. Because the court relied on an admittedly erroneous standard, its finding of widespread non-opposition cannot be sustained.

Dr. Houtrow first espoused the erroneous standard. She characterized parents as opposed or unopposed according to their abstract, perfect-world wishes, without regard to the real-life circumstances that induce them to oppose their children's transfers. *See*, *e.g.*, T2 at 248:13–15 ("So the fact that families are talking about housing as a barrier doesn't change anything about their desire to have their children home."). Housing is the most common example: 40 percent of the parents whom Dr. Houtrow interviewed cited housing as a reason they oppose a transfer,[1] but Dr. Houtrow counted them *all* as unopposed. D.E. 22 at 40. One parent is trying to "save up for 'decent enough' housing." Pl.'s Ex. 5192. Another lives with her other children in a 500-square-foot apartment. Pl.'s Ex. 5194. Another has mold in her home. Pl.'s Ex. 5201. Another has four children in a small home. Pl.'s Ex. 5203. Another has second-hand smoke in her home

---

[1] *See* Interview Notes, Pl.'s Exs. 5192, 5194–23, 5225, 5228–5241, 5243.

and, before a transfer, wants to "create an environment without smoke, perfumes, and loud noises." Pl.'s Ex. 5213. Another lives in a single room with his wife and another child, with a third on the way. Pl.'s Ex. 5205. Another lives with two other children in a small rental that is in poor condition. Pl.'s Ex. 5235. Though these parents obviously oppose their children's transfers home under these real-world circumstances, Dr. Houtrow deemed each of these parents—and eleven others who cited housing—*unopposed*.

The United States misses the point when it quibbles over the precise number of parents who oppose because of housing. Br. 25–27. The point is that its expert applied the wrong standard—and the district court's finding of non-opposition is based on that expert's opinion.

Other examples confirm Dr. Houtrow's application of the wrong standard. One parent cited the anxiety that a move would cause her son, who she thinks suffers from autism. Pl.'s Ex. 5219. Another opposes a transfer because her son has not yet been decannulated; she is concerned that her son or her son's sister would remove the child's trach. Pl.'s Ex. 5229. Yet stunningly, Dr. Houtrow also found these parents *unopposed*.

The district court followed Dr. Houtrow's lead. It applied her erroneous standard and endorsed her findings. D.E. 22 at 37–38. Dr. Houtrow's testimony was the evidentiary foundation of the court's finding of widespread non-opposition. ECF No. 1170 at 57–58.

The court then pointed to the testimony of five parents who testified at trial, *id*. at 59–60, but none of these five parents is "unopposed" under the standard the United States now accepts. Florida discussed three of them (Bobbie King, Marcelia Dalmou, and Michael Rodriguez) in its principal brief. D.E. 22 at 23, 38. The fourth, Shawna Williams, testified that she wants her son to live in a nursing home while he continues to make medical progress; he began to breathe on his own the day before she testified. T6 at 23:23–25:8, 27:3–23. And Beatriz Soliz testified she would prefer nursing-home care for her son—even if he could be guaranteed in-home nursing. *Id*. at 44:13–45:23.

Perhaps aware the court applied an erroneous standard, the United States hangs its hat on a single paragraph in which the court wrote that, even if the narrower standard applied, it would find widespread non-opposition. Br. 21 (citing ECF No. 1170 at 57). That paragraph is insufficient to avoid reversal. First, the court erroneously placed the burden on Florida to prove that parents oppose their children's transfers. ECF No. 1170 at 57 ("To the extent the State suggests it proved this, as a factual matter, I disagree."). Of course, it is not the defendant's burden to prove opposition. ECF No. 840 at 20 ¶ 11. Second, the district court made no factual findings to support its conclusory assertion that parents who oppose a transfer for reasons unrelated to Florida are "outliers," but expressly based that uncorroborated finding on its "perception." ECF No. 1170 at 57.

