No. 23-12331

In the

# United States Court of Appeals
## for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

STATE OF FLORIDA,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Florida
No. 0:12-cv-60460-DMM—Hon. Donald M. Middlebrooks, *Judge*

## BRIEF OF *AMICI CURIAE* STATES OF GEORGIA AND ALABAMA IN SUPPORT OF PETITION FOR REHEARING *EN BANC*

Christopher M. Carr
  *Attorney General of Georgia*
John Henry Thompson
  *Solicitor General*
OFFICE OF THE
GEORGIA ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov

Josh Belinfante
Edward A. Bedard
  *Special Asst. Attys. General*
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD, LLC
500 14th St. NW
Atlanta, GA 30318
(678) 701-9381
ebedard@robbinsfirm.com

*Counsel for Amicus Curiae
State of Georgia*

*Additional counsel listed after signature page*

*United States of America v. State of Florida*
No. 23-12331

## CERTIFICATE OF INTERESTED PERSONS
## & CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for *Amicus* State of Georgia certifies that the Certificate of Interested Persons submitted by the parties is complete to the best of his knowledge and belief, with the addition of the following interested persons listed below.

1. Bedard, Edward A., counsel for *amicus curiae* State of Georgia

2. Belinfante, Josh, counsel for *amicus curiae* State of Georgia

3. Carr, Christopher M., Georgia Attorney General

4. Marshall, Steve, Alabama Attorney General

5. Thompson, John Henry, Solicitor General, counsel for *amicus curiae* State of Georgia

6. State of Alabama, *amicus curiae*

7. State of Georgia, *amicus curiae*

*/s/ Josh Belinfante*
Josh Belinfante
*Counsel for Amicus Curiae*
*State of Georgia*

– C-1 of 1 –

# TABLE OF CONTENTS

Certificate of Interested Persons &
Corporate Disclosure Statement ........................................................ C-1

Table of Authorities ............................................................................ii

Interest of *Amicus Curiae* ................................................................iii

Introduction & Summary of the Argument ........................................ 1

Argument .............................................................................................. 4

   I.   The panel's endorsement of statistical proof cannot be
      squared with *Olmstead*'s individualized framework ...................... 4

  II.   The panel's error invites federal management of state
      programs in areas of traditional state authority ........................... 8

Conclusion ......................................................................................... 12

Certificate of Compliance ................................................................ A-1

# TABLE OF AUTHORITIES

**Cases**

*Georgia Advoc. Off. v. Georgia*, No. 1:17-CV-3999-MLB,
2024 WL 4340034, at \*1 (N.D. Ga. Sept. 27, 2024)............................11

*Olmstead v. L.C. ex. rel. Zimring*, 527 U.S. 581 (1999)..............................
.......................................................................i, iii, 1–5, 8, 10–12

*United States v. Fla. (Florida III)*, 172 F.4th 1201 (11th Cir. 2026)....6–8

*United States v. Fla.*, 682 F. Supp. 3d 1172 (S.D. Fla. 2023),
*aff'd in part, vacated in part, remanded,* 172 F.4th 1201
(11th Cir. 2026). ...............................................................................6

*United States v. Georgia*, No. 1:16-cv-03088-ELR (N.D. Ga.) .......iii, 3, 10

*United States v. Lopez*, 514 U.S. 549 (1995) .............................................9

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)...............................7

**Statutes**

20 U.S.C. § 1414 ......................................................................................9

42 U.S.C. § 12132 .................................................................................4, 9

## INTEREST OF *AMICUS CURIAE*

*Amici* States—Georgia and Alabama—have a well-established interest in the preservation of the proper balance between the States and the federal government, an interest directly implicated by the panel decision in this case. Indeed, Georgia is defending a similar Title II/*Olmstead* enforcement action in the context of public K–12 special education related to the Georgia Network for Educational and Therapeutic Support ("GNETS"). *See United States v. Georgia*, No. 1:16-cv-03088-ELR (N.D. Ga.). There, the federal government has pressed an at-risk theory similar to its theory in this suit, asserting that Title II liability can be established without individualized proof of discrimination against identified persons. A request for interlocutory appeal is now pending in that case before this Court. *See* CA11 No. 25-90025. Especially given that ongoing litigation—and the threat of future litigation from the federal government if the panel's decision is not corrected—*Amici* States have an immediate and powerful interest in the resolution of Florida's petition for rehearing *en banc*. In addition, the panel opinion poses broader threats to federalism beyond the ADA and Medicaid contexts, as explained below.

