

OFFICE OF THE ATTORNEY GENERAL
**Office of the Solicitor General**

PL-01 The Capitol
Tallahassee, FL 32399-1050
Phone (850) 414-3300
Fax (850) 487-0168
*jenna.hodges@myfloridalegal.com*



**JAMES UTHMEIER**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

June 30, 2026

VIA CM/ECF

Mr. David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

Re:  *United States v. Florida*, No. 23-12331

Dear Mr. Smith:

Appellant submits the attached opinion of the Office of Legal Counsel (OLC) as supplemental authority in support of rehearing en banc. *Application of the Rehabilitation Act and Americans with Disabilities Act to State Institutionalization of Patients with Severe Mental Illness or Disabilities*, 50 Op. O.L.C. __ (June 18, 2026).  "As a matter of custom, Executive Branch agencies" such as Appellee "treat OLC's legal conclusions as binding." *Campaign for Accountability v. U.S. DOJ*, 155 F.4th 724, 727 (D.C. Cir. 2025).

The opinion addresses Appellee's authority to enforce Title II of the Americans with Disabilities Act.  OLC concluded that *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), "does not require a state to move institutionalized patients to 'the most integrated setting appropriate to the[ir] needs,'" contrary to DOJ's Title II regulations, Op. 9, and to the panel's decision here.  *See United States v. Florida*, 172 F.4th 1201, 1240

1

(11th Cir. 2026) (concluding Florida violated Title II because it failed to "administer services" in the "most integrated setting"). Instead, *Olmstead* merely held that states "cannot institutionalize [mental-health] patients without justification"—and what constitutes adequate justification "remains an open question." Op. 11.

OLC further opined that a broad reading of Title II—as the panel adopted here—raises "grave constitutional concerns." Op. 39. Congress typically cannot compel states "to govern according to [its] instructions." Op. 14. Thus, OLC "doubts" whether the integration mandate—which the panel enforced against Florida—comports with federalism principles or fits within Congress's powers. Op. 12. Upon OLC's studied reflection, Title II does not grant a "right to demand certain treatment services from states." Op. 23.

Finally, OLC recognized that DOJ guidance "asserted that individuals who were 'at risk' of institutionalization and never actually subject to discrimination were entitled to demand state-provided, community-based services." Op. 35 n.23. While OLC did not reach the legality of that guidance, it noted that, because the at-risk theory "goes further than even DOJ's prior interpretation, which we now conclude to have been overbroad, . . . it too must fall." *Id.* OLC's opinion thus undercuts the lynchpin of the panel majority's decision.

Respectfully submitted.

*/s/ Christine Pratt*
Christine Pratt
DEPUTY SOLICITOR GENERAL

*Counsel for Appellant*

cc (via CM/ECF): All counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2026, I electronically filed the foregoing notice with the Clerk of Court by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Christine Pratt
Christine Pratt

(Slip Opinion)

# Application of the Rehabilitation Act and Americans with Disabilities Act to State Institutionalization of Patients with Severe Mental Illness or Disabilities

In prohibiting discrimination on the basis of disability, neither section 504 of the Rehabilitation Act nor Title II of the Americans with Disabilities Act ("ADA") imposed an integration mandate on states in their treatment of mentally disabled individuals. Nor does either statute authorize the responsible Executive Branch agencies to impose such a mandate.

A statutory mandate that states treat mentally disabled patients in maximally integrated settings would raise serious questions regarding the scope of Congress's power under the Fourteenth Amendment, the Interstate Commerce Clause, and the Spending Clause.

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court did not hold that section 504 of the Rehabilitation Act or Title II of the ADA require states to treat mentally disabled patients in the most integrated setting appropriate to their needs.

June 18, 2026

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

Since the early 1970s, Congress has enacted a number of legislative measures aimed at eliminating discrimination against disabled individuals in the United States.[1] One aspect of this antidiscrimination effort has been to ensure that services are available to individuals with disabilities on the same terms as to other individuals. In 1973, Congress passed the Rehabilitation Act, section 504 of which prohibited discrimination based on disability by entities administering "any program or activity receiving Federal financial assistance." Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794). In 1990, Title II of the Americans with Disabilities Act ("ADA") applied that prohibition to the provision of public services by any "public entity." Pub. L. No. 101-336, § 202, 104 Stat. 327, 337 (codified at 42 U.S.C. § 12132).

In implementing these statutory proscriptions against discrimination, the Department of Health & Human Services ("HHS") and the Depart-

---

[1] Throughout history, the law has used terms to describe individuals with disabilities—particularly mental or cognitive disabilities—that many consider cruel, disparaging, or even shameful. *E.g.*, Michael Clemente, Note, *A Reassessment of Common Law Protections for "Idiots,"* 124 Yale L.J. 2746, 2763–64 (2015). We take those terms as we find them without normative judgment regarding either their use or the people they describe.

ment of Justice ("DOJ") have required covered entities to administer their programs "in the most integrated setting appropriate to the needs of a qualified person with a disability." 45 C.F.R. § 84.76(b) (HHS); *see also* 28 C.F.R. § 35.130(d) (DOJ) (nearly identical).[2] Imposing what is now known as the "integration mandate," these regulations dictate the setting in which states must provide healthcare services to individuals with mental illness or disabilities. In promulgating its version of the mandate, DOJ explained that the "most integrated setting" is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 56 Fed. Reg. 35,694, 35,705 (July 26, 1991); *accord* 45 C.F.R. § 84.10 (HHS). Citing these regulations, the Supreme Court held in *Olmstead v. L.C. ex rel. Zimring* that "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited under Title II. 527 U.S. 581, 600 (1999).

Over the past two decades, DOJ's Civil Rights Division ("CRT") has relied on its integration mandate and *Olmstead* to pressure states into discharging individuals from mental-health institutions. *See Olmstead: Community Integration for Everyone*, ADA.gov (June 22, 2022), https://perma.cc/LD7X-B8B3. By threatening or bringing federal enforcement action, CRT has successfully elicited consent decrees, remedial orders, or out-of-court agreements in nearly a dozen states, obligating the participants to meet DOJ's deinstitutionalization benchmarks.[3] As a result of these efforts, states typically agree to deinstitutionalize "based on each individual's needs and not on the availability, perceived or actual, of current community resources and capacity." Class Action Settlement Agreement at 14, *United States v. New Hampshire*, No. 12-cv-53 (D.N.H. Feb. 12, 2014), Dkt. 105. They also usually commit to "avoid admitting

---

[2] The Secretary of HHS inherited the duties of the Secretary of Health, Education, and Welfare for implementing section 504. *See* Pub. L. No. 96-88, § 301(a)(4)(A), 93 Stat. 668, 678 (1979) (codified at 20 U.S.C. § 3441(a)(4)(A)); *see also* 20 U.S.C. § 3508. The Attorney General has the same responsibility with respect to Title II. Pub. L. No. 101-336, § 204, 104 Stat. at 337 (codified at 42 U.S.C. § 12134).

[3] Memorandum for R. Jonas A. Geissler, Deputy Assistant Attorney General, Civil Rights Division, from James Fletcher, Trial Attorney, Civil Rights Division, et al., *Re: List of DRS* Olmstead *Matters in Various Stages* (Apr. 6, 2026); Memorandum for R. Jonas A. Geissler, Deputy Assistant Attorney General, Civil Rights Division, *Re: SPL Open* Olmstead *Matter* (Apr. 6, 2026).

persons with developmental disabilities to [institutions], except where individuals' acute psychiatric needs cannot be addressed in a more integrated service or treatment setting." *Id.* at 15.

You have asked us three questions relating to the integration mandate: (1) whether *Olmstead* conclusively decided that section 504 of the Rehabilitation Act and Title II of the ADA impose (or authorize the imposition of) the integration mandate; (2) assuming the question remains open, whether Congress constitutionally *could* impose such a mandate; and (3) whether Congress statutorily *did* impose such a mandate.[4] Having sought and considered the views of HHS, CRT, and the Office of Legal Policy ("OLP"),[5] we now answer the first and third questions in the negative. Because we conclude that Congress has not imposed an integration mandate on states, we do not need to resolve the second question concerning such a mandate's constitutionality. Nevertheless, the canon of constitutional avoidance—which applies due to the serious constitutional questions posed by the mandate—supports our statutory conclusion.

## I.

We start with whether *Olmstead* conclusively imposes an integration mandate as a requirement of Title II. We conclude that it does not. Although many have read *Olmstead* quite broadly, the Court's actual holding was narrow: that "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited under Title II. 527 U.S. at 600. This holding leaves several issues unresolved and forms the backdrop for the remainder of our analysis.

---

[4] *See* E-mail for T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, from Samuel D. Adkisson, Associate Counsel to the President, White House Counsel's Office, *Re: Request for Opinion - ADA Integration Mandate* (Feb. 17, 2026, 6:12 PM).

[5] *See* Memorandum for the Office of Legal Counsel, from the Office for Civil Rights, Department of Health and Human Services, *Re: Agency Views Regarding Lawfulness of 45 C.F.R. § 84.76* (Apr. 22, 2026); Memorandum for T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, from Daniel E. Burrows, Assistant Attorney General, Office of Legal Policy, *Re: Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Integration Mandate* (Apr. 6, 2026) ("OLP Memo"); Memorandum for T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, from Jonas Geissler, Deputy Assistant Attorney General, Civil Rights Division, *Re: Responding to OLC Inquir[i]es on ADA and Rehabilitation Act* (Mar. 3, 2026).