Apart from Dr. Houtrow's flawed testimony, the record refutes that perception. As detailed in Florida's briefs, the record reveals countless examples of parents who

oppose a transfer for reasons wholly unrelated to Florida. Meanwhile, the record fails to identify *any parent* who is ready and willing to bring her child home, but who cannot do so because of Florida. In its 61 pages, the United States still cannot identify such a parent.

The United States tries but fails to minimize the impact of the court's reliance on an erroneous standard. It hints, for example, that housing is within Florida's control, since Medicaid provides a housing-assistance benefit. Br. 27. But that benefit consists of $250 *per year* to help recipients pay their utility bills in a bind, T9A at 16:25–17:11, 148:23–149:13—not to finance home purchases. It insists that two parents are "open" to "family-based alternatives," but never defines that amorphous concept or shows that it exists in Florida. Br. 25. It contends that two parents who cited housing accessibility might be served by another state program (the iBudget waiver program), *id.*, but one is ineligible because she lives in Tennessee, Pl.'s Ex. 5222; ECF No. 840 at 15 ¶ 84, while the United States offered no evidence of the other's needs or eligibility, Pl.'s Ex. 5212.

Similarly, the United States asserts that "nearly all" parents who cited housing also cited barriers within Florida's control—a claim that Dr. Houtrow's interview notes refute—and that, if Florida removed those barriers, parents "may" find the motivation to overcome their housing obstacles. Br. 26. But that is sheer speculation. And the two examples the United States cites do not support its argument. Br. 26–27. Those parents

did not say that in-home nursing was unavailable: one said it "needs to be arranged," Pl.'s Ex. 5197, while the other was told it might be "challenging" to arrange, Pl.'s Ex. 5220.

Importantly, it is only at the final stage of the discharge process—after a doctor has issued discharge orders—that in-home nursing is arranged. T8B at 244:1–245:13. While some parents whom Dr. Houtrow interviewed might have expressed their *fears* that services will be unavailable, none claimed to have moved through the discharge process only to find that insufficient in-home nursing prevented her child's discharge. Brenda Legge, a nursing-home administrator who characterized the nursing shortage as the biggest obstacle to discharge, also testified that it has never *prevented* any child's transfer. *Id.* at 278:24–279:13, 288:3–5. At most, it has taken time to arrange services. *Id.*

These facts discredit Dr. Houtrow's blanket assertion that insufficient in-home nursing prevents the discharge of unnamed children. Br. 23–24. That assertion is also inadmissible hearsay. It is only a recitation of what Dr. Houtrow claims the parents told her in unrecorded interviews. An expert's summation of the out-of-court statements of interviewees—even if presented as the expert's opinion—is inadmissible to prove the truth of the matter asserted. D.E. 22 at 42 n.4; *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-02885, 2021 WL 684183, at *2 (N.D. Fla. Feb. 11, 2021);

*Bowe v. Pub. Storage*, No. 1:14-cv-21559, 2015 WL 10857339, at *8 (S.D. Fla. June 2, 2015).[2]

### C.    The Reasonable-Accommodation Element.

#### 1.    The District Court Ordered "Accommodations" Without Evidence of Redressability.

The United States treated the trial like a legislative proceeding and presented no evidence that its proposals to modify Florida's policies will prevent the institutionalization of a single child. Its brief also fails to name any child who will go home because of the injunction. Its claim that the injunction will be effective and produce widespread redress of a cognizable harm—unlawful institutionalization—fails for several reasons.

*First*, the United States does not address the effectiveness of the actual mandates in the injunction. It focuses on two measures that, under the injunction, are ostensibly optional (rate increases and changes to network adequacy) and on the more active use of enforcement mechanisms, which the injunction does not even mention. Br. 31–32. The United States does not argue that the many changes the injunction actually orders will provide an accommodation that prevents any child's unlawful institutionalization.