## INTRODUCTION & SUMMARY OF THE ARGUMENT

The Americans with Disabilities Act prohibits discrimination against "qualified individuals" with disabilities. In *Olmstead v. L.C. ex. rel. Zimring*, the Supreme Court held that this prohibition can reach the unjustified institutional isolation of a disabled person—but it said so cautiously, with only a "qualified yes." 527 U.S. 581, 587 (1999). The Court tied liability to individualized assessments: A treating professional must find community placement appropriate for the person and the person must not oppose it. And the Court disclaimed any suggestion that it was imposing on the States a "standard of care" or requiring them to provide "a certain level of benefits." *Id.* at 603 n.14. In short, while the ADA's coverage may be broad, the remedy *Olmstead* recognized is narrow: A prohibition on actual discrimination against an actual individual, proven through individualized evidence.

Unfortunately, the panel ignored those limits in several ways. *First*, it held that the mere risk of institutionalization is *itself* discrimination, so that a person who is not segregated is nevertheless a victim of discrimination because a State's programs leave him statistically more likely to be institutionalized someday. *Second*, it

– 1 –

skirted Article III by treating a "serious risk" of institutionalization as a present injury, conflating "imminent" and "possible" harm. *Third*, it relieved the federal government of the burden of examining individuals, instead allowing it to characterize an aggregate population (based on limited evidence), and then attribute that characterization to unnamed and unexamined members of that group.

The consequences for federalism are dire: Separately, each move undermines one of *Olmstead*'s guardrails. But together, they destroy its limits completely. And the panel's reasoning is not limited to the Medicaid context: It threatens to reach *any* state program that serves people with disabilities. After all, any such population can be described, in the aggregate, as facing some elevated risk. And the panel offers no principle to cabin its theory—leaving it to the federal government's experts to determine what risks are "serious" enough to constitute discrimination. In sum, the panel's opinion significantly expands federal enforcement power beyond anything envisioned in *Olmstead*.

Georgia is well acquainted with the federal government's efforts to reimagine *Olmstead* as a tool for mandating structural changes to State policy. In *United States v. Georgia*, it contends that a component of

Georgia's special-education program discriminates against students with behavioral disabilities by providing certain programming grants to local school districts. No. 1:16-cv-03088-ELR (N.D. Ga.). There, too, the government seeks to prove its claim using aggregate statistics and expert projection about students no one has identified, and without regard to the individualized judgments of education professionals.

By embracing that approach, the panel transformed an antidiscrimination statute into a tool for the federal government to redesign state programs—in health, education, and beyond—based only on academic theories, speculative projections, and the opinions of its hand-picked experts. Evidence of real discrimination is optional. None of that is consistent with the ADA or *Olmstead*. And this Court should say so, lest *Olmstead* become the threat to federalism some feared. Justice Kennedy urged "deference to the program funding decisions of state policymakers," 527 U.S. at 610, while Justice Thomas's dissent warned that liability liberated from individual proof would impose "significant federalism costs, directing States how to make decisions about their delivery of public services," *id.* at 624. To avoid those costs, this Court should restore the ADA's textual and precedential limits.

– 3 –

## ARGUMENT

**I.    The panel's endorsement of statistical proof cannot be squared with *Olmstead*'s individualized framework.**

The panel held that the ADA prohibits not only unjustified institutionalization, but the theoretical *risk* of it. That atextual holding is irreconcilable with Title II, its implementing regulation, and *Olmstead*. It also strains Article III, treating a risk that is neither concrete nor imminent as a present injury. Florida's petition ably makes both arguments and the *Amici* States will not retrace them here.

Instead, Georgia and Alabama write to highlight a third error, bound up with the first two and equally dangerous: The panel did not merely *recognize* a risk-based violation, it also endorsed the use of generalized, population-level evidence as a method of *proving* such a violation. In other words, it dispensed with individualized evidence and allowed the United States to establish liability by way of aggregate inferences.

That will not do. Title II recognizes a discrimination claim for "qualified individual[s]." 42 U.S.C. § 12132. And *Olmstead* explained that this text demands individualized assessment: Community placement is required *only* when "the State's treatment professionals

– 4 –

determine that such placement is appropriate" and "the affected persons do not oppose such treatment." 527 U.S. at 607. Each element—assessment and consent—involves an *individual*. The *Olmstead* majority was comfortable reaching its decision given the lack of any "genuine dispute" that the plaintiffs—as *individuals* with a diagnosed disability—qualified for and consented to community care. 527 U.S. at 602–03. And Justice Kennedy emphasized that the judgment of a responsible treating physician "ought to be given the greatest of deference." *Id.* at 610 (Kennedy, J., concurring in the judgment).