## A.

*Olmstead* involved the claims of two "mentally retarded women," one of whom "ha[d] also been diagnosed with schizophrenia," the other "with a personality disorder." *Id.* at 593. Each was confined to a psychiatric facility in Georgia during an episode of acute illness. *Id.* Both alleged, *inter alia*, that Georgia healthcare officials had violated Title II by keeping them confined in the institution after "treating professionals determined" that placement in "a community-based program" was appropriate. *Id.* at 594. When their case reached the Supreme Court, the question presented was "whether the [ADA's] proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." *Id.* at 587 (plurality opinion). A plurality of the Court answered that question with "a qualified yes." *Id.*

The Court—by the narrowest possible margin—held that "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited under Title II. *Id.* at 600 (majority opinion). It drew this conclusion not from the ADA's text but by reference to DOJ's regulations. *See id.* at 596–603. Specifically, the Court took 28 C.F.R. § 35.130(d) as its starting point, noting that "the Attorney General concluded that unjustified placement or retention of persons in institutions . . . constitutes a form of discrimination based on disability." *Id.* at 596. Because DOJ is "the agency directed by Congress to issue regulations implementing Title II," the Court concluded that the department's view "warrant[ed] respect." *Id.* at 597–98. But the Court also emphasized that its opinion did not "determine the[] validity" of any such regulation. *Id.* at 592.

In seeking to persuade the Court to the contrary, Georgia had made two counterarguments rooted in Title II's text. The State argued that institutional isolation of individuals with mental disabilities cannot be "discrimination '*by reason of*' . . . disabilities" when patients are "not denied community placement on account of those disabilities" but on account of other factors. *Id.* at 598 (emphasis added) (citation omitted). Nor could it be discrimination, said the State, because "'discrimination' necessarily requires uneven treatment of similarly situated individuals." *Id.* (citation omitted).

4

The Court rebuffed those arguments, writing that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA" than the statutory text suggested—a view that encompassed unjustified institutional isolation, even without a similarly situated comparator. *Id.* at 598 & n.10; *see id.* at 598–600. As support for this conclusion, the Court pointed to (1) Congress's general efforts "to secure opportunities for people with developmental disabilities to enjoy the benefits of community living," and (2) Congress's "findings" underlying the ADA, which twice identified "segregation" as a "for[m] of discrimination." *Id.* at 599–600 (alteration in original) (quoting 42 U.S.C. § 12101(a)(2), (5)). Then, hypothesizing why Congress may have considered unjustified isolation to be discriminatory, the Court observed that isolation *does* create "[d]issimilar treatment," in that it requires "persons with mental disabilities . . . [to] relinquish participation in community life they could enjoy given reasonable accommodations" in order to receive medical services, "while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Id.* at 601.[6]

Importantly for the purpose of your question, although a majority of the Court agreed that Title II prohibited "unjustified institutional isolation," *id.* at 600, that majority splintered in suggesting how to determine when "States are required to provide community-based treatment for persons with mental disabilities," *id.* at 607 (plurality opinion). Justice Ginsburg, writing for a plurality of four, instructed lower courts to consider whether: (1) "the State's treatment professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* In a portion of the opinion belonging to the plurality, Justice Ginsburg stated that when all three conditions attain, deinstitutionalization is mandatory. *See id.*; *see also id.* at 587 (asserting that community-based treatment "is in order" under these conditions).

---

[6] In doing so, the Court did not expressly distinguish between the named plaintiffs' developmental disabilities and the acute episodes of mental illness that led to their institutionalization—instead referring only to "mental disability." *E.g.*, *Olmstead*, 527 U.S. at 597–603 (majority opinion). This treatment is consistent with other instances in which the law has treated mental illness and disability as synonymous. *See, e.g.*, *Schweiker v. Wilson*, 450 U.S. 221, 231–32 n.14 (1981). Given that those distinctions do not affect our analysis, we will follow the convention set by *Olmstead.*

The case generated three additional opinions. *First*, Justice Stevens concurred in the judgment as well as in the majority's fundamental holding that "'unjustified institutional isolation[]' constitutes discrimination under the Americans with Disabilities Act of 1990." *Id.* at 607 (Stevens, J., concurring in part and concurring in the judgment). He withheld his vote, however, from the plurality's definition of when isolation is unjustified. *Id.* at 607–08. Instead, he would have remanded for the district court to consider that question in the first instance. *Id.*

*Second*, Justice Kennedy concurred in the Court's judgment but not its reasoning, writing separately both to express reservations and to explain how unjustified institutional isolation may constitute unlawful discrimination. *Id.* at 609–12 (Kennedy, J., concurring in the judgment). His reservations—shared by Justice Breyer—grew out of the "dark side" of deinstitutionalization. *Id.* at 609. Justice Kennedy observed that patients prematurely released from in-patient care frequently end up homeless or even incarcerated. *Id.* at 609–10. In words that have proven all too prescient,[7] he remarked "it would be a tragic event . . . were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." *Id.* at 610. Justice Kennedy therefore advised "caution and circumspection" in holding States liable for institutionalizing patients, along with "great deference to the medical decisions of the responsible, treating physicians" and "appropriate deference to the program funding decisions of state policymakers." *Id.*

As for the discriminatory nature of institutional isolation, Justice Kennedy (writing only for himself) accepted the dissent's view that "the ordinary interpretation and meaning" of the term "discrimination" necessarily implies "differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic." *Id.* at 611

---

[7] In just the period between 2018 and 2024, the rate of chronic homelessness increased by over 70%. Akash Pillai, Heather Saunders & Robin Rudowitz, *Five Key Facts About People Experiencing Homelessness*, Kaiser Family Found. (Sept. 9, 2025), https://perma.cc/KJ3F-WC87. Of the individuals experiencing homelessness in 2024, 22% had serious mental illness, *id.*, and 67% had some mental-health disorder, Rebecca Barry et al., *Prevalence of Mental Health Disorders Among Individuals Experiencing Homelessness: A Systematic Review and Meta-Analysis*, 81 JAMA Psychiatry 691, 695 (2024).

(citation omitted). In-patient treatment, he explained, can fit that rubric, though not "always" or "by [its] nature." *Id.* at 614. When, "without adequate justification," states expose patients with mental disabilities "to more onerous treatment than a comparison group" in providing medical services, this "irrational" distinction is discriminatory. *Id.* at 611. Hence, it may amount to "discrimination on the basis of mental disability" if "individuals suffering from medical problems of comparable seriousness" receive treatment in "the most integrated setting appropriate for the treatment of those problems," but mentally disabled patients do not. *Id.* at 612. Justice Kennedy further recognized that every state "must make hard decisions on how much to allocate to treatment of diseases and disabilities," *id.*, and that they must "not be forced to create a community-treatment program where none exists," *id.* at 613.

*Third*, Justice Thomas, joined by Chief Justice Rehnquist and Justice Scalia, dissented, based primarily on the textual meaning of "discrimination." As noted, Justice Thomas shared—in fact, supplied—Justice Kennedy's formulation of the ordinary meaning of discrimination as "differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic." *Id.* at 616 (Thomas, J., dissenting). But unlike Justice Kennedy, Justice Thomas concluded that a state's decision to treat some patients with mental disabilities in institutions—regardless of whether it uses more integrated settings for other patients—can *never* "amount to 'discrimination' in the traditional sense of the word." *Id.* Such treatment decisions, he maintained, show only that "some members of a protected group [here, mentally disabled persons] are treated differently from other members of that same group." *Id.* at 622–23. And "dissimilar treatment" between disabled and nondisabled persons, Justice Thomas observed, often "results merely from the fact that different classes of persons receive different services—not from 'discrimination' as traditionally defined." *Id.* at 625. In Justice Thomas's view, rather than prohibiting differential treatment of "similarly situated persons," the majority read Title II to impose a specific "standard of care" for patients with mental disabilities treated by the states. *Id.* at 623.

## B.

Properly understood, *Olmstead* did not conclusively resolve your remaining questions, thus requiring any interested parties to "navigate . . .

the murky waters between" the constitutional, statutory, and regulatory provisions at play on their own. *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 617 (9th Cir. 2005). When the Court splinters on the rationale for its judgment, we are to look for the "position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted). In this instance, there were not five votes for the proposition that Title II imposes an integration mandate on states—let alone that such a mandate would pass constitutional muster.

Five justices agreed that "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited under Title II. *Olmstead*, 527 U.S. at 600. *Olmstead* offers remarkably little guidance, however, about the circumstances under which in-patient—that is, institutional—treatment *is* unjustified. Recall Justice Ginsburg's view that "States are *required* to provide community-based treatment" when three factors are present, namely when: (1) an individual's "treatment professionals determine that such placement is appropriate," (2) that individual "do[es] not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607 (plurality opinion) (emphasis added). But that view appears only in sections of the opinion that expressly are *not* the opinion of the Court. *See id.* at 587 (opinion of the Court limited to "Parts I, II, and III-A").[8] Thus, *Olmstead* did not conclusively resolve which justifications a state may offer in defense of its treatment choices—it held only that institutionalization must be "[]justified." *Id.* at 600 (majority opinion).

The Court's majority did make clear that it was not "determin[ing] the[] validity" of the HHS and DOJ regulations, meaning it had no occasion to decide whether "the regulatory formulations themselves [are] outside the

---

[8] The paragraph appearing after the dinkus—the "set of three asterisks . . . used to divide sections of text," Joe Fore, *Ending a Section with Style*, 71 Va. Law. 54, 54 (2023) (emphasis omitted)—is not part of the majority opinion and indeed cites parts of the plurality's reasoning from Part III-B that the Court's deciding votes expressly did *not* join. *Compare Olmstead*, 527 U.S. at 607 (discussing whether institutional "placement can be reasonably accommodated, taking into account the resources available to the State"), *with id.* at 604 (plurality opinion) (describing "the reasonable-modifications regulation" designed to "allow the State to show that, in the allocation of available resources, immediate relief for the [disabled] would be inequitable").

congressional authorization." *Id.* at 592. To be sure, the Court cited the regulations as persuasive authority for its holding that isolation could, under some circumstances, amount to discrimination even without preferential treatment for similarly situated persons who do not have the same disabilities. *See id.* at 597–98. But accepting that proposition does not require a state to move institutionalized patients to "the most integrated setting appropriate to the[ir] needs." 28 C.F.R. § 35.130(d). In other words, stating that institutional isolation *can* be discriminatory does not equate to saying that it *is* discriminatory under specific circumstances.