---

[2] The United States attacks the credibility of two caring and competent nursing-home case managers because they work at nursing homes. Br. 28. But its only example of alleged inaccuracy in their testimony is in fact accurate: Karina Rodriguez's mother had "no plans to transition" her child home. ECF No. 1121-4 at 11; *accord* T4 at 28:15–21, 29:17–21. (For the coding scheme used on redacted exhibits, see ECF No. 881-1.)

*Second*, even as to ostensibly optional modifications, the United States presents an incomplete picture of Dr. Bachman's testimony. It references her *ipse dixit* that those measures would enable "more children to live at home," Br. 31 (citing T4 at 167:19–22), but ignores or minimizes her admissions that she did not assess their effectiveness and could not name any child whose institutionalization would be prevented. D.E. 22 at 45–46.

As to rates, Dr. Bachman did not even know what rates Florida pays or how they compare to rates in other States. T4 at 183:3–21. She did not analyze whether higher rates would increase the pool of in-home nurses or divert children from institutionalization. *Id*. at 190:1–21, 193:16–19. She conceded that, to predict the effectiveness of rate increases, one would need to know why the service is underutilized, which she did not. *Id*. at 171:12–22, 192:7–12. As to network adequacy, Dr. Bachman could not identify any State that had changed its network-adequacy standards to increase utilization of in-home nursing and did not analyze whether such changes might have that effect in Florida. *Id*. at 195:24–196:4, 198:6–10. She had no knowledge of the provider networks of the health plans that serve Medicaid recipients in Florida. *Id*. at 196:16–198:4.

*Third*, the question here is not whether the injunction will increase access to in-home nursing, but whether it will prevent unlawful institutionalization. Br. 30–31. Dr. Bachman's testimony that her proposed modifications are effective tools other States routinely use to increase access to services does not answer the relevant question. *Id*.

The United States contends that the Medicaid Act requires Florida to deliver 100 percent of authorized services. *Id*. at 30. That is irrelevant, since this is not an action to enforce the Medicaid Act. It is also plainly incorrect. The Medicaid Act does *not* entitle recipients to universal access—or to better access than the general population enjoys. Rather, its so-called Access Provision requires services to be available "at least to the same extent that such care and services are available to the general population in the geographical area." 42 U.S.C. § 1396a(a)(30)(A); *accord Hoag Mem'l Hosp. Presbyterian v. Price*, 866 F.3d 1072, 1079–80 (9th Cir. 2017); Medicaid Program, Methods for Assuring Access to Covered Medicaid Services, 80 Fed. Reg. 67,576, 67,587 (Nov. 2, 2015) ("To clarify, states must assure that access is available to Medicaid beneficiaries to the extent that care is available to the general population in a geographic area."). The United States not attempt to prove that Florida violates this access standard. T4 at 182:2–6.

The United States asserts that the EPSDT provision requires 100-percent access for *children*, Br. 30 n.9, but no authority supports that assertion. The EPSDT provision requires States to *cover* more services for children than for adults, but nothing in those provisions displaces the Access Provision and mandates 100-percent availability of the covered services. 42 U.S.C. § 1396d(a)(4)(B), (r)(5). Dr. Bachman herself testified that she would not expect to find 100-percent service utilization anywhere. T4 at 179:1–10.

14

The United States cites no evidence that the injunction's actual mandates will prevent any child's unlawful institutionalization, let alone widespread unlawful institutionalization. Like the district court, it indulges the presumption that the injunction's many provisions will help someone, someday, somewhere. That is insufficient to establish the effectiveness and redressability needed to support a systemwide injunction.

### 2. The District Court Ordered "Accommodations" That Were First Disclosed After Trial.

The United States presented one set of accommodations at trial and another in its post-trial proposed injunction. Its brief fails to point out where and when it disclosed the injunction's mandates, including the 90-percent mandate. Because the injunction orders many accommodations the United States never disclosed, the injunction cannot stand.