The panel twice departed from *Olmstead*'s individualized framework—first when assessing whether certain children were at risk of unjustified institutionalization, and again when suggesting that non-opposition could be established by extrapolation.

To begin with, an assessment of whether a person faces unjustified institutionalization is necessarily unique to the individual's condition, circumstances, and needs. But the liability finding here did not rest on any such individualized showing. It instead simply traced Florida's purported "denial of access to services," then used generalized data and anecdotal evidence to infer—without analysis—that members

– 5 –

of a defined class were, as a statistical matter, *more likely* to be institutionalized. *United States v. Fla. (Florida III)*, 172 F.4th 1201, 1227–29 (11th Cir. 2026); *see also United States v. Fla.*, 682 F. Supp. 3d 1172, 1220 (S.D. Fla. 2023) (tracing state's "denial of access to services" and holding, without analysis, that this creates a "serious risk" of unnecessary institutionalization), *aff'd in part, vacated in part, remanded,* 172 F.4th 1201 (11th Cir. 2026). The federal government did not need to prove that unjustified institutionalization loomed for any particular member, let alone each member. *Id.*

Compounding its error, the panel suggested that a similar technique of statistical analysis—based on extrapolations from government experts' interviews of a fraction of the families—could be enough to establish non-opposition for the entire population. *Florida III*, 172 F.4th at 1232–36. But interviews with some members of a group say nothing about what the others want. This is not proof of categorical non-opposition—it's pure speculation.

Of course, the Supreme Court has already explained that "Trial by Formula"—resolving individual claims by extrapolating from a sample rather than adjudicating each—is no substitute for individualized proof.

*See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011). If that's true in a civil class-action setting—where federalism concerns are generally absent—it's even more obvious in cases like this one. The panel reasoned that an expert "may extrapolate information from qualitative samples and surveys," and that the sampling here was "far different" from the formula *Dukes* condemned. *Florida III*, 172 F.4th at 1236. But as Judge Brasher's dissent aptly notes, the majority relied on trademark cases concerned with determining *collective* questions—*e.g.*, whether consumers are confused—not the question of *individual* discrimination presented by Title II. *Id.* at 1262 n.7 (Brasher, J., dissenting). The question here is not what the average member of a population might believe; it is whether a particular individual opposes a particular transfer. A survey can measure the first. But it cannot resolve the second without doing exactly what *Dukes* forbids: Deciding one person's case based on other people's answers.

Whether generalized evidence can be used to prove liability in individual-rights cases is more than a mere evidentiary quarrel. That evidentiary strategy empowers an ADA plaintiff—including the federal government—to engage in policymaking through litigation that usurps

– 7 –

the roles of elected state officials. All it needs to do is characterize a population (without examining its members), then offer expert testimony that a State program, in the aggregate, exposes some unidentified subset of the population to risk. And because populations are large and statistics pliable, this method transforms a statute focused on individualized discrimination into a launching pad for systemic claims designed to conform state policy to federal preferences. In short, the panel's approach enables precisely the program-level audits *Olmstead*'s "standard of care" disclaimer was meant to foreclose. *See* 527 U.S. at 603 n.14.

## II.    The panel's error invites federal management of state programs in areas of traditional state authority.

The panel's blessing of generalized proof—coupled with the other errors Florida identifies—presents serious risks to federalism and States' ability to manage their own programs. Together, the panel's mistakes dissolve *Olmstead*'s tether to individualized discrimination, transforming Title II into a federal cudgel. As Judge Brasher observed, the at-risk theory alone "transformed a case about 140 children in institutions into a case about thousands of children living in community settings." *Florida III*, 172 F.4th at 1255 (Brasher, J., dissenting).

Liability can now attach to an entire state program on a showing that some unnamed member might someday be segregated—and remedied by an injunction redesigning the program *for everyone.*

While this case involves Medicaid, the fallout from the panel opinion threatens every "service, program, or activity" a State provides to people with disabilities. 42 U.S.C. § 12132. Because any disabled population can be characterized as facing *some* elevated risk relative to the general population—and because the panel offers no principle distinguishing a cognizable risk from that baseline, deferring instead to expert witnesses—its theory could reach countless programs. The consequences for federalism are severe.