One counterargument, which the Seventh Circuit has accepted, is that the first two factors proposed by the plurality—professional determination of fitness for community-based treatment and patient opposition to care in an in-patient setting—should be deemed part of the Court's holding because they "appear in Section III.A of the *Olmstead* decision." *Steimel v. Wernert*, 823 F.3d 902, 914 (7th Cir. 2016). The majority opinion certainly references "the reasonable assessments of [a state's] professionals" and patient "desire" as relevant to the question of whether institutionalization—that is, the provision of care in an in-patient setting, typically over the medium or long term—is justified in a given case. *Olmstead*, 527 U.S. at 602. But not even the *Olmstead* plurality held that Title II makes *maximal* integration obligatory based on these factors alone. Given the dire consequences it has already spawned for so many, *see supra* note 7, we decline to go further than *Olmstead* clearly required by its limited majority rule. *Cf.* Richard M. Re, *Beyond the* Marks *Rule*, 132 Harv. L. Rev. 1943 (2019) (discussing the difficulties in applying the *Marks* "narrowest grounds" framework); Adam Steinman, *Nonmajority Opinions and Biconditional Rules*, 128 Yale L.J.F. 1, 2–3 (2018) (same).

With respect to professional assessment and patient consent, the *Olmstead* majority opinion says only that these factors *can justify* so-called institutionalization. Specifically, the Court said that "the State generally *may* rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." 527 U.S. at 602 (emphasis added). The Court further observed that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.*

But it is a logical fallacy to say that the Court necessarily held the inverse: that without these factors a public entity *cannot* justify treatment in an institutional setting.[9] Indeed, the majority explained that it offered these factors to "emphasize that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Id.* at 601–02. Read in this light, the opinion *permits* treatment in an institution based on professional assessment and patient consent. It does *not* say that these factors are the only acceptable justifications. Such statements that Title II "require[s] placement of persons with mental disabilities in community settings rather than in institutions" appear only in portions of the *Olmstead* opinion written by the plurality. *Id.* at 587 (plurality opinion); *see also id.* at 607.

A second counterargument is that *Olmstead* took at least some justifications off the table when it rejected Georgia's argument that the choice to institutionalize a patient "due to insufficient space in the program, insufficient federal or state resources, or safety concerns" was not based on disability but on other factors. Brief for Petitioners at 20, *Olmstead*, 527 U.S. 581 (No. 98-536). As noted above, the Court implicitly repudiated that argument (without addressing the legitimacy of the cited rationales), along with the argument about the need for a comparator to establish "discrimination." *See Olmstead*, 527 U.S. at 598. Importantly, the two rejected arguments were distinct textual moves, one about the meaning of "discrimination" and the other about the meaning of "by reason of." *Cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350–52 (2013). Although the Court rejected the view that program capacity, resource constraints, and safety concerns automatically break the causal link between disability and discrimination, it did not decide whether—because Georgia did not argue that—those considerations were sufficient justifications for in-patient treatment in an institution. *Cf. Cooper Indus., Inc. v.*

---

[9] *See NLRB v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J., concurring in the judgment) (discussing "the fallacy of the inverse (otherwise known as denying the antecedent)" as "the incorrect assumption that if P implies Q, then not-P implies not-Q"); *see also, e.g.*, *United States v. Holland*, 117 F.4th 1352, 1359 (11th Cir. 2024) (same); Memorandum for the Legal Advisor, National Security Council, from T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela* at 16 (Dec. 23, 2025).

*Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). If they are, then such institutional treatment is not discriminatory in the first place, meaning there is no need to reach the second question of whether discrimination is "by reason of" disability.

Looking only to those aspects of the opinion that represent the law, we conclude that *Olmstead* did not hold that Title II requires maximal integration for patients with mental disabilities receiving state treatment. Rather, it held only that a state cannot institutionalize such patients without justification. *See* 527 U.S. at 600 (majority opinion). What counts as adequate justification remains an open question.

## C.

We recognize that this view of *Olmstead*'s import is out of step with the common understanding of that decision within the federal courts. *Olmstead* is typically thought to have "reified" the integration mandate as codified in HHS and DOJ regulations. *United States v. Mississippi*, 82 F.4th 387, 388 (5th Cir. 2023). Moreover, the vast majority of federal courts of appeals treats as binding the plurality's statements that Title II "require[s]" deinstitutionalization when the three listed factors are met. *Olmstead*, 527 U.S. at 607.[10] There is consequently a risk that any final agency action adopting our view will be subject to challenge in litigation under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2). Moreover, any state that chooses to treat a person with mental disabilities in an institution based on our reasoning may still be subject to individual "*Olmstead* claims" seeking a judicial order to release party patients. *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002).

---

[10] *See, e.g.*, *Powers v. McDonough*, 163 F.4th 1162, 1187–88 (9th Cir. 2025); *Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 149 F.4th 917, 929 (7th Cir. 2025); *Harrison ex rel. Harrison v. Young*, 103 F.4th 1132, 1138–39 (5th Cir. 2024); *Waskul ex rel. Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460 n.14 (6th Cir. 2020); *United States v. Florida*, 938 F.3d 1221, 1250 (11th Cir. 2019); *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 18–19 (1st Cir. 2019); *Brown v. District of Columbia*, 928 F.3d 1070, 1077–78 (D.C. Cir. 2019); *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016). *But see Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 956–57 (3d Cir. 2012) (recognizing these statements belong to the plurality).

But our legal system is built on the idea that "contested legal questions," especially those concerning Executive Branch practices, should be permitted "to percolate and potentially be resolved by the political branches in the democratic process." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024). In that system, it is the duty of the Supreme Court to assess the meaning and vitality of its opinions regarding the laws that Congress has passed. *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550–51 (2025); *United States v. Mendoza*, 464 U.S. 154, 160 (1984). At the same time, it is the President's duty to "take Care that [such] Laws be faithfully executed." U.S. Const. art. II, § 3. And it is our duty to provide an independent assessment of what faithful execution means—even if it requires disagreeing with a federal court so that the question can receive adversarial testing. *See Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense*, 49 Op. O.L.C. __, at *17 (June 21, 2025) ("*Eluding Inspection*").

In our good-faith and independent judgment, *Olmstead* does not conclusively hold that Title II (or section 504) mandates maximal integration in state treatment of mentally disabled patients. It certainly does not resolve the question of whether Congress may constitutionally impose an integration mandate—a presumption which was "neither brought to the attention of the court nor ruled upon" and thus is "not to be considered . . . precedent[]." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

## II.

Having concluded that *Olmstead* does not resolve your questions, we would normally turn next to your statutory question—whether Congress imposed an integration mandate—under the canon of constitutional avoidance. *See Eluding Inspection* at *10–11. Our analysis of your statutory question, however, raised grave doubts regarding whether reading section 504 and Title II to impose a universal integration mandate on states would tread on fundamental principles of federalism and exceed the scope of Congress's powers under Section 5 of the Fourteenth Amendment as well as the Interstate Commerce and Spending Clauses. Under such circumstances, the avoidance canon imposes a "'clarity tax' on Congress" in order to "advance values external to a statute." *Biden v. Nebraska*, 143 S. Ct. 2355, 2376–77 (2023) (Barrett, J., concurring)

(quoting John F. Manning, *Clear Statement Rules and the Constitution*, 110 Colum. L. Rev. 399, 403 (2010)). Because that clarity tax necessarily informs our statutory analysis, we explain our constitutional concerns before turning to the enacted text.[11]

### A.

We start with foundational principles of federalism that must always guide our analysis when, as here, the burden of federal policy falls upon states. The dual sovereignty of the federal and state governments reflects "a fundamental structural decision incorporated into the Constitution." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). "The Constitution limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Id.* (citation omitted); *accord The Federalist* No. 39, at 256 (James Madison) (Jacob E. Cooke ed., 1961). "[I]f a power is an attribute of state sovereignty reserved [to the states] by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States*, 505 U.S. 144, 156 (1992). And the Supreme Court has specifically warned *not* to overread the three powers that Congress invoked to pass section 504 and Title II, lest they "subver[t] . . . the governmental powers reserved to the individual states." *United States v. Butler*, 297 U.S. 1, 75 (1936) (Spending Clause); *City of Boerne v. Flores*, 521 U.S. 507, 534–35 (1997) (Fourteenth Amendment); *United States v. Lopez*, 514 U.S. 549, 564–68 (1995) (Commerce Clause); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 204–06 (1824) (same).

---

[11] For the avoidance of doubt, nothing in this memorandum should be interpreted to question the facial constitutionality of either section 504 or Title II, which extend far beyond the integration mandate as it has been applied to the type of mental disabilities directly at issue in *Olmstead*. Congress certainly has a number of tools in its kit by which it can address discrimination in its myriad forms, including discrimination on the basis of disability (whether mental, physical, or both). We question only whether various constitutional principles permit Congress, in passing broadly worded statutes such as section 504 or Title II, to impose a mandate on states that has cut through those states' mental-health programs like a chainsaw. To the extent Congress can mandate integration of the states' mentally disabled patients, we believe the Constitution requires more precise implementation. The constitutionality of any other application of either statute is beyond the scope of this opinion.

In interpreting the reach of Congress's enumerated powers, then, we must be careful to remember that Congress typically cannot compel the states "to govern according to [its] instructions." *New York*, 505 U.S. at 162. Nor may it imperil the states' sovereign powers over "all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the State." *The Federalist* No. 45, at 313 (James Madison). True, "Congress may legislate in areas traditionally regulated by the States," but that "is a power that we must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Thus, "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).