The United States attempts to separate the reasonable-accommodation element from the specific relief ordered by the court, claiming a court may craft wholly different accommodations than those presented at trial. Br. 33–34. But that position converts the plaintiff's burden to establish the effectiveness, necessity, and reasonableness of an accommodation into mere theater and altogether denies the defendant's right to "resist modifications" that fundamentally alter its services and programs. *Olmstead*, 527 U.S. at 597, 603. When a court devises new accommodations after trial, those accommodations undergo no evidentiary testing of their consistency with the ADA's requirements.

15

The United States asserts that it timely disclosed a demand that Florida comply with the Medicaid Act. Br. 34–35. It reasons that, because the Medicaid Act requires 100-percent availability of services, Florida cannot complain about a less onerous 90-percent mandate. *Id.* But as explained above, the Medicaid Act does not require 100-percent service availability. Thus, a general demand that Florida comply with the Medicaid Act did not provide notice to Florida that it must marshal evidence to "resist" a mandate that all 2,750 children utilize at least 90 percent of their authorized in-home nursing.

The United States string-cites documents in which it claims to have disclosed the injunction's transition-planning and care-coordination provisions. Br. 36. But those documents did no such thing. They either disclosed accommodations not contained in the injunction, or they recited general platitudes. *See*, *e.g.*, ECF No. 773 at 34 (demanding that Florida provide "sufficiently individualized and effective care coordination services and assessments to help avoid unnecessary nursing facility placements and to help Institutionalized Children transition to the community"). If the United States had disclosed the injunction's modifications, then surely its brief would have pointed out where.

Florida was entitled to rely on two documents to disclose the accommodations the United States sought: the United States' answer to an interrogatory that specifically *asked* for that information, and Part IV.B. of Dr. Bachman's expert report, which listed

16

the accommodations she proposed. But these documents did not reveal the undisclosed accommodations either. *See* U.S.'s Suppl. App., Vol. 4 at 15–22; ECF No. 785-6 at 19–27. After a decade of litigation, the United States went to trial with one set of accommodations—and then, days after the trial concluded, proposed another. The court erred when it imposed accommodations that were not subject to evidentiary testing and that Florida had no opportunity to "resist" with evidence. *Olmstead*, 527 U.S. at 597, 603.

## III. THE DISTRICT COURT'S SYSTEMWIDE INJUNCTION IS AN IMPROPER REMEDY.

### A. The United States Failed to Prove Widespread Unlawful Institutionalization.

The district court identified only seven children ever admitted to nursing homes because of insufficient in-home nursing, and the United States does not do much better. It claims it found two more instances in the voluminous record: D.O. and K.G. Br. 45. But whether the precise number is seven or nine—or six[3]—is immaterial. The point is that, despite all the resources committed to this litigation over the last decade, the number of children shown to have been admitted to nursing homes because of insufficient in-home nursing over the last ten years is vanishingly small. While those children, like the plaintiffs in *Olmstead*, might have requested individualized accommodations, their

---

[3] One of the seven children in the district court's count was not in fact admitted to a nursing home because of insufficient in-home nursing. *See* ECF No. 1170 at 37. Jamaya was admitted when his parents were reported for neglect and lost custody of Jamaya. T1 at 256:17–20, 271:10–22.

number is insufficient to establish pervasive violations that warrant systemwide relief.

To prove widespread unlawful institutionalization, the United States attempts to establish a presumption that, because in-home nursing is "vital" to children with complex medical needs, *any* shortage of in-home nursing hours places the child at the cusp of institutionalization. Br. 43–44. But the United States' own expert, Dr. Foster, insisted that parents, once trained, can handle medical equipment, respond to emergencies, and otherwise care for their children with complex medical needs, and that a home without a nurse can be medically safe. T1 at 137:22–138:20, 157:20–158:9, 180:7–25, 182:4–11, 183:17–20, 199:1–200:11. The district court agreed and concluded that a "trained parent can do everything the caregivers in nursing homes are doing," ECF No. 1170 at 50, and that "the level of nursing care at the facilities and at home is the same," *id*. at 49. The United States cannot now contend that in-home nursing services are so unique and irreplaceable that any shortfall imperils the child's ability to live in the community.