Education—"a traditional concern of the States"—is a prime example. *United States v. Lopez,* 514 U.S. 549, 564 (1995) (Kennedy, J., concurring). To address the intersection of disability and education, Congress did not rely on Title II's general terms; it enacted the Individuals with Disabilities Education Act. The IDEA facilitates a child's placement by an IEP Team through an individualized, procedurally exacting process built around that child's individual needs. *See* 20 U.S.C. § 1414. But by its own terms, the panel's approach would

– 9 –

empower a federal court to override that legislative solution to the placement of disabled children based on a plaintiff's expert's statistical projection about children no one has examined.

The federal government's ongoing litigation against Georgia shows this concern is not merely hypothetical. *United States v. Georgia*, No. 1:16-cv-03088-ELR (N.D. Ga.). There, the government argues that students who have *never been segregated* have nevertheless suffered an "injury-in-fact" in the form of "the denial of necessary behavioral health services resulting in a serious risk of unnecessary segregation." *Id.*, Dkt. 496 at 25 (quoting DOJ Br., Dkt. 448-1 at 6 n.7). In other words, the absence (or purportedly insufficient amount) of a service in a community school establishes the completed Title II injury, because it raises the statistical odds of an eventual segregated placement. *Id.* at 25 & n.8. Under its theory, the government need not identify one or more injured students, nor concern itself with the recommendations of any healthcare professional or the student's IEP team. *But see Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring) ("The opinion of a responsible treating physician … ought to be given the greatest of deference."). It relies instead on its expert's roster of risk-correlated

diagnostic and behavioral traits, stirred in with policy preferences. *See Georgia*, Dkt. 496 at 34–38, No. 1:16-cv-03088-ELR (N.D. Ga.). The district court accepted that theory. *Id.* at 34–35.[1]

The consequences come into further focus when one considers the remedies available to the United States once it convinces a court to find a violation. The panel's liability test empowers a federal court to hold a State liable for a statewide program, and thus to redesign its funding, staffing, and facilities by injunction. A State subjected to such a decree may not have been found to have discriminated against *any individual*. That is not a remedy for discrimination; it is federal management of state programs and the fiscal choices behind them—the very displacement of the "program funding decisions of state policymakers"

---

[1] A second judge in the same district reached the opposite conclusion in parallel litigation challenging the same program, holding that proving unnecessary segregation "requires individualized evidence under *Olmstead*" and that "[w]ithout knowing the unique characteristics of each student, it is impossible to say whether each could be appropriately served in his or her zoned school." *Georgia Advoc. Off. v. Georgia*, No. 1:17-CV-3999-MLB, 2024 WL 4340034, at *7 (N.D. Ga. Sept. 27, 2024) (Brown, J.). That court concluded that it could not deem students at risk without indulging in "rank speculation" by "simply assum[ing]" that IEP Teams would act on disability alone. *Id.* at *9. The two courts diverged on other matters as well, which are the subject of a pending interlocutory petition. No. 25-90025.

Justice Kennedy warned against. *Olmstead*, 527 U.S. at 610.

Title II is an antidiscrimination statute. The panel rewrote it into a structural-reform statute. *En banc* review is necessary to correct that damaging judicial legislation.

## CONCLUSION

For the reasons stated above, the Court should grant the petition.

Respectfully submitted this 5th day of June, 2026,

Christopher M. Carr
  *Attorney General of Georgia*
John Henry Thompson
  *Solicitor General*
OFFICE OF THE
GEORGIA ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov

*/s/ Josh Belinfante*
Josh Belinfante
Edward A. Bedard
  *Special Asst. Attys. General*
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD, LLC
500 14th St. NW
Atlanta, GA 30318
(678) 701-9381
ebedard@robbinsfirm.com

*Counsel for Amicus Curiae*
*State of Georgia*

## ADDITIONAL *AMICUS CURIAE*

STEVE MARSHALL
Attorney General
State of Alabama

USCA11 Case: 23-12331    Document: 91    Date Filed: 06/05/2026    Page: 18 of 18

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) and 11th Cir. R. 29-3 because it contains 2,388 words as counted by the word-processing system used to prepare the document.

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because the document was prepared in Microsoft Word using the proportionally-spaced Century Schoolbook typeface in a 14-point font.

*/s/ Josh Belinfante*
Josh Belinfante

– A-1 –