A mandate that states undertake not only the duty to provide medical care for those with mental disabilities but the obligation to do so in the setting preferred by the federal government would trigger this clear-statement rule because such a mandate would "upset the usual constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985). Consequently, there are clear "federalism costs inherent in [subjecting] state decisions regarding the administration of treatment programs and the allocation of resources to" federal control. *Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring in the judgment); *see also id.* at 624–25 (Thomas, J., dissenting). Thus, we must tread carefully in interpreting both the positive reach of Congress's powers to legislate and how it exercised those powers, lest we trample the principle of federalism inherent in our constitutional structure.

### B.

With those principles in mind, we turn first to the integration mandate putatively imposed by Title II, the statute directly at issue in *Olmstead*. Congress passed the ADA pursuant to both its "power to enforce the fourteenth amendment and to regulate commerce." 42 U.S.C.

§ 12101(b)(4).[12] On their face, neither constitutional provision clearly authorizes Congress to dictate where state and local programs must provide services to individuals with mental disabilities.

### 1.

Having "expand[ed] federal power at the expense of state autonomy," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996), the Fourteenth Amendment provides Congress considerable leeway to ensure that "all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). For Congress to invoke its authority for enforcing equal protection, however, "there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001); *cf. Louisiana v. Callais*, 146 S. Ct. 1131, 1155 (2026) (explaining that Congress may only "enforce a right that the Amendment secures"). In other words, Congress's power under Section 5 is purely "remedial and preventive," aimed solely at addressing state conduct that violates the Fourteenth Amendment. *Boerne*, 521 U.S. at 524.

Even assuming that in-patient treatment of individuals with mental disabilities can be considered discrimination, it is not the kind of discrimination forbidden by the Fourteenth Amendment unless it is entirely unsupported by any rational justification. As the Supreme Court has reiterated time and again, the Equal Protection Clause "was surely not intended to make every discrimination between groups of people" unconstitutional. *Oregon v. Mitchell*, 400 U.S. 112, 127 (1970); *see also, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 24 (1973). "[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement," there is often a legitimate basis for treating those individuals differently from others. *Cleburne Living Ctr.*, 473 U.S. at 441. Such is the case with men-

---

[12] In passing Title II, Congress purported to "invoke the sweep of congressional authority." 42 U.S.C. § 12101(b)(4). We can think of no alternative source of congressional authority that would justify the integration mandate where the Constitution's most capacious grants of legislative power fail to do so.

tally disabled persons. Because they have different treatment needs than their nondisabled peers, the Supreme Court has squarely held that "mental [disability] is a characteristic that the government may legitimately take into account in a wide range of decisions." *Id.* at 446. The Court has also held that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett*, 531 U.S. at 367. Thus, "classifications based on disability" violate equal protection only "if they lack a rational relationship to a legitimate governmental purpose." *Tennessee v. Lane*, 541 U.S. 509, 522 (2004).

Taking as a given *Olmstead*'s holding that long-term in-patient care—what *Olmstead* called "institutionalization"—may be irrational in some instances, Congress has the authority to remedy such arbitrary discrimination against people with disabilities. *Id.* But it would take a strong legislative record to demonstrate that a universal mandate of maximal integration for mentally disabled persons is "congruent and proportional" to existing state violations. *Garrett*, 531 U.S. at 374.

*Olmstead* itself suggests why a universal integration mandate is unlikely to pass scrutiny. As every member of the *Olmstead* Court recognized, treating mentally disabled people in institutions, even when community-based treatment is a viable option, is not irrational *per se*.[13] States may have many legitimate reasons for doing so, including resource constraints, capacity limitations in community-based facilities, and safety concerns for both the patient and the community. *See, e.g.*, *Addington v. Texas*, 441 U.S. 418, 426 (1979); *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 364 F.3d 487, 497–98 (3d Cir. 2004); *Jackson ex rel. Jackson v. Fort Stanton Hosp. & Training Sch.*, 964 F.2d 980, 992 (10th Cir. 1992).

Because institutional treatment "is not invidious nor palpably arbitrary," it does not, as a general matter, violate the Fourteenth Amendment.

---

[13] *Olmstead*, 527 U.S. at 603 (majority opinion) (allowing states to rely on the determinations of their own treatment professionals regarding what treatment setting is appropriate); *id.* at 607 (Stevens, J., concurring in part and concurring in the judgment) (affirming the decision that the district court should consider the state's "fundamental-alteration defense"); *id.* at 614 (Kennedy, J., concurring in the judgment) (noting that institutionalization is not "always discriminatory"); *id.* at 625 (Thomas, J., dissenting) (observing that the "dissimilar treatment" observed in *Olmstead* "result[ed] merely from the fact that different classes of persons receive different services").

*Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 530 (1959). As a result, a universal mandate to maximally integrate mentally disabled state patients would not be "remedial" because the conduct it targets—institutional treatment—is generally not violative of the Fourteenth Amendment. *Boerne*, 521 U.S. at 519 (citation omitted).[14]

No sufficient legislative record exists to justify an integration mandate on states as a remedial measure against irrational discrimination. *Olmstead* relied in large part on two congressional findings to conclude that Title II prohibits isolating disabled people in some instances, *see* 527 U.S. at 599–600, but neither finding is even specific to states or to the so-called institutionalization of the mentally disabled, *see* 42 U.S.C. § 12101(a)(2), (5). They certainly do not purport to find a pattern of states institutionalizing mentally disabled patients for entirely arbitrary reasons—which pattern might justify legislation under Section 5. Moreover, like any other antidiscrimination statute that depends on the Reconstruction Amendments for constitutional legitimacy, the "statute's 'current burdens' must be justified by 'current needs'"—not "decades-old data and eradicated practices." *Shelby County v. Holder*, 570 U.S. 529, 550–51 (2013) (citation omitted). As the integration mandate imposed under Title II is now more than thirty-five years old, its vague findings about the social ills associated with discrimination against those with disabilities would likely be insufficient to justify the significant burden that the

---

[14] Again, this observation may not be true for other aspects of section 504 and Title II enforcement. *Supra* note 11. These statutes often act against non-state actors. *See A.J.T. ex rel. A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 145 S. Ct. 1647, 1652 (2025) (describing these statutes as "broadly applicable . . . in a wide variety of contexts"). The limitations of Congress's ability under the Fourteenth Amendment to force states to act in a certain manner are not pertinent to such applications of these statutes. *See United States v. Morrison*, 529 U.S. 598, 621 (2000) (explaining the Fourteenth Amendment has "reference to State action exclusively, and not to any action of private individuals" (citation omitted)). Moreover, there are undoubtedly ways other than choosing to treat a patient in an institutional setting by which a state could arbitrarily distinguish between the disabled and the nondisabled, thus potentially triggering Congress's enforcement authority under Section 5. And, of course, Congress can legislate against conduct that does not violate the Fourteenth Amendment—including discrimination with a rational basis—pursuant to other enumerated powers, assuming it abides by the limitations on such powers. *Infra* Part II.B.2 (discussing Congress's power to regulate discrimination under the Commerce Clause).

integration mandate imposes upon states. *Id.*; *cf. Allen v. Milligan*, 143 S. Ct. 1487, 1519 (2023) (Kavanaugh, J., concurring).[15]

### 2.

The Commerce Clause also likely provides too thin a reed to support a generally applicable integration mandate. The scope of Congress's power to regulate interstate commerce is unquestionably "broad." *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.); *accord Katzenbach v. McClung*, 379 U.S. 294, 305 (1964). But like any other power in Article I, it "has limits," *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968), particularly in core areas of state responsibility such as "provid[ing] for the health of its citizens," *Gibbons*, 22 U.S. (9 Wheat.) at 205. It cannot reach "noneconomic . . . conduct based solely on that conduct's aggregate effect on interstate commerce." *Morrison*, 529 U.S. at 617. And it cannot "be pushed to such an extreme as to destroy the distinction . . . between commerce 'among the several States' and the internal concerns of a State." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937).

A mandate of *where* states provide healthcare to patients with mental disabilities within their own borders goes beyond any approved exercise of Congress's power over interstate commerce of which we are aware. Of course, some aspects of state healthcare may affect interstate commerce such that they are subject to federal regulation. *Cf. Gonzalez v. Raich*, 545 U.S. 1, 18–19 (2005). For example, the decision *whether* to provide such care is in some sense "an economic activity that might, through repetition elsewhere, substantially affect . . . interstate commerce." *Lopez*, 514 U.S. at 567. But that is not what is at issue in the context of the integration mandate. Instead, the only question implicated here is the "setting" of treatment. *E.g.*, *Olmstead*, 527 U.S. at 602 (citing 28 C.F.R. § 35.130(d)). A choice *by the state*, among treatment facilities *within the state*, for

---

[15] Although *Shelby County* and *Milligan* involved allegations of *race* discrimination, we can identify no reason that laws aimed at ending discrimination on the basis of disability would be immune from these limits—particularly given that the limits apply even when Congress is legislating to eliminate racial discrimination, which serves "the central purpose of the Fourteenth Amendment." *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964); *cf. United States v. Skrmetti*, 145 S. Ct. 1816, 1862 (2025) (Alito, J., concurring in part and concurring in the judgment) (discussing *Shelby County* in the context of alleged gender-identity discrimination).

patients *of the state* falls on the "local" side of the line between that which is national and that which is local, a line which our federalism demands be maintained. *Lopez*, 514 U.S. at 567–68; *see also Morrison*, 529 U.S. at 617–18. At most, any marginal effect that a state's choice to treat mentally ill patients in institutional settings may have on the national economy is "attenuated," making it less likely that Title II would survive constitutional scrutiny under the Commerce Clause if the statute were read to include an integration mandate. *Morrison*, 529 U.S. at 612.[16]

Our concerns are not assuaged by the fact that Congress has, with the Supreme Court's blessing, invoked the Commerce Clause to regulate discrimination, particularly by private parties. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261–62 (1964); *McClung*, 379 U.S. at 304–05. The Court has made clear that discrimination targeted under the Clause may occur purely within a single state, but it must still involve "persons or things in interstate commerce" or "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–59. Thus, antidiscrimination laws previously upheld as legitimate exercises of the commerce power either prohibited "obstructions . . . in interstate commerce," *Heart of Atlanta Motel*, 379 U.S. at 261, or regulated "establishments having a close tie to interstate commerce," *McClung*, 379 U.S. at 304. Mentally disabled people are people, not objects in interstate commerce. *Cf.* U.S. Const. amend. XIII (forbidding commerce in human beings). Nor has Congress made findings to the effect that interstate commerce is affected by whether a state treats disabled patients within its care in an institution, a group home, or their own homes. *See* 42 U.S.C. § 12101(a).[17] Although not dispositive, the absence of legislative findings

---

[16] In making this point, we do not mean to minimize the costs—both human and economic—associated with the homelessness and crime that all too often have followed the release of potentially dangerous individuals into the community. *See supra* note 7. The Supreme Court has held, however, that such a rationale is constitutionally insufficient to support legislation under the Commerce Clause, lest Congress's limited power to regulate interstate commerce be transformed into "a general federal police power." *Lopez*, 514 U.S. at 564.