The United States again relies on Dr. Houtrow's blanket statement that parents told her that insufficient in-home nursing causes institutionalization, and points to Dr. Houtrow's interview notes in support. Br. 44–45 & n.12. But the United States provides no specifics or examples—only another opaque generalization in a case replete with them. And for obvious reasons, Dr. Houtrow's interview notes were not admitted for the truth of the matters asserted in them. T2 at 194:17–195:4, 197:4–7, 217:15–218:12.

The United States' explanation of the interrogatory answer in which it identified only seven children admitted to nursing homes because of insufficient in-home nursing does not pass the straight-face test. Br. 46. The United States argues there was so *much* evidence of widespread violations that it did bother to present all of its evidence at trial. *Id*. It also argues that its interrogatory answer did not include children transferred from hospitals to nursing homes, *id*., but indeed it did, ECF No. 1122-9 at 7 (Child C0181). Nothing in the interrogatory excluded transfers from hospitals to nursing homes. *Id*. at 2.[4]

Finally, unable to identify a single child ever admitted to a nursing home because of inadequate care coordination, the United States characterizes its care-coordination challenge as part of its broader claim that Florida does not provide sufficient in-home nursing. Br. 49–50. Because the United States failed to prove that insufficient in-home nursing causes pervasive institutionalization, its care-coordination challenge fails too.

### B.    The Injunction Is Overbroad and Offends Federalism Principles.

The injunction imposes detailed, onerous mandates and places the district court, through *ex-parte* communications with the monitor, in a position of continual direction and supervision over the administration of Florida's services and programs. The district

---

[4] The United States claims it called as witnesses the parents of five (not three) children who lived in nursing homes at the time of trial. Br. 45 n.12. But two of these children (J.M. and C.N.) were discharged before trial began. ECF No. 1121-1 at 28–32; ECF No. 1194-4 at 25–26.

court was presented with no evidence that, in the midst of a national nursing shortage, utilization rates of in-home nursing in Florida differ from those in other States. Yet the district court subordinated Florida to federal micromanagement and entailed on a state sovereign the immense, daily costs and burdens of answering to federal managers. Because the injunction gives short shrift to principles of federalism, it should be reversed.

The United States downplays the 90-percent utilization mandate, claiming the Medicaid Act already requires 100-percent utilization. Br. 51. It does not. As explained above, the Medicaid Act requires States to provide access to services to the same extent that services are available to the general population. 42 U.S.C. § 1396a(a)(30)(A). The Medicaid Act promised mainstream healthcare—not the Nation's premier insurance plan—to the poor and disabled. The United States cannot rely on its misinterpretation of the Medicaid Act to suggest that an arbitrary 90-percent utilization mandate is not a heavy and onerous new burden and a rewrite of the Medicaid Act's Access Provision.

The United States denies that the injunction mandates legislative appropriations to fund increases in reimbursement rates for in-home nursing. Br. 52–53. It first claims the district court found that other means would also be effective in increasing the availability of in-home nursing, Br. 52, but in fact the court's order contains no such finding.

The United States then argues that Florida can increase rates without legislative appropriations. Br. 53. But Florida spends $500 million *annually* on in-home nursing. ECF No. 840 at 13. Even a 20-percent increase would require $100 million. The United

States betrays a profound unawareness of Florida's tripartite system of government if it believes an executive agency may spend $100 million without legislative authority. *See* Art. VII, § 1(c), Fla. Const. ("No money shall be drawn from the treasury except in pursuance of appropriation made by law."). The United States even maintains that Florida could find the money in "efficiencies," Br. 53, but fails to point out where in the Agency for Health Care Administration's prudently managed budget Florida could find so much waste.

While an injunction is not invalid merely because it incidentally requires state expenditures, an injunction that, at its core, effectively requires a State to enact enormous new appropriations is qualitatively different.