[17] The outcome might be different for the care of individuals whose treatment is funded through, for example, private insurance. Although we presume such actions are rare in this context, insurers can and do offer services that require travel across state lines. *See, e.g.*, *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715, 725 (10th Cir. 1980) (acknowledging "commerce in medical insurance from out-of-state sources" and "com-

that regulated conduct has any "effects upon interstate commerce" can and has called into question the constitutionality of an enactment under the Commerce Clause. *Lopez*, 514 U.S. at 562–63.

## C.

Turning next to section 504, although admittedly a closer question, the integration mandate could raise serious constitutional concerns if based on Congress's spending power. By conditioning the receipt of "Federal financial assistance" on a lack of discrimination against disabled people, 29 U.S.C. § 794(a), Congress invoked its constitutional authority to "fix the terms on which it shall disburse federal money," *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1569 (2022) (citation omitted). Like any other power granted to the federal government, however, the spending power has limits. *E.g.*, *Butler*, 297 U.S. at 75; *supra* Part II.A. Because there is no clear hook for the mandate in section 504's text, it likely transgresses those limits.

Longstanding practice and judicial precedent have recognized that when Congress spends money to "provide for . . . the general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, it may "place conditions on the grant of federal funds," *Barnes*, 536 U.S. at 185–86. By so doing, Congress can "induce the States [and private actors] to adopt policies that the Federal Government itself could not impose." *Sebelius*, 567 U.S. at 537. But "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State [or private actor] voluntarily and knowingly accepts the terms" of the funding conditions. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

In the light of these principles, Congress surely *could* condition some amount of federal funds on maximal integration for disabled persons. *See*

---

merce arising out of the interstate movement of patients"). Even if the treatment setting of a single individual does not affect interstate commerce, the aggregate effect of an insurance company's activities may do so within the meaning of current precedent. *See United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 553 (1944) ("No commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance."). Similarly, even if some state patients cross state lines, that fact would not empower Congress to regulate any state's relationship with all its patients, including those who are treated entirely within the state's borders.

*id.* But, again, there are limits. For example, Congress likely could not "threat[en] to terminate other significant independent grants" unless a state provides maximally integrated care for disabled persons, as such a law would likely cross the line into "indirectly coerc[ing] a State to adopt a federal regulatory system as its own." *Sebelius*, 567 U.S. at 578, 580 (opinion of Roberts, C.J.). It also could not condition the receipt of highway funding on the provision of care to mentally disabled patients in a community-based setting because such a condition would be "unrelated 'to the federal interest in particular national projects or programs.'" *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987) (quoting *Massachusetts v. United States*, 435 U.S. 444, 461 (1978) (plurality opinion)). Most pertinent here, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U.S. at 17; *cf. Osseo Area Schs.*, 145 S. Ct. at 1660 (Thomas, J., concurring) (questioning whether section 504 bans unintentional discrimination as a condition of federal funding, since "nothing in the [statutory] text conveys" that was "Congress's intent").

By invoking deference to a federal agency, *see* 527 U.S. at 597–98 (citing, *inter alia*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)), even the *Olmstead* majority seems to have acknowledged that section 504 and Title II are (at best) ambiguous as to whether they impose an integration mandate, *see, e.g.*, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008) (noting that *Skidmore* deference would apply only if "we had found the statute ambiguous"). As a result, even if section 504 theoretically could be read to impose such a mandate on the receipt of federal funding, it certainly did not "do so unambiguously." *Pennhurst*, 451 U.S. at 17.

True, "Congress need not specifically identify and proscribe each condition in the legislation." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (cleaned up). But the statute must still "proscribe[]" the relevant conduct "with sufficient clarity." *Id.* Said differently, though Congress can prohibit many unspecified activities by using broad language in its funding conditions, such conditions validly extend only to activities that clearly fall within the meaning of the language used. *Cf. Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (finding no Spending Clause defect because sexual harassment was "[u]nquestionably" within the meaning of "discrimination" under the

relevant statute). Because maximal integration is not clearly encompassed within the antidiscrimination provision of section 504, it cannot be a condition of federal funding under Congress's spending power. And as it is the text of the statute that must clearly authorize a given condition, legislative history cannot be used to save an ambiguous funding condition. *Contra Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 536 (E.D. Pa. 2001).

Nor could we get out of the constitutional thicket by relying on federal regulations given the language of section 504 (or Title II for that matter). "[T]he ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021); *accord West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023). Because "[l]egislative power . . . belongs to the legislative branch, and to no other," *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2496 (2025), it could merely raise a *different* constitutional problem if HHS or DOJ created conditions that Congress chose not to impose (or, at least, clearly allow the *agency* to impose), *see infra* Part III.B; *cf. Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 472 (2001). As DOJ has explained in other fora, in matters involving different statutes, there may be circumstances under which Congress has delegated the power to impose additional conditions on spending.[18] But such gap-filling regulations are valid as conditions on funding only to the extent they are indeed authorized by statute. *See Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013). As we will explain below, the regulations imposing the integration mandate exceed the regulatory authority conferred by section 504 and Title II. *See infra* Part III.B.3.

## III.

Fortunately, however, we need not resolve the many thorny constitutional questions left open by *Olmstead*, due to our conclusion regarding your statutory question—namely, that current HHS and DOJ regulations

---

[18] *See, e.g.*, Motion for Stay Pending Appeal and Administrative Stay at 17, *California v. HHS*, No. 25-2165 (1st Cir. Dec. 8, 2025); Reply Brief for Appellants at 10, *City & County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) (No. 18-17308), Dkt. 60.

incorrectly interpret section 504 of the Rehabilitation Act and Title II of the ADA to impose an integration mandate on federal funding recipients and states.

The next part of our analysis proceeds in two parts. *First*, we ask whether the best interpretation of the statutes requires maximal integration. It does not. These statutes forbid "discrimination" based on disability in the context of government services and programs. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Consistent with *Olmstead*'s fundamental holding, the choice to treat a disabled patient in an institution can be unjustified and hence discriminatory, but only when there are no legitimate, nondiscriminatory factors that weigh in favor of it. *Second*, we evaluate whether the statutes authorize regulatory imposition of the integration mandate. Again, the answer is no. "When the constitutional violation is unequal treatment," a state or "a court theoretically can cure that unequal treatment either by extending the benefits or burdens to the exempted class, or by nullifying the benefits or burdens for all." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2354 (2020). By requiring states to extend community-based services to mentally disabled individuals, even when in-patient treatment is not discriminatory, the HHS and DOJ regulations provide such individuals a right to demand certain treatment services from states—a right that is not granted by either section 504 or Title II. Hence, the regulations are unlawful.

## A.

"The task of resolving the dispute over the meaning of [a statutory text] begins where all such inquiries must begin: with the language of the statute itself." *Nebraska v. Parker*, 577 U.S. 481, 488 (2016) (alteration in original) (citation omitted). Absent "specialized definitions," statutory terms are best understood according to their "ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480–81 (2021). Such terms should also be read "in light of [a statute's] context, structure, and related statutory provisions." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). Under these fundamental rules of statutory interpretation, we conclude that neither section 504 nor Title II obliges regulated entities to provide services to individuals with disabilities in the most integrated setting possible. Instead, these

statutes prohibit only arbitrary distinctions between individuals with similar medical needs.

### 1.

By their text, both section 504 and Title II prohibit "discrimination" "by reason of . . . disability." 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Because neither provision supplies a specialized definition for "discrimination," we look to the term's ordinary meaning at the time the relevant statutes were passed. *Niz-Chavez*, 141 S. Ct. at 1480; *see also Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).

In 1973, when the Rehabilitation Act was passed, "discrimination" was commonly understood to mean "making a distinction in favor of or against[] a person or thing based on the group, class, or category to which that person or thing belongs rather than on individual merit." *The Random House Dictionary of the English Language* 411 (1st ed. 1967) ("*Random House*"); *see also Webster's Third New International Dictionary* 648 (1966 ed.) ("*Webster's Third New International*") ("the act, practice, or an instance of discriminating categorically rather than individually"). These definitions remained constant through 1990, when Title II was enacted. *See The Random House Dictionary of the English Language* 564 (2d ed. 1987); *Webster's Third New International Dictionary* 648 (1986 ed.). The "ordinary meaning" of discrimination at the relevant time thus was understood to be "treat[ing] groups that are similarly situated differently without sufficient justification." *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (cleaned up).