The United States brushes over the injunction's other provisions, which require Florida to establish two new programs, regulate the details of Florida's care-coordination and transition-planning services, and impose a compliance monitor. The injunction far exceeds what is necessary to afford relief in any individual cases that might warrant it.

Federalism requires the federal government to vindicate federal rights "in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44 (1971). Because the injunction shows inadequate "sensitivity to the legitimate interests of both State and National Governments," *id.*, it should be vacated.

21

### C.    The Injunction's Cornerstone Provision Does Not Prescribe Objective Actions, But an Arbitrary and Unachievable Performance Goal.

The mandate to deliver 90 percent of all authorized hours of in-home nursing to each one of 2,750 children is an improper remedy because nothing in the record even remotely suggests it is achievable during a nationwide nursing shortage—or ever. The district court's finding that 90-percent utilization is "well within" Florida's capabilities rests on no evidence, since neither the 90-percent threshold nor *any* percentage-based utilization threshold was mentioned once during a nine-day trial. ECF No. 1170 at 68.

The United States does not dispute the existence of a critical nursing shortage or Dr. Letourneau's compelling expert testimony about the shortage. Instead, it claims only that the national nursing shortage is not the "primary" cause of unutilized in-home nursing hours. Br. 56. Even if this were so—a dubious claim that Dr. Bachman failed to persuasively support, *see* T4 at 176:5–178:13; T8A at 85:7–86:9—nobody doubts it is a significant factor. Pamela Buchanan, a care coordinator whom the court considered "experienced" and "very competent," ECF No. 1170 at 39, described the shortage as the "number one difficulty" she encounters when she arranges in-home nursing for children, T9A at 80:23–81:9. The shortage, she explained, is a "national crisis and has been for some time." *Id*. at 80:23–81:9. Laura Weaver, another care coordinator whom the court considered both "dedicated" and "competent," ECF No. 1170 at 38, expressed

similar sentiments, T9A at 139:13–140:1. The shortage and many other reasons conspire to render 90-percent across-the-board utilization unachievable. D.E. 22 at 19–20.

The United States claims that 90-percent utilization is achievable because "[o]n average" children currently receive 70 to 80 percent of authorized hours. Br. 67. But the injunction does not require an *average* utilization of 90 percent; it requires 90 percent by all 2,750 of 2,750 children. According to the seven spreadsheets on which Dr. Bachman relied, approximately 25 percent of children received at least 90 percent of all authorized hours of in-home nursing. Pl.'s Exs. 2604–10. The injunction requires a gargantuan leap from 25 to 100 percent of children without any evidence that Florida can *quadruple* the number of children who utilize 90 percent during a nursing shortage.

Dr. Bachman's expression of confidence in her proposed modifications did not address the feasibility of 90-percent utilization, since that threshold was not mentioned at trial. Nor could Dr. Bachman opine on the feasibility of a 90-percent utilization rate. She did not even know the utilization rates in other States or assess whether the nursing shortage affects Florida's ability to deliver the service. T4 at 175:15–21, 178:14–180:6.

The United States again leans on its baseless claim that the federal Medicaid Act requires 100-percent service availability, Br. 56, which it does not. Nor would it prove feasibility, if it did.

The United States argues that district courts may issue injunctions that contain performance goals and leave the means of achieving those goals to the enjoined party.

Br. 55 n.15 (citing *Brown v. Plata*, 563 U.S. 493 (2011)). In *Brown*, however, the goal was achievable. The injunction there required a State to reduce a prison's population to a specific number. The State could attain that goal, if necessary, by releasing inmates. But where the goal has not been shown to be achievable, a court's decision to leave the means to the State might relieve the court of the trouble of framing an operative command (or expressly ordering legislative appropriations), but it does the State no favors. It shifts to the State a tremendous hazard of liability for non-compliance in the event it cannot convince a skeptical court that compliance with its injunction was impossible. And the injunction here even prohibits Florida from asserting an impossibility defense in some circumstances. ECF No. 1171 ¶ II.D.