Judicial analysis of the term "discrimination" has consistently agreed with this understanding of the word. Interpreting Title VII of the Civil Rights Act of 1964—"the paradigmatic antidiscrimination law," *Olmstead*, 527 U.S. at 616 (Thomas, J., dissenting)—the Supreme Court has explained that the statute was designed to prevent employers from "favor[ing] an identifiable group . . . over *other* employees." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971) (emphasis added). The Court has applied the same understanding of discrimination when interpreting section 504 itself. For instance, it has held that section 504 requires no more than "the evenhanded treatment of qualified handicapped persons" relative to nondisabled people. *Se. Cmty. Coll. v. Davis*, 442

U.S. 397, 410 (1979); *accord Traynor v. Turnage*, 485 U.S. 535, 548 (1988). The same logic extends to Title II of the ADA, 42 U.S.C. § 12134(b), which Congress drafted to parallel section 504 and "generally [is] interpreted *in pari materia*," *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011).

That traditional understanding does not, by its terms, denote an integration mandate. Instead, it recognizes that differentiation amounts to "discrimination" only if the result is to "treat[] . . . similarly situated" people "differently" from disabled people—whether that latter category includes all people with disabilities or only those with a specific kind of disability—"without sufficient justification." *CSX Transp*, 575 U.S. at 26 (cleaned up). What matters is whether "individuals suffering from medical problems of comparable seriousness" yet without the relevant disability receive more favorable treatment than those with the disability. *Olmstead*, 527 U.S. at 612 (Kennedy, J., concurring in the judgment). The mere fact that one patient with disabilities is treated in an in-patient setting while another sharing the same disability is treated in a group home or at his own home "cannot prove 'discrimination.'" *Olmstead*, 527 U.S. at 618 (Thomas, J., dissenting).

This understanding of section 504 and Title II is also consistent with the larger statutory context of each, which demonstrates both that Congress knows how to mandate integration when it so chooses and that it did not so choose in enacting either of the relevant antidiscrimination provisions. This can be seen most plainly by looking to Title III of the ADA, which explicitly provides that public "accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual." 42 U.S.C. § 12182(b)(1)(B)).[19] We presume the omission from Title II of a similar integration guarantee was "intentional[]." *City & County of San Francisco v. EPA*, 145 S. Ct. 704, 713–14 (2025) (citation omitted). And because the ADA was the direct descendant of the Rehabilitation Act, the fact that Congress felt the need to expressly target segregation in Title III suggests that it did not under-

---

[19] Further buttressing this conclusion, Titles I and III, but not Title II, list "segregat[ion]" as an impermissible form of discrimination. 42 U.S.C. §§ 12112(b)(1), 12182(b)(2)(A)(iii).

stand its own language in section 504—which it copied into Title II—as proscribing such conduct.[20]

Our understanding is also consistent with Title II's historical context. In passing Title II, Congress acknowledged a long and sad history of unnecessary isolation and segregation of disabled individuals. 42 U.S.C. § 12101(a)(2), (5); *see also* U.S. Comm'n on Civ. Rts., *Accommodating the Spectrum of Individual Abilities* 40–41 (1983). But, as Justice Kennedy explained, "[t]hese findings do not show that segregation and institutionalization are *always* discriminatory or that segregation or institutionalization are, *by their nature*, forms of prohibited discrimination." *Olmstead*, 527 U.S. at 614 (Kennedy, J., concurring in the judgment) (emphases added). Rather, they "underscore Congress' concern that," as of 1990, "discrimination ha[d] been a frequent and pervasive problem in institutional settings and policies and its concern that segregating disabled persons from others can be discriminatory." *Id.* Thus, we now turn to the key question left open by *Olmstead*: When does institutionalization treat similarly situated patients differently in a manner that is unjustified?

## 2.

To start rooting out potential discrimination on the grounds of disability, one must first identify similarly situated patients. All too often, those seeking to eliminate past discrimination can create "classifications [that] rest on incoherent stereotypes" and "sweep[] into one pile" individuals who have little in common. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2210 (2023) (Gorsuch, J. concurring). This risk is particularly acute when it comes to mental illness and disability, both of which can come in innumerable shades of grey. *See generally* Am. Psychiatric Ass'n, DSM-5-TR, *Diagnostic and Statistical Manual of Mental Disorders* (rev. 5th ed. 2022) (spanning

---

[20] To be sure, a committee report suggests that some members of Congress (or their staffers) wanted "the forms of discrimination prohibited by [Title II to] be identical to those set out in the applicable provisions of [T]itles I and III." H.R. Rep. No. 101-485, pt. 2, at 84 (1990). But "[w]hat Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017). By contrast, enacted findings are part of the law that Congress passed and should be considered to the extent that they "inform application" of the operative text. *Olmstead*, 527 U.S. at 614 (Kennedy, J., concurring in the judgment).

more than 1,100 pages). Not all community-based settings are appropriate for everyone who falls under the umbrella of mental disability. Oftentimes, an individual's unique medical needs themselves justify institutionalization. *Cf. Alexander v. Choate*, 469 U.S. 287, 303 (1985). And it has been well understood since before *Olmstead* that antidiscrimination statutes "do[] not require" a covered entity "to alter" its services "simply to meet the reality that the handicapped have greater medical needs." *Id.* In short, differential treatment based on bona fide medical needs is never discriminatory.

Even when patients with mental disabilities are arguably situated similarly to patients without such disabilities—because their needs *could* be addressed outside an institutional setting—other considerations may still justify treatment in an institution.[21] There are many reasons that *anyone* might be treated in an institutional setting—reasons that have nothing to do with mental disability. For example, institutional settings might be necessary to treat emergent conditions, *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017), to ensure recovery after treatment for acute medical needs, *United States ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, LLC*, 157 F.4th 758, 761 (5th Cir. 2025), or to treat chronic conditions associated with age, *Friedberg v. Schweiker*, 721 F.2d 445, 448–49 (3d Cir. 1983). That individuals with mental disabilities are more likely to have needs that require treatment in a supervised setting than individuals without mental disabilities may necessitate "dissimilar treatment" compared to other individuals, *Olmstead*, 527 U.S. at 625 (Thomas, J., dissenting), but a state does not discriminate based on a protected characteristic merely because it "classifies on the basis of medical use" that correlates with that characteristic, *Skrmetti*, 145 S. Ct. at 1829.

It would be difficult to comprehensively list all the possible justifications a state could raise for treating its mentally disabled patients in an in-patient setting—as the splintered Court learned when trying to write a

---

[21] As noted above, our opinion is limited to the legality of the integration mandate with respect to patients with mental disabilities of the type discussed specifically in *Olmstead*. To the extent that the mandate has been applied to people with physical disabilities, including temporary physical disabilities, the same general legal principles apply, but how they apply likely varies due to differences in context. We leave questions regarding how to apply these principles to the physical-disability context for another day.

test in *Olmstead*. *See supra* Part I.B. But legitimate justifications could include concerns about the safety of the individual or the community. *E.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Addington*, 441 U.S. at 426. Such concerns go beyond the risk of violent behavior; they include the heightened risk that mentally disabled patients will be unable or unwilling to take necessary medication without the regular supervision that is only available in an institutional setting. *See* Natasha A. Spassiani et al., *Did I Take My Medication Today? Understanding Medication Self-Management for Adults with Intellectual Disabilities Through Participatory Research*, 38 J. Applied Rsch. Intell. Disabilities e70059, at 1–2 (2025). Resource and space constraints in community-based treatment facilities must also be taken into account, lest the ADA be read in such a way as to "drive those in need of medical care and treatment . . . into settings with too little assistance and supervision." *Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring in the judgment).

Rather than attempting to provide an exhaustive list of proper justifications, we conclude that institutional treatment constitutes disability discrimination only where the mere fact of disability—as opposed to the special needs resulting from that disability—is the sole factor motivating the choice of treatment setting. In other words, where the state has any nonarbitrary rationale for treating a disabled person in an institution, such treatment is not discriminatory under section 504 or Title II. Moreover, because the federal-state balance is at stake, *supra* Part II.A, state justifications must be judged for rationality based on current realities—not "decades-old data and eradicated practices." *Shelby County*, 570 U.S. at 551. Comparison to Title VII of the Civil Rights Act further supports this understanding. Title VII prohibits discrimination whenever a protected characteristic is "a motivating factor . . . , even [if] other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Neither section 504 nor Title II contains such a provision, suggesting that disability discrimination is only prohibited when it is the sole motivating factor for treatment choices. *Cf. San Francisco*, 145 S. Ct. at 713–14.

Before committing a patient with mental disabilities to an institution—or upon request for a transfer by a patient currently institutionalized—states should assess the appropriateness and feasibility of both institutional and community-based treatment options and make a decision based on a nonarbitrary rationale. What such rationales may be, however, present

mixed questions of fact and policy that either are not answerable in the abstract or fall entirely outside the remit of this Office.

### 3.

We have identified six potential counterarguments. None changes our conclusion. *First*, although our definition may be the more common one, at least one dictionary contemporary with the Rehabilitation Act defined "discrimination" more simply as "[a]n act based on prejudice." *The American Heritage Dictionary of the English Language* 376 (1971 ed.). "Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012); *see also, e.g.*, *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7–8 (2011) (discussing different definitions of the verb "file"). Although some of their colleagues adopted a broader definition based on factors unique to the ADA (albeit not its text), 527 U.S. at 605–06 (plurality opinion), four Justices in *Olmstead* agreed that the "ordinary interpretation and meaning of the term . . . discrimination" is that an individual "receive[s] differential treatment vis-à-vis members of a different group on the basis of a statutorily described characteristic," *id.* at 611 (Kennedy, J., concurring in the judgment) (quoting *id.* at 616 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.)). Even if the term encompassed prejudice more broadly, the statute would only prohibit institutional treatment that is based on "false and unjustified stereotypes." *Id.* It would not mandate maximal integration in instances when institutional treatment is based on other factors.