The 90-percent utilization mandate is not "framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law." *Fla. Ass'n of Rehab. Facilities*, *Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1223 (11th Cir. 2000). The court should vacate that portion of the injunction.

## IV.  THE UNITED STATES LACKS AUTHORITY TO ENFORCE THE RIGHTS OF CHILDREN WHO NEVER INITIATED THE ADA'S ADMINISTRATIVE ENFORCEMENT PROCESS.

Finally, the United States claims that, if it receives one administrative complaint, then it may sue to enforce any person's rights—or thousands of people's rights. It relies on *General Telephone*, which held that, in enforcing Title VII of the Civil Rights Act,

24

the EEOC is not limited to vindication of the rights of the complainants.[5] But essential differences between the two statutes clearly illustrate why, under Title II of the ADA, the United States may not enforce the purported rights of those who never complained.

Title VII expressly authorizes the EEOC to bring enforcement actions, including disparate-impact actions, to eradicate "unlawful employment practices." 42 U.S.C. §§ 2000e-2, 2000e-3, 2000e-5(a), (f). While Title VII protects personal rights, its focus is on prohibited practices. Thus, it authorizes the Attorney General to bring pattern-or-practice claims. *Id*. § 2000e-6(a). When Congress amended Title VII to empower the EEOC to sue, it made clear that the EEOC's new litigation authority was coextensive with the Attorney General's. *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 328 (1980). The Supreme Court concluded that the EEOC may vindicate the rights of all "persons adversely affected by the unlawful practices"—not merely the complainant's. *Id*. at 324.

Unlike Title VII, Title II does not prohibit "practices" or create claims with a systemic or institutional focus, such as pattern-or-practice or disparate-impact claims. Rather, it grants personal rights to individuals. 42 U.S.C. § 12132; *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (noting the ADA's consistent emphasis on the "individual"); *Everett v. Cobb Cnty. Sch. Dist.,* 138 F.3d 1407, 1409 (11th Cir. 1998)

---

[5] The United States also cites *United States v. Board of Trustees*, 908 F.2d 740 (11th Cir. 1990), but the question raised here was not raised or decided in that appeal.

(analogizing claims under Title II of the ADA to personal-injury actions to vindicate personal rights). Its enforcement provision provides "remedies, procedures, and rights" to the "person alleging discrimination." 42 U.S.C. § 12133. While this Court held that the remedies, procedures, and rights provided to an individual complainant include a federal enforcement action, *United States v. Florida*, 938 F.3d 1221, 1244–45 (11th Cir. 2019), it did not hold that the remedies, procedures, and rights provided to a complainant include a federal enforcement action to enforce the rights of countless *others*.

A federal enforcement action to mass-adjudicate the personal rights of thousands of children at once is wholly inconsistent with the personal nature of the substantive rights and enforcement powers that Title II confers. It is also implausible that an enforcement provision that does not even mention the United States should confer on the United States some of the most sweeping enforcement powers anywhere in the United States Code. Because the scope of a federal enforcement action under Title II is limited to vindication of the rights of the "person alleging discrimination," 42 U.S.C. § 12133, this Court should reverse.

## <u>CONCLUSION</u>

This Court should reverse the district court's judgment and vacate its injunction.

Dated December 6, 2023.    Respectfully submitted,


/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
James Timothy Moore, Jr. (FBN 70023)
tim.moore@gray-robinson.com
Ashley H. Lukis (FBN 106391)
ashley.lukis@gray-robinson.com
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090
*Attorneys for Appellant*, the State of
Florida

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), undersigned counsel certifies, in reliance on the word count of the word-processing system used to prepare this document, that this document contains 6,500 words and therefore complies with the type-volume limitation set forth in Federal Rule of Appellate Rule 27(d)(2).

Undersigned counsel further certifies that this document was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font and therefore complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.

28