*Second*, it could be argued that we are taking the term "discrimination" out of context. Both statutes also prohibit "exclud[ing]" from or "den[ying]" to disabled persons the benefits of services, programs, or activities offered by covered entities. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. By their terms, however, the regulations imposing the integration mandate aim to implement the statutes' proscription on discrimination specifically, not these separate prohibitions. *See* 45 C.F.R. § 84.76(b); 28 C.F.R. § 35.130. HHS and DOJ cannot rely on alternative statutory bases to justify their rule. *E.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908–09 (2020); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Even if HHS and DOJ were to try reframing their regulations, we do not think either agency could justify the integration mandate as implementing the prohibitions on exclusion and denial. To determine whether a right or benefit has been denied on a discriminatory basis, one must first identify the relevant right or benefit. In this instance, a clear majority of the Court agreed that the right or benefit is the medical "care and treatment of a large and diverse population of persons with mental disabilities." *Olmstead*, 527 U.S. at 604 (plurality opinion); *id.* at 610 (Kennedy, J., concurring in the judgment); *id.* at 625–26 (Thomas, J., dissenting). The mandate does not affect the *care* that a mentally disabled individual receives—only the "setting" in which services are "administer[ed]." 45 C.F.R. § 84.76(b); 28 C.F.R. § 35.130(d). In other words, an individual has not been denied or excluded from a service just because he receives it in a different setting. *Cf. Tex. Democratic Party v. Abbott*, 978 F.3d 168, 191 (5th Cir. 2020) (explaining that a person's right is not abridged by "a law that makes it *easier* for others" to exercise that right).

Similar reasons preclude reliance on Congress's expressed purpose of guaranteeing "equal opportunity" for disabled individuals. 29 U.S.C. § 701(b)(1)(F); *see also* 42 U.S.C. § 12101(a)(7). Although a legislative declaration of purpose is admittedly "an appropriate guide to the meaning of the statute's operative provisions," *Gundy v. United States*, 139 S. Ct. 2116, 2127 (2019) (cleaned up), a "general statement of purpose" cannot override the text of the operative provisions themselves, *Sturgeon v. Frost*, 587 U.S. 28, 55–56 (2019). To the extent Congress thought that integration was necessary to achieve its stated purposes, it clearly knew how to require it. *See* 42 U.S.C. § 12112(b)(1) (prohibiting disability-based segregation in employment); *id.* § 12182(b)(1)(B) (requiring public accommodations to provide "the most integrated setting appropriate" to disabled individuals). The omission of a comparable provision from Title II suggests that Congress did not consider maximal integration necessary to achieve "equal opportunity" in public services and programs for individuals with disabilities. 29 U.S.C. § 701(b)(1)(F). In any event, "congressional findings [are] a rather thin reed upon which to base a requirement . . . neither expressed nor . . . fairly implied in the operative sections of" the statutes. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994).

Whether the Rehabilitation Act or ADA Impose or Authorize an Integration Mandate

*Third*, it could be argued that the ban on "discrimination" in section 504 and Title II is sufficiently "broad" to encompass a generalized integration requirement. Of course, a statute may sometimes be "applied in situations not expressly anticipated by Congress" because of its "breadth." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted). But such applications must still be consistent with the "single, best meaning" of the statute. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). As we have explained, even if broad, the term "discrimination"—at least as used in section 504 and Title II— cannot be read to require maximal integration. *Supra* Part III.A.1.

*Fourth*, a critic will likely say that regardless of what the *Marks* narrowest-grounds rule dictates, our view depends on adopting the view of the concurrence or dissent in *Olmstead*, which by definition did not carry the day. Not so. We certainly agree with the dissent—and Justice Kennedy—that as a textual matter, discrimination under section 504 and Title II requires a showing that disabled individuals have been treated differently from similarly situated nondisabled persons. *See Olmstead*, 527 U.S. at 616 (Thomas, J., dissenting); *id.* at 611 (Kennedy, J., concurring in the judgment). As a result, if writing on a clean slate, we would not jettison the traditional meaning of discrimination for a "more comprehensive" one divorced from the text of the operative statutory provisions. *Id.* at 598 (majority opinion). But our position is entirely consistent with the majority's holding that institutional isolation of individuals with mental disabilities can qualify as discrimination. We merely choose not to adopt the plurality's expansive projection of the circumstances under which that might occur.

*Fifth*, it could be argued that regardless of what "discrimination" meant when the Rehabilitation Act and ADA were passed, Congress has now acquiesced in the "more comprehensive" view adopted by *Olmstead* by failing to amend the statutes. *Id.* But "[c]ongressional inaction cannot amend a duly enacted statute." *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989). The Supreme Court itself has explained that it is "'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the Court's statutory interpretation." *Id.* (citation omitted). In interpreting the relevant statutes, we therefore decline to take meaning from Congress's silence in the wake of *Olmstead*. In any event, based on the narrowness of

*Olmstead*'s holding, it is far from clear that Congress's inaction—even if it were an implicit blessing of the Court's decision—would cut against our conclusions here.

*Sixth*, the standard that we apply to assess whether institutionalization is justified could be criticized for rendering the ADA a nullity, since our test largely tracks the Fourteenth Amendment's prohibition against disability discrimination. *See Cleburne Living Ctr.,* 473 U.S. at 439–40, 446. If it does so, that is because the Supreme Court told us to adopt this view: In *Tennessee v. Lane*, the Court explained that "Title II . . . seeks to enforce [the Fourteenth Amendment's] prohibition on *irrational* disability discrimination." 541 U.S. at 522 (emphasis added). Justice Kennedy echoed this point in *Olmstead*, saying that Title II "can be understood to deem as *irrational*, and so to prohibit" any distinction made "by reason of . . . disability and *without adequate justification*." 527 U.S. at 611 (Kennedy, J., concurring in the judgment) (emphases added). Consistent with the source of Congress's power to pass that statute, *supra* Part II.B.1, these statements reflect that Title II—and, by extension, section 504— forbids only institutional treatment that lacks rational justification.

Of course, evidence that a state's justifications are pretextual will be relevant in deciding whether institutional treatment is, in fact, discriminatory in any given instance. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05 (1973). But the "ultimate burden" of proving discrimination "remains at all times with the [complainant]." *Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1545 n.2 (2025) (citation omitted).

### B.

Turning from the statute to the regulations that played so prominent a role in *Olmstead*, neither the reasoning nor the longevity of 45 C.F.R. § 84.76(b) and 28 C.F.R. § 35.130(d) persuades us that the foregoing textual analysis is incorrect. Although the *Olmstead* majority expressly disclaimed reliance on the now-defunct deference regime established in *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), it nonetheless gave considerable deference to the views expressed in these regulations, *see Olmstead*, 527 U.S. at 597–98. As the Court recently emphasized, however, "[i]n the business of statutory interpretation, if [a reading of the text] is not the best, it is not permissible." *Loper Bright*, 144 S. Ct. at 2266; *cf. Interpretation of "Federal Means-Tested Public*

*Benefit" in the Personal Responsibility Work Opportunity Reconciliation Act of 1996*, 49 Op. O.L.C. __, at \*6 n.2 (Dec. 16, 2025) (noting the effect of *Loper Bright* both on court opinions and on those of this Office). At times, the best reading of a statute's text can be that Congress has "confer[red] discretionary authority on agencies" to issue regulations based on their own understanding of what the statute requires. *Loper Bright*, 144 S. Ct. at 2268. We conclude this is not such a time.

## 1.

Section 504 requires each Executive Branch agency administering federal financial assistance to "promulgate such regulations as may be necessary to carry out" the purposes of the section. 29 U.S.C. § 794(a). HHS's predecessor—the Department of Health, Education, and Welfare ("HEW")—was tasked with coordinating section 504 standards across federal agencies. *See* Exec. Order No. 11914 (1976). HEW included an early form of the integration mandate in 1977 when it promulgated regulations specific to programs to which HEW gave "federal financial assistance." 42 Fed. Reg. 22,676 (May 4, 1977). A year later, HEW extended its own regulation to all federal agencies, creating the mandate as we know it today. *See* 43 Fed. Reg. 2,132 (Jan. 13, 1978).

When describing the statutory foundations of this regulation, HEW cited only "basic principles that [it] determined . . . to be inherent in section 504." *Id.* at 2,134. Specifically, HEW read section 504's "general prohibitions against discrimination on the basis of handicap" to include a guarantee of "equal opportunity and truly effective benefits and services" for disabled individuals. *Id.* On that basis, it invented the rule requiring that recipients of federal funds "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." *Id.* at 2,138 (codified at 45 C.F.R. § 85.51(d) (1978)).

We are not persuaded by HEW's analysis. As explained above, the "basic principles" of antidiscrimination upon which HEW purported to rely may be "inherent in section 504," *id.* at 2,134, but they do *not* impose a mandate of maximal integration, *supra* Part III.A. We think that view is consistent not only with *Olmstead* but also with the sweep of the Supreme Court's antidiscrimination jurisprudence. For example, the Court has repeatedly held that section 504 is concerned only with "evenhanded treatment," not with "affirmative efforts to overcome the disabilities

caused by handicaps." *Davis*, 442 U.S. at 410. The same reasoning applies to the language in Title II, which runs parallel to section 504. *Cf. Olmstead*, 527 U.S. at 611 (Kennedy, J., concurring in the judgment); *id.* at 616 (Thomas, J., dissenting). Like the Court, we "decline to read into" these statutes a requirement that is "not to be found in the text" itself. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004); *accord Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) (declining to "read into statutes words that aren't there").

## 2.

The Attorney General's subsequent regulations fail for the same reasons. Indeed, following a statutory directive to make Title II regulations "consistent with . . . the coordination regulations . . . applicable to recipients of Federal financial assistance under" section 504, the Attorney General issued a substantively identical rule with respect to Title II. *See* 56 Fed. Reg. at 35,719 (codified at 28 C.F.R. § 35.130(d)). In doing so, the Attorney General did not offer any independent legal analysis, referencing only HEW's 1978 regulation and his perception that "Congress clearly intended the regulations issued under [T]itle II to adopt the standards of section 504." *Id.* at 35,703. As a result, the Attorney General's analysis incorporates, rather than cures, any legal errors committed by HEW a decade earlier.

One potential counterargument to our conclusion that these regulations lack statutory support is that Title II's instruction for the Attorney General to make regulations "consistent with" HEW's 1978 coordinating regulations ratified the integration mandate. 42 U.S.C. § 12134(b). We are unpersuaded. "Absent . . . overwhelming evidence of [congressional] acquiescence," it is always a risky business to "replace the plain text and original understanding of a statute with an . . . agency interpretation." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 n.5 (2001) ("*SWANCC*"). Here, Title II does not approve the substance of the regulations either by "statutory incorporation," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 45 (1983), or by "express[] ratifi[cation]," *Zuber v. Allen*, 396 U.S. 168, 194 n.30 (1969) (citation omitted). Rather, the statute reflects Congress's desire for regulatory consistency in implementing the Rehabilitation Act and the ADA—hardly "overwhelming evidence" of

Congress's acquiescence to the integration mandate specifically. *SWANCC*, 531 U.S. at 169–70 n.5.[22] In 2012, then-Judge Gorsuch drew this very conclusion, explaining that "[s]ection 12134(b) does not incorporate the Rehabilitation Act's regulations into the ADA or direct the Attorney General to promulgate identical regulations for Title II." *Elwell v. Oklahoma ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303, 1313 (10th Cir. 2012). "It simply says the Attorney General's regulations must be 'consistent'—that is, compatible or not contradictory—with those under the Rehabilitation Act." *Id.*

Indeed, during the *Chevron* era, "even an unequivocal ratification" of the integration mandate "would not connote approval or disapproval of an agency's later decision to rescind the regulation." *State Farm*, 463 U.S. at 45. After all, at the time, if Congress approved the agency's interpretation, it would only have been as a *reasonable* policy choice under the terms of the existing statute—"even if the agency's reading differs from what [a] court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Under that framework, it is far from clear whether any particular member of Congress—let alone Congress as a whole—would have understood the regulation to which he supposedly acquiesced as representing the *best* interpretation of the statute in question. As a result, even if the consistency provision in section 12134 could be seen as ratifying the 1978 HEW regulations as a reasonable interpretation of section 504, it would not fix those regulations as the best interpretation of Title II. HHS and DOJ can thus rescind their integration-mandate regulations because Title II does not, by its terms, mandate maximal integration.[23]

---

[22] Congress also forbade construing the ADA "to apply a lesser standard than the standards applied under . . . the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to" it. 42 U.S.C. § 12201(a). This provision, too, merely signals that Congress meant the ADA to be as protective of disabled individuals as the Rehabilitation Act. It does not fix the substantive standards for implementing either statute.

[23] In rescinding its regulation imposing the integration mandate, DOJ should also rescind any guidance documents on the subject. Under previous administrations, DOJ enforced sub-regulatory guidance pertaining to the integration mandate as though it had the force of law. *See* 28 C.F.R. pt. 35, app. B ("Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services Originally Published July 26, 1991"). That guidance asserted that individuals who were "at risk" of institutionalization and never actually subject to discrimination were entitled to demand

Related to—though analytically distinct from—ratification, we acknowledge that the best argument in favor of the integration mandate is its longevity. Like the Supreme Court, we think that "the informed judgment" of Executive Branch entities entrusted with administering a statute "could be entitled to 'great weight,'" especially when reflected in "an interpretation issued contemporaneously with the enactment of the [relevant] statute." *Loper Bright*, 144 S. Ct. at 2259 (citation omitted). But even longstanding interpretations have, at most, the "power to persuade," dependent on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id.* (citation omitted). For reasons already explained, HEW's reasoning is not persuasive, and the Attorney General's reasoning is effectively nonexistent. What is more, HEW's original view, which was based on "the plain language of the [Rehabilitation] Act," *Davis*, 442 U.S. at 404 n.4, was that "Congress had not intended any regulations to be issued" for the implementation of section 504, *id.* at 411–12 n.11. HEW imposed the integration mandate only after reversing that position, which "substantially diminishes the deference to be given to HEW's . . . interpretation of the statute." *Id.*; *see also, e.g.*, *Chamber of Com. of the U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 381 (5th Cir. 2018).

### 3.

Nor do we consider "the best reading" of section 504 and Title II to be that either statute "delegates discretionary authority" to impose such a mandate. *Loper Bright*, 144 S. Ct. at 2263. As a result, we conclude that 45 C.F.R. § 84.76(b) and 28 C.F.R. § 35.130(d) exceed the scope of authority granted to HHS and DOJ to implement the statutory proscriptions on disability-based discrimination.

"[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated." *Decker*, 568 U.S. at 609 (citation omitted). Because antidiscrimination statutes authorize only that which is

---

state-provided, community-based services. *Id.* The legality of that guidance is beyond the scope of this opinion. Given that such guidance goes further than even DOJ's prior interpretation, which we now conclude to have been overbroad, however, it too must fall. Moreover, we emphasize that, by definition, guidance documents "do not have the force and effect of law." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

"necessary to eliminate discrimination," *Davis*, 442 U.S. at 410, the Supreme Court has already held that section 504 does not authorize regulations imposing "affirmative-action obligation[s]" on federal-funding recipients to "accommodat[e] . . . the needs of handicapped individuals," *id.* at 411. In doing so, the Court rejected the argument that section 504 "impose[d] an obligation to ensure full participation in covered programs by handicapped individuals and . . . to make the kind of adjustments that would be necessary to permit [their] safe participation in the . . . program." *Id.* at 409. Regulations that created such requirements, the Court explained, constituted "an unauthorized extension of the obligations imposed by th[e] statute," which the implementing agency "lack[ed] the authority" to impose. *Id.* at 410, 412.

The text of section 504 makes this limit on regulatory authority clear. It authorizes only "such regulations as may be *necessary* to carry out" the statute's antidiscrimination provision. 29 U.S.C. § 794(a) (emphasis added). This is a tighter nexus than many other statutes empowering agencies to create regulations.[24] Under its ordinary meaning, to be "necessary," a regulation must be "something that is logically required or logically inevitable." *Webster's Third New International* at 1510; *see also, e.g.*, *Random House* at 955 ("being essential, indispensable, or requisite"). We share the Supreme Court's longstanding view that "affirmative efforts to overcome the disabilities caused by handicaps" are not logically required to eliminate discrimination. *Davis*, 442 U.S. at 410; *cf. Barr*, 140 S. Ct. at 2354 (noting that "cur[ing] . . . unequal treatment" does not necessarily require "extending the benefits or burdens to the exempted class"). Indeed, the HHS regulation goes further even than *Olmstead*'s plurality by requiring states to transfer a patient to a more integrated setting, if available, even when the patient consents to institutional treatment. *See* OLP Memo at 6–7. Because institutional treatment does not amount to discrimination merely if there is a more integrated setting available, generally mandating maximal integration is not "necessary to carry out" section 504. 29 U.S.C. § 794(a). Consequently, 45 C.F.R. § 84.76(b) exceeds HHS's authority under the statute.

The question of DOJ's authority under Title II is somewhat closer, but the same principles lead us to the same conclusion. Title II requires the

---

[24] *See, e.g.*, 12 U.S.C. § 5512(b)(1); 21 U.S.C. § 371(a); 29 U.S.C. §§ 652(8), 655(b); 42 U.S.C. § 1382*i*; 46 U.S.C. § 70003(e).

Attorney General to issue regulations "consistent with this chapter and with the coordination regulations" under section 504. 42 U.S.C. § 12134(b). Although not necessary to eliminate discrimination, the integration mandate could arguably be considered consistent with that goal in that it simply raises the standard of inclusivity above the floor set by Title II. *Cf. Guardians Ass'n v. Civ. Serv. Comm'n of the City of New York*, 463 U.S. 582, 635, 643 (1983) (Stevens, J., dissenting) (concluding "an administrative agency may validly impose additional requirements" that are "consistent with . . . [statutory] objectives"). But it could also be said that "permit[ting] agencies to proscribe conduct that Congress did not intend to prohibit" would be "inconsistent with" a limited statutory prohibition. *Id.* at 615 (O'Connor, J., concurring in the judgment).

We believe that the latter view comports more with Title II. Congress intentionally chose not to require general and maximal integration of mentally disabled patients served by states and other public entities. *Supra* Part III.A.1. Title II, like section 504, aims only to ensure "the evenhanded treatment of qualified handicapped persons" vis-à-vis their nondisabled peers. *Davis*, 442 U.S. at 410. Because "the expressed will of Congress is that [public entities] are prohibited only from . . . discriminating" based on disability, we conclude that a regulation proscribing nondiscriminatory action is inconsistent with Title II. *Guardians Ass'n*, 463 U.S. at 615 (O'Connor, J., concurring in the judgment).[25]

We acknowledge that this position contravenes the longstanding practice of both HHS and CRT. For the reasons already explained, we hold the reasoning undergirding the agencies' earlier practice is inconsistent with the "single, best meaning" of section 504 and Title II. *Loper Bright*, 144 S. Ct. at 2266.

\* \* \* \* \*

For the reasons discussed above, we conclude that notwithstanding the broad interpretation many courts and commentators have given *Olmstead*,

---

[25] A House committee report on Title II stated that part of the intended purpose of Title II was to "direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited." H.R. Rep. No. 101-485, pt. 3, at 52 (1990). Even if this statement were law (and it is not), it would establish, at most, that Congress gave the Attorney General discretion to decide which forms of conduct meeting the definition of discrimination are forbidden. It does not follow that the Attorney General has power to label any conduct he deems undesirable as discriminatory.

the case held nothing more than that unjustified institutionalization of individuals with mental disabilities can constitute discrimination on the basis of disability as that term is used in section 504 of the Rehabilitation Act and Title II of the ADA. If, in passing those proscriptions, Congress had imposed an integration mandate on state and local governments, both statutes would raise grave constitutional concerns. However, we need not resolve that issue here, because Congress did not purport to impose such a mandate, nor did it authorize HHS or DOJ to do so.

LANORA C. PETTIT
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*